**Nos. 23-3940, 23-3943, 23-3945, 23-3946, 23-3947**

# In the United States Court of Appeals for the Sixth Circuit

———————————————

DIANE OWENS, ET AL.,

*Plaintiffs-Appellees,*

v.

FIRSTENERGY CORP., ET AL.,

*Defendants-Appellants.*

———————————————

On Appeal from the United States District Court for the
Southern District of Ohio (Nos. 20-cv-3785, 20-cv-4287)
(Hon. Algenon L. Marbley)

———————————————

## BRIEF FOR APPELLANT FIRSTENERGY CORP. AND CERTAIN INDIVIDUAL APPELLANTS

———————————————

ROBERT J. GIUFFRA, JR.
SHARON L. NELLES
DAVID M.J. REIN
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
(212) 558-4000

MORGAN L. RATNER
KATHLEEN O'MALLEY
SULLIVAN & CROMWELL LLP
1700 New York Ave. NW
Washington, DC 20006
(202) 956-7500

*Counsel for Appellant FirstEnergy Corp.*

*(Additional counsel listed on the following page)*

GEOFFREY J. RITTS
ADRIENNE F. MUELLER
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
(216) 586-3939

MARJORIE P. DUFFY
M. RYAN HARMANIS
JONES DAY
325 John H. McConnell Blvd.
Suite 600
Columbus, Ohio 43215
(614) 469-3939

*Counsel for Appellants Steven E. Strah, K. Jon Taylor, Jason J. Lisowski, George M. Smart, Paul T. Addison, Michael J. Anderson, Steven J. Demetriou, Julia L. Johnson, Donald T. Misheff, Thomas N. Mitchell, James F. O'Neil III, Christopher D. Pappas, Sandra Pianalto, Luis A. Reyes, Jerry Sue Thornton, and Leslie M. Turner*

DAVID L. AXELROD
TIMOTHY D. KATSIFF
EMILIA MCKEE VASSALLO
BALLARD SPAHR LLP
1735 Market Street
Philadelphia, PA 19103
(215) 665-8500

*Counsel for Appellant James F. Pearson*

## CORPORATE DISCLOSURE STATEMENT

Defendant FirstEnergy Corp.'s common stock is publicly traded on the New York Stock Exchange. FirstEnergy is not a subsidiary of any publicly owned corporation. As of February 9, 2024, no publicly held company owns more than 10% of the outstanding shares of common stock of Defendant FirstEnergy Corp.

The following companies have issued a primary or excess policy as part of the directors and officers insurance program of FirstEnergy Corp. and have a potential financial interest if and to the extent an obligation for payment were to be triggered: Arch Capital Group Ltd. (Arch Insurance Company); American International Group, Inc. (Illinois National Insurance Company); AXIS Capital Holdings Limited (AXIS Insurance Company); Berkshire Hathaway Inc. (Berkshire Hathaway Specialty Insurance Company); The Chubb Corporation (Federal Insurance Company); CNA Financial Corporation (Continental Casualty Company); QBE Insurance Group Limited (QBE Insurance Corporation); Sompo Holdings (Endurance American Insurance Company); Tokio Marine Holdings, Inc. (U.S. Specialty Insurance Company); XL Group plc (XL Specialty Insurance Company); and Zurich Insurance Group Ltd. (Zurich American Insurance Company).

# TABLE OF CONTENTS

*Page*

**CORPORATE DISCLOSURE STATEMENT** ..................................................i

**TABLE OF AUTHORITIES**...............................................................iv

**STATEMENT REGARDING ORAL ARGUMENT**......................................ix

**INTRODUCTION**.................................................................................1

**JURISDICTIONAL STATEMENT** ..........................................................7

**STATEMENT OF THE ISSUES** .............................................................8

**STATEMENT OF THE CASE** ...............................................................8

    A.    Factual Background .........................................................8

        1.    Defendants' Alleged Acts.......................................10

        2.    Defendants' Alleged Misstatements....................14

    B.    Procedural Background ..................................................15

        1.    The Complaint......................................................15

        2.    Motions To Dismiss .............................................16

        3.    Class Certification ...............................................18

        4.    Plaintiffs' Post-Certification Motions For
            Clarification ........................................................21

**SUMMARY OF ARGUMENT**.............................................................22

**STANDARD OF REVIEW**..................................................................27

**ARGUMENT** ...................................................................................28

**I.    THE *AFFILIATED UTE* PRESUMPTION OF RELIANCE
DOES NOT APPLY HERE** ..................................................29

    A.    The *Affiliated Ute* Presumption Applies Only In Cases
Primarily Involving Omissions ........................................30

    B.    This Case Does Not Primarily Involve Omissions ......................34

        1.    Plaintiffs' claims are based exclusively, or at least
primarily, on alleged half-truths ...........................................34

        2.    As eight courts of appeals have held, the *Affiliated
Ute* presumption does not apply to claims based on
half-truths .................................................................................39

**II.   PLAINTIFFS FAILED TO MEET THEIR BURDEN OF
PROVIDING A DAMAGES MODEL THAT SATISFIES
*COMCAST*** ...........................................................................45

    A.    *Comcast* Applies Here ..................................................46

    B.    The District Court's *Comcast* Analysis Was Based On
Clear Legal Error ...............................................................48

    C.    Plaintiffs Did Not Propose Any Classwide Damages
Methodology That Satisfies *Comcast* ........................51

    D.    Plaintiffs Cannot Rely On Their Experts' Promises Of A
Future *Comcast*-Compliant Methodology .....................60

**CONCLUSION** ................................................................................63

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*Adams* v. *Kijakazi*,
   2022 WL 987337 (E.D. Ky. Mar. 31, 2022)....................................................22

*Affiliated Ute Citizens of Utah* v. *United States*,
   406 U.S. 128 (1972).......................................................................*passim*

*In re Aluminum Warehousing Antitrust Litig.*,
   336 F.R.D. 5 (S.D.N.Y. 2020)....................................................58, 61

*Amchem Prod., Inc.* v. *Windsor*,
   521 U.S. 591 (1997)....................................................................28, 45

*Basic Inc.* v. *Levinson*,
   485 U.S. 224 (1988).......................................................................*passim*

*In re BP p.l.c. Sec. Litig.*,
   2013 WL 6388408 (S.D. Tex. Dec. 6, 2013)....................................................59

*Butler* v. *Sears, Roebuck & Co.*,
   727 F.3d 796 (7th Cir. 2013)....................................................47

*Cavalier Carpets, Inc.* v. *Caylor*,
   746 F.2d 749 (11th Cir. 1984)....................................................32, 33

*Chelsea Assocs.* v. *Rapanos*,
   527 F.2d 1266 (6th Cir. 1975)....................................................32

*City of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS AG*,
   752 F.3d 173 (2d Cir. 2014)....................................................41

*Comcast Corp.* v. *Behrend*,
   569 U.S. 27 (2013).......................................................................*passim*

*Cox* v. *Collins*,
   7 F.3d 394 (4th Cir. 1993)....................................................32

*Dura Pharms., Inc.* v. *Broudo*,
    544 U.S. 336 (2005)......................................................................50, 53

*Freeman* v. *Laventhol & Horwath*,
    915 F.2d 193 (6th Cir. 1990)...............................................................42

*Fort Worth Emps.' Ret. Fund* v. *J.P. Morgan Chase & Co.*,
    301 F.R.D. 116 (S.D.N.Y. 2014)..........................................................62

*Glickenhaus & Co.* v. *Household Int'l, Inc.*,
    787 F.3d 408 (7th Cir. 2015)...............................................................52

*Goldman Sachs Group, Inc.* v. *Arkansas Teacher Ret. Sys.*,
    141 S. Ct. 1951 (2021) ...........................................................43, 44, 52

*Halliburton Co.* v. *Erica P. John Fund, Inc.*,
    573 U.S. 258 (2014)...............................................................17, 42, 43

*Hohider* v. *United Parcel Serv., Inc.*,
    574 F.3d 169 (3d Cir. 2009) ...............................................................35

*Holdsworth* v. *Strong*,
    545 F.2d 687 (10th Cir. 1976).............................................................32

*Indiana Pub. Ret. Sys.* v. *AAC Holdings, Inc.*,
    2023 WL 2592134 (M.D. Tenn. Feb. 24, 2023)..............................54

*In re Interbank Funding Corp. Sec. Litig.*,
    629 F.3d 213 (D.C. Cir. 2010).....................................................31, 39

*Johnston* v. *HBO Film Mgmt., Inc.*,
    265 F.3d 178 (3d Cir. 2001) ....................................................23, 31, 39

*Joseph* v. *Wiles*,
    223 F.3d 1155 (10th Cir. 2000).................................31, 32, 33, 39, 42

*Little* v. *First California Co.*,
    532 F.2d 1302 (9th Cir. 1976)............................................................42

*Loritz* v. *Exide Techs.*,
    2015 WL 6790247 (C.D. Cal. July 21, 2015) ..................................58

*Ludlow* v. *BP, P.L.C.*,
   800 F.3d 674 (5th Cir. 2015)...................................................................55

*Matrixx Initiatives, Inc.* v. *Siracusano*,
   563 U.S. 27 (2011)........................................................................40, 41

*McMahan & Co.* v. *Wherehouse Ent., Inc.*,
   65 F.3d 1044 (2d Cir. 1995) ..................................................................50

*Ohio Pub. Emps. Ret. Sys.* v. *Fed. Home Loan Mortg. Corp.*,
   2018 WL 3861840 (N.D. Ohio Aug. 14, 2018)..............................................58

*In re Omnicare, Inc. Sec. Litig.*,
   769 F.3d 455 (6th Cir. 2014)..................................................................40

*Parko* v. *Shell Oil Co.*,
   739 F.3d 1083 (7th Cir. 2014)...........................................................60, 61

*Plumber & Steamfitters Local 773 Pension Fund* v. *Danske Bank A/S*,
   11 F.4th 90 (2d Cir. 2021)....................................................................35

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
   725 F.3d 244 (D.C. Cir. 2013)................................................................47

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
   292 F. Supp. 3d 14 (D.D.C. 2017) ...........................................................44

*Regents of the Univ. of Cal.* v. *Credit Suisse First Boston*,
   482 F.3d 372 (5th Cir. 2007)...........................................................31, 34

*Rikos* v. *Procter & Gamble Co.*,
   799 F.3d 497 (6th Cir. 2015)...........................................................28, 46

*Rowe* v. *Maremont Corp.*,
   850 F.2d 1226 (7th Cir. 1988)................................................................39

*Santa Fe Indus.* v. *Green*,
   430 U.S. 462 (1977)....................................................................24, 35

*Slade* v. *Progressive Sec. Ins. Co.*,
   856 F.3d 408 (5th Cir. 2017).................................................................47

*Smith* v. *Ayres*,
   845 F.2d 1360 (5th Cir. 1988)........................................................23, 41

*Stoneridge Inv. Partners, LLC* v. *Sci.-Atlanta*,
   552 U.S. 148 (2008)............................................................17, 32, 36

*Teamsters Loc. 237 Welfare Fund* v. *ServiceMaster Glob.*
   *Holdings, Inc.*,
   83 F.4th 514 (6th Cir. 2023) ...............................................................35

*In re Tivity Health, Inc.*,
   2022 WL 17243323 (6th Cir. Nov. 21, 2022) .....................................28

*Turnbow* v. *Life Partners, Inc.*,
   2013 WL 3479884 (N.D. Tex. July 9, 2013) .......................................58

*Vervaecke* v. *Chiles, Heider & Co., Inc.*,
   578 F.2d 713 (8th Cir. 1978)..............................................................39

*In re Vivendi, S.A. Sec. Litig.*,
   838 F.3d 223 (2d Cir. 2016) ...............................................................37

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs.,*
   *& Prod. Liab. Litig.*,
   2 F.4th 1199 (9th Cir. 2021) ........................................................*passim*

*Waggoner* v. *Barclays PLC*,
   875 F.3d 79 (2d Cir. 2017) ...........................................................31, 39

*Ward* v. *Apple, Inc.*,
   784 Fed. Appx. 539 (9th Cir. 2019)....................................................62

*Zehentbauer Family Land, LP* v. *Chesapeake Expl., L.L.C.*,
   935 F.3d 496 (6th Cir. 2019)..............................................................47

## Statutes

15 U.S.C.
    § 77k ..................................................................................................7, 48
    § 77*l* ...................................................................................................48
    § 78j ...................................................................................4, 7, 24, 35
    § 78u-4 ...........................................................................................36, 50

## Other Authorities

17 C.F.R. § 240.10b-5(b) ...........................................................................9, 38

Federal Rule of Civil Procedure 23 ..........................................................*passim*

Federal Rule of Civil Procedure 62.1 ........................................................21, 22

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Sixth Circuit Rule 34(a), defendants FirstEnergy Corp., Steven E. Strah, K. Jon Taylor, Jason J. Lisowski, George M. Smart, Paul T. Addison, Michael J. Anderson, Steven J. Demetriou, Julia L. Johnson, Donald T. Misheff, Thomas N. Mitchell, James F. O'Neil III, Christopher D. Pappas, Sandra Pianalto, Luis A. Reyes, Jerry Sue Thornton, Leslie M. Turner, and James F. Pearson (Defendants) hereby request oral argument.  As the Court recognized in granting interlocutory review, this appeal presents several important legal questions, not previously decided by the Sixth Circuit, regarding the proper application of the Supreme Court's decisions in *Affiliated Ute Citizens of Utah* v. *United States*, 406 U.S. 128 (1972), and *Comcast Corp.* v. *Behrend*, 569 U.S. 27 (2013).  The Court's resolution of those questions will have significant implications for this case—a securities class action in which Plaintiffs seek billions in damages—and for class-action litigation more generally in this Circuit.  Defendants respectfully suggest that oral argument would materially assist the Court in analyzing the issues on appeal.

## INTRODUCTION

This is a Rule 23(f) interlocutory appeal challenging class certification of securities-fraud claims brought by stockholders and bondholders of FirstEnergy Corp., one of the Nation's largest investor-owned electric systems.  In July 2020, after the bribery indictment of then-Ohio House Speaker Larry Householder implicated FirstEnergy in illegal political contributions, the price of the company's securities dropped significantly.  In response, Plaintiffs filed this class-action lawsuit alleging securities fraud under Section 10(b) of the Securities Exchange Act of 1934.

FirstEnergy has admitted that it made illegal political contributions.  But that does not mean that FirstEnergy committed securities fraud.  And it certainly does not mean that the district court should have certified the sweeping and unworkable class Plaintiffs proposed here:  all purchasers of FirstEnergy stock and bonds over about 3.5 years (861 trading days) who claim that they were defrauded by 46 separate misstatements.

Class-certification orders in cases like this can have "massive ramifications for plaintiffs and defendants alike."  *In re Ford Motor Co.*, 86 F.4th 723, 725-726 (6th Cir. 2023).  As a result, district courts must take "particular care in their issuance," and conduct a "rigorous analysis" to ensure

that each of Rule 23's "prerequisites for [class] certification have actually been satisfied." *Pipefitters Loc. 636 Ins. Fund* v. *Blue Cross Blue Shield of Mich.*, 654 F.3d 618, 629-630 (6th Cir. 2011).  That did not happen below.

In Plaintiffs' telling, FirstEnergy committed securities fraud because, from February 2017 to April 2020, it told investors dozens of "half-truths," *i.e.*, statements that were misleadingly incomplete because the company did not also disclose its misconduct.  For example, FirstEnergy truthfully stated that it was pursuing "legislative and regulatory solutions" to address the costs of its aging nuclear plants, without disclosing that those efforts—first to curry favor with state legislators, then to secure favorable legislation (known as HB6), and finally to defend that law against a repeal referendum—included illegal political contributions.  Plaintiffs do not allege that any of these half-truths increased FirstEnergy's stock or bond prices when made.  Rather, Plaintiffs contend that the half-truths "maintained" inflated prices in the company's stock and bonds, which then declined when FirstEnergy's involvement in illegal political contributions was revealed to investors.

From this brief description, two things are clear:  *First*, this is a case about what FirstEnergy actually *said* to investors.  *Second*, given the nature and duration of FirstEnergy's evolving  wrongdoing, the impact of the

company's alleged misstatements on its stock and bond prices, to the extent there was any impact, varied significantly over the class period. Statements in 2017, for example (when courting Householder was part of an inchoate plan), would have affected FirstEnergy's stock and bond prices differently than statements in early 2019 (when Householder was elected Speaker) or in late 2019 (after HB6 had been enacted).

In order to conduct the required "rigorous analysis" of Plaintiffs' proposed 3.5-year Exchange Act class, the district court needed to take account of both of these common-sense propositions. But the court took account of neither. As a result, its determination under Rule 23(b)(3) that common issues predominate over individual ones—the critical prerequisite to class certification—was infected with two fundamental errors.

*First*, the district court wrongly concluded that Plaintiffs could prove the reliance element of their Section 10(b) claims on a classwide basis by invoking the so-called *Affiliated Ute* presumption of reliance. That narrow presumption allows courts to presume reliance on a classwide basis only if the class's claims are primarily based on the wholesale omission of material information by someone owing a special duty to disclose. The *Affiliated Ute* presumption is distinct from the more common fraud-on-the-market (or *Basic*)

presumption that generally governs securities class actions involving public companies.

*Affiliated Ute* has no application here. Plaintiffs' case is based not on complete silence, but on 46 separate misstatements alleged in the complaint. These affirmative statements are what make this a cognizable (albeit flawed) securities-fraud case. Under settled law, FirstEnergy had no freestanding duty to affirmatively disclose wrongdoing, and making illegal political contributions is not, in itself, a fraud "in connection with the purchase or sale of any security" under Section 10(b). 15 U.S.C. § 78j(b). If FirstEnergy misled investors, it did so by speaking.

Nevertheless, the district court held that *Affiliated Ute* applies because the challenged statements were allegedly rendered false by an omission: FirstEnergy's failure to disclose the political contributions. That was error. To be sure, misleadingly incomplete statements "omit" the full truth, but they still are affirmative *statements*, not actionable omissions. That is why every court of appeals to have considered the question (eight, by our count) has concluded that the *Affiliated Ute* presumption does not apply to securities-fraud claims based on half-truths.

*Second*, the district court wrongly concluded that Plaintiffs had carried their burden to provide a reliable methodology to measure damages on a classwide basis under Section 10(b) of the Exchange Act.  Under *Comcast Corp.* v. *Behrend*, 569 U.S. 27 (2013), before certifying a damages class, a district court "must conduct a rigorous analysis to determine" whether the plaintiffs have established, through "evidentiary proof," that all putative class members' damages can be measured with a common methodology that is "consistent with [their] liability case."  *Id.* at 33-35 (internal quotation marks omitted).  Without a common, workable damages methodology, individual damages issues will predominate, barring class certification.

The district court performed nothing approaching the "rigorous" scrutiny *Comcast* requires.  The court's limited reasoning in its class-certification order is wrong on its face:  it specifically relied on the existence of a common statutory damages formula in the *Securities Act of 1933* to certify an *Exchange Act* class, even though the Securities Act formula does not apply to Exchange Act claims.[1]  Other than that, the court said nothing explaining how Plaintiffs' proposed damages model satisfies *Comcast*.  Plaintiffs

---

[1]  Defendants do not challenge the district court's class-certification order insofar as it applies to Plaintiffs' claims under the Securities Act, which is a separate statute with distinct elements and defenses.

themselves recognize this error, because eight months after the certification decision (and several months after this Court granted review), Plaintiffs asked the district court to issue an "indicative" ruling "clarifying" its opinion. The district court cannot rewrite its opinion while this appeal is pending, but the fact that Plaintiffs have asked it to do so is telling.

In any event, Plaintiffs provided no *Comcast*-compliant damages methodology. They agree that such a methodology must be capable of quantifying the impact of the alleged fraud on the price of FirstEnergy's securities on each day of the 3.5-year class period. Yet in support of class certification, Plaintiffs' damages experts submitted only brief, generic descriptions of hypothetical approaches to calculating Exchange Act damages—so generic that one expert's report was copied almost verbatim from a different case. Such boilerplate does not work here, where investors allegedly were misled over 861 trading days by dozens of different "half-truths" describing FirstEnergy's evolving efforts—many lawful—to manage the financial exposure from its aging nuclear plants. It will be difficult, if not impossible, to build *one* model that could reliably determine the impact of FirstEnergy's alleged misconduct on securities prices on all 861 days.

And Plaintiffs' experts did not even try.  Instead, they promised to someday build a model using "standard economic, financial, and valuation techniques."  R. 293-7 (Dalrymple Rep.) at 6304 ¶ 108.[2]  But they never said what those techniques would be, or how they would work in measuring classwide damages given the nature and duration of FirstEnergy's evolving alleged misconduct .  Under *Comcast*, an expert's promise to provide a suitable classwide damages methodology tomorrow cannot satisfy Rule 23 today.

This Court should reverse.

## JURISDICTIONAL STATEMENT

The district court has subject-matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' claims arise under the Securities Act, 15 U.S.C. § 77k(a), and the Exchange Act, 15 U.S.C. § 78j(b).  This Court has jurisdiction over this interlocutory appeal under Federal Rule of Civil Procedure 23(f).  The district court entered the class-certification order under review on March 30, 2023.  Defendants timely filed their Rule 23(f) petition for review on April 13, 2023, which this Court granted on November 16, 2023.

---

[2] Pursuant to Sixth Circuit Rule 28(a)(1), citations to the record correspond to the Page ID number of the referenced pages.

## STATEMENT OF THE ISSUES

1.    Whether the district court erred in declining to follow eight courts of appeals and instead extending the presumption of reliance recognized in *Affiliated Ute Citizens of Utah* v. *United States*, 406 U.S. 128 (1972), to cover securities-fraud claims based on "half-truth" statements, rather than applying the fraud-on-the-market presumption established in *Basic Inc.* v. *Levinson*, 485 U.S. 224 (1988).

2.    Whether the district court misconstrued the Supreme Court's requirement in *Comcast Corp.* v. *Behrend*, 569 U.S. 27 (2013), that plaintiffs must submit a common damages methodology as a prerequisite to class certification by (i) certifying an Exchange Act class in reliance on a statutory damages formula that applies only to Securities Act claims, and (ii) excusing Plaintiffs from identifying the common damages methodology on which they would rely to measure damages across their proposed 3.5-year class period.

## STATEMENT OF THE CASE

### A.    Factual Background

FirstEnergy is an Ohio corporation that, through its affiliates, generates, distributes, and transmits electricity to more than six million customers.  In their complaint, Plaintiffs allege that FirstEnergy made 46 public statements to investors from February 2017 to April 2020, all of which

8

were false or misleading because they did not disclose FirstEnergy's plan to use improper means, including concealed political contributions, to secure a legislative or regulatory solution to the financial exposure associated with the company's aging nuclear power plants.  R. 72 (Compl.) at 1576-1592, ¶¶ 95-135.

After FirstEnergy's illegal political contributions came to light, and the price of the company's stock and bonds fell significantly, Plaintiffs filed this putative class action under the federal securities laws, including Section 10(b) of the Exchange Act, as implemented by Rule 10b-5.  *See* 17 C.F.R. § 240.10b-5(b).  Plaintiffs claim that Defendants' alleged wrongdoing violated multiple provisions of Rule 10b-5.  They allege that FirstEnergy made dozens of false or misleading public statements and thus violated Rule 10b-5(b)'s prohibition on such statements in connection with the sale or purchase of a security.  *See* R. 72 (Compl.) at 1576-1595 ¶¶ 95-138.  Plaintiffs also allege that FirstEnergy's years-long efforts to reduce its financial exposure from its nuclear plants through improper means constituted a "device, scheme, or artifice to defraud" in connection with the purchase or sale of a security, in violation of Rule 10b-5(a) and (c).  *See id.* 1574-1576 ¶¶ 93-94, 1645-1646 ¶¶ 269-270.

### 1.    Defendants' Alleged Acts

For years, FirstEnergy's nuclear plants struggled under the weight of growing costs, decreasing profit margins, and competition from renewable resources.    R. 72 (Compl.) at 1557-1558 ¶¶ 43-44.    Starting in 2016, FirstEnergy began pursuing various strategic options for its nuclear plants. According to the company's 2016 Form 10-K (filed in February 2017), those options included "legislative or regulatory" assistance, "asset sales," "plant deactivations," "restructuring" of debt, and "bankruptcy." *Id.* at 1576 ¶ 95.

Throughout 2017 and 2018, FirstEnergy focused on legislative and regulatory solutions.  R. 72 (Compl.) at 1580 ¶ 103, 1585-1588 ¶¶ 113, 115, 118, 120, 122.    In Ohio, the company sought legislation establishing a "zero-emission nuclear" program that would have provided greater ratepayer support to nuclear power.  *Id.* at 1566 ¶ 66, 1585-1587 ¶¶ 113-117.    At the federal level, FirstEnergy lawfully tried to persuade the Department of Energy to subsidize nuclear and coal plants nationwide.  *See* R. 72 (Compl.) at 1588 ¶¶ 121-122.  At some point in 2018, when it became clear that neither effort was succeeding, FirstEnergy pivoted to a different strategy.  It moved to decommission its nuclear plants and minimize its liabilities through Chapter

11 bankruptcy proceedings for a subsidiary that operated the plants. *Id.* at 1558 ¶ 45.

Although bankruptcy was allegedly FirstEnergy's "first-choice plan," R. 219 (MTD Op.) at 4743, the company was simultaneously "laying the groundwork for [a] backup plan": currying favor with Ohio public officials. R. 72 (Compl.) at 1565 ¶ 63. Specifically, FirstEnergy began courting Larry Householder, a former Speaker of the Ohio House of Representatives who, after time out of office, had recently been re-elected to that body. *Id.* at 1566-1567 ¶¶ 65, 67. Starting in early 2017, the company and one of its subsidiaries began making donations to tax-exempt entities connected to Householder, and using those entities to conceal the extent of its contributions. *Id.* at 1566-1567 ¶¶ 65, 67-68. Throughout 2018, as the bankruptcy proceedings progressed, FirstEnergy continued its financial support of Householder and his political allies. *Id.* at 1566-1567 ¶¶ 67-70.

On January 7, 2019, Householder was again elected Speaker of the Ohio House. R. 72 (Compl.) at 1566-1567 ¶¶ 67, 71. Around the same time, FirstEnergy "broadened the reach" of its political activities by arranging a large payment (nominally a consulting fee) to Samuel Randazzo, soon-to-be Chairman of the Public Utilities Commission of Ohio. *Id.* at 1568 ¶ 72.

FirstEnergy's bankruptcy option hit a major snag in March 2019, when the federal government objected to the proposed reorganization, which would have released FirstEnergy from any future third-party claims asserted against its subsidiary that owned the nuclear plants. R. 72 (Compl.) at 1561-1562 ¶ 54. Several weeks later, the bankruptcy court "effectively halt[ed] the bankruptcy process" by denying the releases. *Id.* at 1564-1565 ¶ 62.

FirstEnergy then shifted to its alleged political "backup plan." The company turned to Householder and Randazzo to help draft a new piece of legislation, House Bill 6 (HB6), that included subsidies for FirstEnergy's nuclear plants in Ohio. Householder introduced the bill in April 2019. Over the next several months, FirstEnergy and a subsidiary contributed millions of dollars to non-profit entities connected to Householder and his allies in the Ohio House and Senate. R. 72 (Compl.) at 1566-1568 ¶¶ 67-75. This was a sharp increase in their "concealed" political contributions, which jumped from a combined total of $2.9 million in 2017 and 2018 to $9.5 million in early 2019. *Id.* at 1566-1567 ¶ 67.

In May 2019, the Ohio House enacted a version of HB6 that included $1.3 billion in subsidies for FirstEnergy's nuclear plants. R. 72 (Compl.) at 1568 ¶ 74. The bill then moved to the Ohio Senate, which added another

provision allowing FirstEnergy to apply for "decoupling," a rate-setting mechanism that was allegedly worth an additional $700 million to the company. *Id.* at 1547-1548 ¶ 5, 1568 ¶¶ 75-76. On July 23, 2019, the Governor signed HB6 into law. *Id.* at 1569 ¶ 78.

Shortly thereafter, opponents of HB6 sought to repeal the law through a referendum. R. 72 (Compl.) at 1570 ¶ 81. In response, FirstEnergy enlisted Householder to head the anti-referendum effort, and the company and a subsidiary made another $38 million of "concealed" contributions to additional entities connected to Householder. R. 72 (Compl.) at 1570-1572 ¶¶ 81-85. After the referendum effort failed to collect enough signatures to appear on the ballot, HB6 went into effect in October 2019. *Id.* at 1572 ¶ 86.

In July 2020, the U.S. Attorney's Office for the Southern District of Ohio arrested Householder on bribery charges. R. 72 (Compl.) at 1549 ¶ 8. The U.S. Attorney also filed a criminal complaint against Householder and others alleging involvement by an unnamed company that was obviously FirstEnergy. *Id.* at 1596-1598 ¶¶ 143-144. In October 2020, FirstEnergy fired a number of its senior executives. *Id.* at 1607 ¶ 172, 1610 ¶ 184, 1621 ¶ 216. Around the time of these events, the price of FirstEnergy stock and most of the relevant bonds dropped significantly. *Id.* at 1640-1643 ¶¶ 258-263.

In March 2021, Ohio repealed the subsidy and decoupling provisions of HB6. Later that year, FirstEnergy agreed to pay a $230 million fine as part of a deferred prosecution agreement with the U.S. Department of Justice. *See* R. 219 (MTD Op.) at 4723. The company also reached a settlement, approved by the Public Utilities Commission of Ohio, that provides over $300 million in benefits to FirstEnergy's Ohio utility customers.

### 2.    Defendants' Alleged Misstatements

In their complaint, Plaintiffs allege that, throughout these various events, Defendants made 46 separate public statements that were misleading because they did not disclose the complete picture of FirstEnergy's efforts to reduce its financial exposure from its nuclear plants. These statements were made from February 21, 2017 to April 24, 2020, and appeared in FirstEnergy's Form 10-Ks and 10-Qs, proxy statements, investor calls, and statements to the press. *See* R. 72 (Compl.) at 1576-1592 ¶¶ 95-134.

Dozens of FirstEnergy's alleged misstatements were commonplace descriptions of corporate policies and standards, made months or years before Householder became Speaker or HB6 was introduced. For example, in 2017 and 2018 FirstEnergy stated, as virtually every public company does, that it was committed to "good corporate governance," "integrity," "openness," and

14

"trust." R. 72 (Compl.) at 1580-1581 ¶¶ 104-105. FirstEnergy's internal codes of conduct, also like those of virtually every public company, promised "high ethical standards," "fair dealing," and "compliance with the law." *Id.* at 1581-1584 ¶¶ 106-109.

Of the other alleged misstatements, several described or referred to FirstEnergy's pursuit of "legislative or regulatory solutions" to address its aging nuclear plants. *E.g.*, R. 72 (Compl.) at 1576 ¶¶ 95-96, 1580 ¶ 103, 1591 ¶ 131. Most of these statements were made months or years before HB6 was introduced, and many referred explicitly to lawful "solutions" other than HB6, such as federal lobbying and the ongoing bankruptcy proceedings. *See id.* at 1586-1589 ¶¶ 117-121, 123-125. Only six statements discussed or even obliquely referred to what became HB6. *E.g.*, *id.* at 1591 ¶ 130 ("We are very pleased that Governor Mike DeWine signed HB6 following its successful bi-partisan passage."); *id.* at 1590-1592 ¶¶ 127-129, 131-132.

## B.   Procedural Background

### 1.   The Complaint

Plaintiffs filed their operative complaint on February 26, 2021, naming FirstEnergy, 25 former or current officers and directors, and 16 underwriters as defendants. R. 72 (Compl.) at 1546 ¶ 1. This complaint asserts claims under

Sections 11 and 12(a)(2) of the Securities Act, and Section 10(b) of the Exchange Act. *Id.* Plaintiffs bring their Securities Act claims on behalf of purchasers of FirstEnergy bonds issued in February and July 2020. *Id.* at 1649-1650 ¶¶ 285-290. They bring their Exchange Act claims on behalf of both those bondholders and purchasers of FirstEnergy common stock between February 21, 2017, and July 21, 2020. *Id.* at 1546 ¶ 1. Plaintiffs allege that Defendants violated the Exchange Act both by making misstatements under Rule 10b-5(b) and by engaging in a "scheme to defraud" investors under Rule 10b-5(a) and (c). Plaintiffs seek billions in damages for their Exchange Act claims and $250 million for their Securities Act claims. *Id.* at 1640-1641 ¶ 258, 1649-1650 ¶¶ 286-290, 1654 ¶ 301.

### 2.    Motions To Dismiss

All defendants filed motions to dismiss for failure to state a claim. Defendants maintained that the contribution "scheme" alleged in the complaint did not constitute a "scheme . . . to defraud" investors under Rule 10b-5(a) or (c) because the alleged acts lacked the required connection to the purchase or sale of securities, beyond the fact that FirstEnergy is a public company. R. 161 (FirstEnergy MTD Br.) at 2237-2240. Defendants also

argued that Plaintiffs had not pleaded the reliance element of their securities-fraud claims. *Id.* at 2240-2243.

In response to Defendants' reliance arguments, Plaintiffs asserted that they were entitled to a "rebuttable presumption of reliance," which the Supreme Court has recognized "in two different circumstances." *Stoneridge Inv. Partners, LLC* v. *Sci.-Atlanta*, 552 U.S. 148, 159 (2008). The first traces back to *Affiliated Ute*, in which the Supreme Court held that reliance is presumed where "there is an omission of a material fact by one with a duty to disclose." *Id.* That presumption accounts for the "difficulty of proving" "that the plaintiff relied on what was not said." *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, 2 F.4th 1199, 1204 (9th Cir. 2021). The second, "fraud-on-the-market" presumption was first recognized in *Basic Inc.* v. *Levinson*, 485 U.S. 224, 244-247 (1988). That presumption rests on the premise that all public information is baked into the price of a security that is traded in an efficient market. As a result, "anyone who purchases the [security] at the market price" can be said to have relied on the company's public statements. *Halliburton Co.* v. *Erica P. John Fund, Inc.*, 573 U.S. 258, 283-284 (2014) (*Halliburton II*).

The district court denied Defendants' motions to dismiss.  It permitted both Plaintiffs' misstatement and "scheme to defraud" claims to proceed "in tandem."  R. 219 (MTD Op.) at 4748.  The court rejected FirstEnergy's argument that its political contributions did not themselves violate Section 10(b), deeming it sufficient for purposes of scheme liability that the political contributions "related directly to investors' valuations and purchases of securities."  *Id.* at 4764.  It also held that Plaintiffs could rely on both the *Affiliated Ute* and *Basic* presumptions to establish the required element of reliance.  Considering it "unsettled whether" a plaintiff may "engage the *Basic* and *Affiliated Ute* presumptions simultaneously," the court assumed that Plaintiffs could.  *Id.* at 4767 n.33.  It reasoned that, "as part of the scheme," certain Defendants had made both "omissions of material fact" (triggering *Affiliated Ute*) and "material misrepresentations in their public statements" (triggering *Basic*).  *Id.* at 4767-4768.

### 3.   Class Certification

In June 2022, Plaintiffs moved to certify a class comprising all purchasers of FirstEnergy stock and bonds from February 21, 2017, to July 21, 2020.  R. 293 (Mot. for Class Certification) at 6198-6199.  Plaintiffs invoked Federal Rule of Civil Procedure 23(b)(3), which applies where "questions of law or fact

18

common to class members predominate over any questions affecting only individual members." Defendants requested that the district court hold an evidentiary hearing with live expert testimony before ruling on the motion, R. 339 at 7174, but the court declined that application without explanation. R. 389 at 9125. The court granted the motion on March 30, 2023. R. 435.

This appeal concerns only the district court's certification of Plaintiffs' Exchange Act claims on behalf of both stockholders and bondholders.[3] For those claims, the district court assessed whether Plaintiffs had shown that common issues would predominate over individual ones. The court first determined that Plaintiffs were entitled to the *Affiliated Ute* presumption of reliance. R. 435 (Certification Op.) at 9821. Recognizing that "a significant number of courts" disagreed with its approach, the court found that *Affiliated Ute* applies because "Defendants made omissions of material fact," regardless of whether "Plaintiffs' allegations hinge upon mostly or exclusively omissions." *Id.* at 9820-9821. The court then concluded that, in any event, Plaintiffs' case

---

[3] The Securities Act and Exchange Act have different elements, and Plaintiffs' claims here are brought against different groups of defendants. Plaintiffs also seek far more in damages for their Exchange Act claims (up to nearly $8 billion) than their Securities Act claims ($250 million), and the Securities Act class period is much shorter: at most, February 19, 2020 to July 21, 2020. R. 72 (Consolidated Compl.) at 1649-1650 ¶¶ 286, 288.

is "primarily omissions-based" because it rests on "statements" that "painted an incomplete picture of the alleged truth." *Id.* at 9821-9822. The court alternatively held that it would apply the *Basic* presumption for both stockholders and bondholders, finding "no binding precedent holding that Plaintiffs may not engage both the *Basic* and *Affiliated Ute* presumptions simultaneously." *Id.* at 9822.

The district court next concluded that "[q]uestions of individual damage calculations" would not "overwhelm questions common to the class," *Comcast*, 569 U.S. at 34, because Plaintiffs had put forward a common damages methodology that satisfied the requirements set forth by the Supreme Court in *Comcast*. R. 435 (Certification Op.) at 9819. Here, the district court offered just one sentence of reasoning: "This Court concludes that predominance exists with respect to damages for *the same reasons as articulated in the* ***previous section***." *Id.* (emphasis added). That "previous section" of the court's opinion had concluded that the Securities Act's express statutory formulas for damages could be applied classwide to the Securities Act claims to satisfy *Comcast*'s requirement of a common classwide damages methodology. But the Exchange Act contains no similar statutory damages formula, and Exchange Act damages are calculated quite differently from

Securities Act damages.  The court did not explain how its Securities Act reasoning could be applied to damages calculations under Section 10(b) of the Exchange Act.

### 4.    Plaintiffs' Post-Certification Motions For Clarification

Since certification, Plaintiffs have twice asked the district court to "clarify" its class-certification order.  Their first request, made four days after the court's order, concerned several individual defendants who did not make any of the public statements challenged here.  In its original order, the district court had wrongly held that Plaintiffs could pursue class claims against these "non-speaking defendants," even though it also held that those claims were not covered by any presumption of reliance.  R. 435 (Certification Op.) at 9828.  Recognizing this error, Plaintiffs sent the court a letter asking it to dismiss the claims against the non-speaking defendants.  *See* R. 439-1, Ex. A at 10058.  The court granted that request.  R. 446 at 10138-10139.

Plaintiffs' second motion, filed over six months later and two months after this Court granted Defendants' petitions for interlocutory review, asked the district court to "clarify" the *Comcast* portion of its certification order by issuing an "indicative ruling" under Federal Rule of Civil Procedure 62.1(a).  R. 617-1 (Rule 62.1(a) Mot.) at 13689.  Specifically, Plaintiffs requested

"clarification" that the court's ruling was "*not* premise[d]" on "an assumption that Plaintiffs' proposed Securities Act and Exchange Act damages methodologies are the same." *Id.* Plaintiffs did not offer any alternative interpretation of what the court's ruling *had* said; instead, they merely asked the court to state that its order was "based on full consideration of the parties' briefing, the submitted expert testimony, [and] oral argument." *Id.* at 13697. The district court has not yet ruled on Plaintiffs' latest motion.[4]

## SUMMARY OF ARGUMENT

The district court's order certifying a class for Plaintiffs' Exchange Act claims rests on multiple independent errors of law and should be reversed.

I.     To begin, the district court wrongly concluded that Plaintiffs may invoke the *Affiliated Ute* presumption of reliance.

---

[4] Plaintiffs' motion is improper. District courts cannot issue Rule 62.1 indicative rulings on questions pending before an appellate court, as that would improperly "place[] the same issue in front of two courts at the same time." *Adams* v. *Kijakazi*, 2022 WL 987337, at *2 (E.D. Ky. Mar. 31, 2022). Plaintiffs also cannot ask the district court to "correct" or "revise" its earlier ruling, while insisting that such relief "will not change any of [its] findings or holdings." R. 617-1 (Rule 62.1(a) Mot.) at 5, 9. Regardless, they should have alerted the district court to their concern about its *Comcast* analysis in their first motion for clarification. And they cannot now contradict their prior statement to this Court, in opposing Defendants' Rule 23(f) petition, that the district court's "explicit rulings" satisfy *Comcast*. 23(f) Opp. at 13.

A.    That presumption applies only in cases based on omissions, when the defendant owes a special duty to disclose.  Its narrow scope reflects both the "circumstances of" *Affiliated Ute* itself, which "involv[ed] primarily a failure to disclose" by persons with a fiduciary duty, 406 U.S. at 153, and the justification for the presumption:  "to aid plaintiffs when reliance . . . would be practically impossible to prove." *Johnston* v. *HBO Film Mgmt., Inc.*, 265 F.3d 178, 193 (3d Cir. 2001).  That problem of proof does not exist unless a plaintiff's case turns primarily on omissions, and thus requires him to somehow show that he "rel[ied] upon what he [was] not told." *Smith* v. *Ayres*, 845 F.2d 1360, 1363 (5th Cir. 1988).  The district court was therefore incorrect that the *Affiliated Ute* presumption applies even if the case does not "hinge upon mostly or exclusively omissions."  R. 435 (Certification Op.) at 9820.

B.    This case does not primarily involve omissions for a simple reason: Plaintiffs allege 46 separate *affirmative misstatements*.  In trying to justify the application of *Affiliated Ute*, Plaintiffs have framed those many statements as part of a larger, actionable omission:  an undisclosed "scheme to defraud" under Rule 10b-5(a) and (c).  But deeming FirstEnergy's illegal political contributions a securities-fraud "scheme" is unprecedented.  Defendants did not employ "any manipulative or deceptive device or

23

contrivance" "in connection with the purchase or sale of any security," 15 U.S.C. § 78j, such as "wash sales, matched orders, or rigged prices," *Santa Fe Indus. Inc.* v. *Green*, 430 U.S. 462, 476 (1977).  The disclosure of corporate wrongdoing may impact the price of the company's securities, but—contrary to the district court's conclusion—that does not turn such wrongdoing into securities fraud.

Rather, if Plaintiffs were harmed in their purchase of securities, it is because, as the district court described, FirstEnergy made statements "while omitting information necessary to qualify or to place [such statements] into doubt," thereby "paint[ing] an incomplete picture of the alleged truth."  R. 435 (Certification Op.) at 9821-9822.  That describes a species of affirmative misrepresentation, known as "half-truths," that are actionable under Rule 10b-5(b).

The *Affiliated Ute* presumption does not apply to securities-fraud claims based on half-truths, as all eight courts of appeals to have decided the question have concluded.  *See infra* at 39-40.  When a defendant makes a half-truth misstatement, it has (by definition) omitted information necessary to disclose the full truth.  But the defendant still has made an affirmative statement, and the plaintiff can prove that it relied on what the defendant said.  That is not

24

true in omission cases like *Affiliated Ute*, where the defendant never says anything on the relevant subject. Applying *Affiliated Ute* to claims based on half-truths would also "swallow the reliance requirement almost completely," *Volkswagen*, 2 F.4th at 1205, because plaintiffs can almost always reframe an affirmative misstatement as an omission: every misstatement, after all, "omits" to disclose the full truth. Allowing that end-run would have massive ramifications for securities class actions and the defenses available at class certification.

II.    The district court also misapplied *Comcast* in certifying Plaintiffs' Exchange Act claims.

A.    As the Supreme Court has long directed, plaintiffs have the burden of establishing all of the requirements of Rule 23 before a class may be certified. That is particularly true for a Rule 23(b)(3) damages class. In *Comcast*, the Supreme Court held that a damages class may be certified under Rule 23(b)(3) only if the plaintiffs prove that "damages are susceptible of measurement across the entire class" in a manner that reliably "measure[s] only those damages attributable to" their liability theory. 569 U.S. at 35. As a result, "certification is proper only if the trial court is satisfied, after a rigorous analysis," that the plaintiffs have put forward such a methodology.

25

*Id.* at 33.  As this Court has recognized, that rule applies to every putative damages class—not just those in which plaintiffs offer multiple liability theories.

B.    The district court's opinion did not reflect *any* analysis of whether Plaintiffs had proposed a workable damages methodology for their Exchange Act claims.  The court offered only one sentence analyzing *Comcast*, referring back to its earlier conclusion that "*Comcast* does not bar certification" of Plaintiffs' Securities Act claims because "*the Securities Act* provides a statutory formula for damages."  R. 435 (Certification Op.) at 9812 (emphasis added).  But the Securities Act statutory formula does not apply to claims under the *Exchange Act*, which has no comparable formula and for which damages calculations are much more complex.

C.    Nor did Plaintiffs otherwise provide a damages methodology that "measure[s] only those damages attributable to" their liability theory.  *Comcast*, 569 U.S. at 35.  Plaintiffs claim that, over 3.5 years, Defendants made 46 misleading statements concerning FirstEnergy's evolving efforts to address its nuclear liabilities, which ranged from lawful attempts to obtain relief (*e.g.*, from the U.S. Department of Energy and the bankruptcy court) to illegal political contributions.  The price impact, if any, of these alleged

misstatements—that is, the artificial inflation any one statement caused in the price of FirstEnergy securities—necessarily varied significantly over the 861 trading days of the class period. But Plaintiffs did not provide any methodology to address that complexity. Instead, their experts merely summarized generic approaches that presumed artificial inflation was exactly the same on every trading day of the class period.

D.    To try to satisfy *Comcast*, Plaintiffs' experts promised that they *could* develop a model that would tease out the differences in inflation across 3.5 years using "any number" of different "techniques." R. 339-3 (Dalrymple Dep. Tr.) at 7288 p. 187:8-12, 7289 p. 190:13-17. But they never explained what techniques they would use, or how those techniques would measure classwide damages given the nature and duration of FirstEnergy's alleged misconduct. Plaintiffs cannot satisfy their burden under *Comcast* to establish the propriety of class certification now with conclusory promises to provide a workable damages methodology later.

## STANDARD OF REVIEW

This Court reviews a class-certification order for abuse of discretion. *Ford*, 86 F.4th at 727. It is an abuse of discretion to "improperly appl[y] the law or use[] an erroneous legal standard" in evaluating a class-certification

motion. *Rikos* v. *Procter & Gamble Co.*, 799 F.3d 497, 504 (6th Cir. 2015). "One way to misapply the proper legal standard is . . . [to] neglect[] to perform the rigorous analysis" required by Rule 23. *Ford*, 86 F.4th at 727 (vacating class certification); *see In re Tivity Health, Inc.*, 2022 WL 17243323 (6th Cir. Nov. 21, 2022) (vacating class certification); *Pipefitters*, 654 F.3d at 621 (6th Cir.) (reversing class certification).

## ARGUMENT

"By enabling enormous aggregation of claims and parties," class certification "magnifies the stakes of litigation and can thus have massive ramifications" for the outcome of a case. *Ford*, 86 F.4th at 725-726. In applying Rule 23, district courts must "serve[] as a gatekeeper" to "ensure appropriate use of this potent litigation device." *Id.* at 726. As the Supreme Court and this Court have directed, a district court cannot certify a class "unless its 'rigorous analysis' shows that" all of the Rule 23 requirements are met. *Id.* (quotation omitted). And that rigorous scrutiny is most critical for the most "demanding" of the Rule 23 factors: "Rule 23(b)(3)'s predominance criterion." *Comcast*, 569 U.S. at 34. Otherwise, the court risks certifying a "proposed class[]" that is not "sufficiently cohesive to warrant adjudication by representation." *Amchem Prod., Inc.* v. *Windsor*, 521 U.S. 591, 623 (1997).

That is what happened below.  *First*, the district court erroneously applied the *Affiliated Ute* presumption.  *Second*, the court failed to analyze whether Plaintiffs' damages are "capable of measurement on a classwide basis," as required by *Comcast*, 569 U.S. at 34.

## I.    THE *AFFILIATED UTE* PRESUMPTION OF RELIANCE DOES NOT APPLY HERE.

As the complaint makes clear, this case is about the 46 public statements by FirstEnergy that Plaintiffs allege to be actionable misrepresentations.  As a result, the district court should not have certified a class under the narrow presumption identified in *Affiliated Ute*, but should have scrutinized Plaintiffs' class-certification motion exclusively under *Basic*'s "fraud-on-the-market" framework.

The district court's contrary conclusion suffers from two fatal flaws. *First*, despite recognizing that a "significant number of courts" disagree, the district court held that the *Affiliated Ute* presumption applies even if the case does not "hinge upon mostly or exclusively omissions."  R. 435 (Certification Op.) at 9820-9821.  This was incorrect; *Affiliated Ute* applies only to cases *primarily* involving omissions.

*Second*, the district court wrongly concluded that this case is somehow "primarily omissions-based."  *Id.* at 9821.  This is also wrong.  Misleading half-

truths are affirmative misrepresentations, not omissions.  In addressing this question, every court of appeals (eight, so far) has rejected the district court's application of the *Affiliated Ute* presumption, and this Court should as well.

### A.    The ***Affiliated Ute*** Presumption Applies Only In Cases Primarily Involving Omissions.

*Affiliated Ute* represents a narrow presumption of reliance.  The facts of that case make clear that the presumption is not broadly generalizable, but rather applies only where (i) there is a special duty of disclosure and (ii) the defendant breaches that duty by staying silent.

In *Affiliated Ute*, plaintiffs were members of the Ute tribe who were in a fiduciary relationship with the defendant bankers.  The bankers had agreed to act as transfer agent for tribe members who held illiquid stock in a tribal corporation, and had expressly promised to "act[] for the [selling] stockholders."  406 U.S. at 136-138, 152.  But the bankers quietly "developed and encouraged" a secondary market, solicited orders from third parties to buy any available shares, and induced the tribe members to sell their shares without ever disclosing that the shares were being resold for a higher price.  *Id.* at 146-147, 152-153.

The Supreme Court held that the bankers had violated Rule 10b-5(b) by affirmatively misrepresenting to a few tribal sellers that the sales had

occurred at the "prevailing market price." *Id.* at 152. The Court also held that, for most tribal sellers to whom the bankers had said nothing at all, the bankers had violated Rule 10b-5(a) and (c) by failing to disclose the existence of the lucrative secondary market in which the bankers had acted as market makers. *Id.* at 153. The Court recognized that "[u]nder the circumstances of this case, *involving primarily a failure to disclose*, positive proof of reliance" was not required for plaintiffs to succeed on their claims. *Id.* (emphasis added).

Since *Affiliated Ute*, plaintiffs have tried to expand its presumption of reliance to cases that do not involve primarily a failure to disclose. But as even the district court here recognized, R. 435 (Certification Op.) at 9820-9821, every court of appeals to address this question has rejected that expansion. All eight have agreed that the *Affiliated Ute* "presumption should not be applied to cases that allege both misstatements and omissions unless the case can be characterized as one that primarily alleges omissions." *Volkswagen*, 2 F.4th at 1204 (9th Cir.) (citation omitted); *see Waggoner* v. *Barclays PLC*, 875 F.3d 79, 93 & n.24 (2d Cir. 2017); *In re Interbank Funding Corp. Sec. Litig.*, 629 F.3d 213, 219-220 (D.C. Cir. 2010); *Regents of the Univ. of Cal.* v. *Credit Suisse First Boston*, 482 F.3d 372, 384 (5th Cir. 2007); *Johnston*, 265 F.3d at 192-193 (3d Cir.); *Joseph* v. *Wiles*, 223 F.3d 1155, 1162 (10th Cir. 2000),

*abrogated on other grounds by California Pub. Emps.' Ret. Sys.* v. *ANZ Sec., Inc.*, 582 U.S. 497 (2017); *Cox* v. *Collins*, 7 F.3d 394, 395-396 (4th Cir. 1993); *Cavalier Carpets, Inc.* v. *Caylor*, 746 F.2d 749, 756 (11th Cir. 1984).

That limitation makes sense for two reasons.  *First*, the *Affiliated Ute* presumption is necessary only when a plaintiff faces "the conceptual difficulty of proof of reliance on a negative fact."  *Chelsea Assocs.* v. *Rapanos*, 527 F.2d 1266, 1271 (6th Cir. 1975); *see Joseph*, 223 F.3d at 1162 ("[T]he *Affiliated Ute* presumption of reliance exists in the first place to aid plaintiffs when reliance on a negative would be practically impossible to prove.").  No such difficulty arises when a plaintiff's case turns mainly on affirmative misstatements, because in that circumstance he can prove whether those statements affected the decision to buy securities.  *See Holdsworth* v. *Strong*, 545 F.2d 687, 695 (10th Cir. 1976) ("[W]here . . . there are affirmative misrepresentations, the problem of proving reliance is not the same [as in *Affiliated Ute*].").  Applying the *Affiliated Ute* presumption in cases involving misstatements would thus contradict the Supreme Court's repeated admonition that "the judicial creation of [the Section 10(b)] private cause of action caution[s] against its expansion."  *Stoneridge*, 552 U.S. at 165.

*Second*, in a mixed case involving both omissions *and* misstatements, courts have recognized that a uniform approach to proving reliance is necessary.  It would be unworkable to apply the *Affiliated Ute* presumption to omissions, but apply some other framework to alleged misstatements.  That "would require the jury to search for proof of reliance by the plaintiff with regard to the misrepresentations, and to search for proof of nonreliance by the defendant with regard to the omissions."  *Cavalier Carpets*, 746 F.2d at 757.  "Rather than subject the jury to such a confounding exercise," courts set "a unitary burden of proof on the reliance issue."  *Joseph*, 223 F.3d at 1162.

The most straightforward approach—and the one that eight courts of appeals have adopted—is thus to "analytically characterize the action as either primarily a nondisclosure case (which would make the [*Affiliated Ute*] presumption applicable), or a positive misrepresentation case (where the presumption would be unavailable)."  *Volkswagen*, 2 F.4th at 1204-1205 (alteration and citation omitted); *see Cavalier Carpets*, 746 F.2d at 756-757 (same).  This Court should adopt the same approach.

33

**B.    This Case Does Not Primarily Involve Omissions.**

**1.    Plaintiffs' claims are based exclusively, or at least primarily, on alleged half-truths.**

On the face of the complaint, this case *exclusively* involves misrepresentations:  Plaintiffs allege 46 separate affirmative misstatements on eight different subjects over 17 pages of their complaint.  R. 72 (Compl.) at 1576-1592, ¶¶ 95-134.  That ought to be the end of the matter.

Plaintiffs seek to avoid this bar to *Affiliated Ute*'s application by claiming that Defendants' statements also furthered a "scheme to defraud" under Rule 10b-5(a) and (c).  According to Plaintiffs, "the thrust of [this] scheme liability" claim is an "omission":  FirstEnergy's failure to disclose its illegal political contributions.  R. 293 (Class Cert Mot.) at 6233.  This argument fails.

*First*, FirstEnergy's misconduct does not amount to an actionable *securities-fraud scheme* under Rule 10b-5(a) and (c), as the district court erroneously believed, R. 219 (MTD Op.) at 4764.[5]  This Court has not yet

_____

[5]  This Court can address this question now, notwithstanding that it "implicate[s] the merits of [P]laintiffs' cause of action," because it "also implicate[s] the merits of the class certification decision" on appeal.  *Regents*, 482 F.3d at 380-382 (finding district court's "broad theory of 'scheme' liability" cognizable on Rule 23(f) appeal because theory was "highly relevant to class

"defined the elements required to state" a scheme claim under Rule 10b-5(a) and (c). *Teamsters Loc. 237 Welfare Fund* v. *ServiceMaster Glob. Holdings, Inc.*, 83 F.4th 514, 525 (6th Cir. 2023). However, "the Second Circuit has," *id.*, and requires plaintiffs to show that "(1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, . . . (4) reliance," and (5) that "the deceptive or fraudulent scheme or activity . . . occurred 'in connection with the purchase or sale of a[] security," *Plumber & Steamfitters Local 773 Pension Fund* v. *Danske Bank A/S*, 11 F.4th 90, 105 (2d Cir. 2021) (citation omitted).

Simply put, Defendants did not employ any deceptive or manipulative act "in connection with the purchase or sale of any security." 15 U.S.C. § 78j(b). Defendants plainly did not engage in any securities "manipulation," which means practices like "wash sales, matched orders or rigged prices, that are intended to mislead investors by artificially affecting [securities] market activity." *Santa Fe Indus.*, 430 U.S. at 476. And even assuming that FirstEnergy's political contributions were "deceptive device[s] or

---

certification"); *see Hohider* v. *United Parcel Serv., Inc.*, 574 F.3d 169, 196–197 (3d Cir. 2009) (finding "[e]valuation of what substantive elements are necessary to prove plaintiffs' theories . . . critical to the class certification analysis," and "thus properly undertaken at [that] stage").

contrivance[s]," they had no "connection with the purchase or sale of any security."  FirstEnergy is a publicly traded company, but—contrary to what the district court suggested—not every action that is "fraudulent and affect[s] the price of a security in some attenuated way" constitutes a securities-fraud scheme.  *Stoneridge*, 552 U.S. at 161-162.

Nor do FirstEnergy's public statements create a sufficient "connection" with the purchase or sale of a security to deem the company's illegal political contributions a Rule 10b-5(a) or (c) scheme.  Statements that were misleading in light of that conduct may be actionable under Rule 10b-5(b), but the underlying conduct *itself* is not a Section 10(b) scheme.  Although "the subsections of Rule 10b-5 . . . are not hermetically sealed," *SEC* v. *Rio Tinto plc*, 41 F.4th 47, 49 (2d Cir. 2022) (citing *Lorenzo* v. *SEC*, 139 S. Ct. 1904 (2019)), it cannot be that every misstatement case is also a scheme case.  *Id.* at 54 ("[M]isstatements and omissions alone are not enough for scheme liability.").  Among other reasons, keeping the categories separate "assures that private plaintiffs remain subject to the heightened pleading requirements for Rule 10b-5(b) claims," such as the requirement that plaintiffs must specify the actual challenged statements and why those statements were misleading.  *Id.* at 54-55 (citing 15 U.S.C. § 78u-4(b)(1)).

36

*Second*, even if Plaintiffs could establish an actionable "scheme" here, their claims still are *primarily* based on 46 alleged misstatements. As just explained, FirstEnergy's affirmative statements provide the only possible "connection" between its alleged misconduct and the purchase or sale of its securities. Indeed, the district court acknowledged that Plaintiffs' claims turn on affirmative "communications" and "statements." R. 435 (Certification Op.) at 9821.

The district court nevertheless found that FirstEnergy's allegedly misleading "communications" were "primarily omissions-based" because "they painted an incomplete picture of the alleged truth of the situation." R. 435 (Certification Op.) at 9821-9822. There is a term that courts employ for incomplete "statements" and "communications" in the securities-fraud context: "half-truths." And half-truths are not omissions; they are a species of affirmative misstatement. *See In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239-240 (2d Cir. 2016) ("'Pure omissions,' of course, must be distinguished from 'half-truths'—statements that are misleading . . . by virtue of what they omit to disclose."); *Abell* v. *Potomac Ins. Co.*, 858 F.2d 1104, 1119 (5th Cir. 1988) ("Misrepresentations include statements that are themselves false— outright lies—and true statements that are nonetheless so incomplete as to be

37

misleading, i.e., distorted half-truths."), *vacated in part on other grounds sub nom. Fryer* v. *Abell*, 492 U.S. 914 (1989).  Indeed, Rule 10b-5(b) itself puts both complete misstatements and half-truths in the "misrepresentation" category, making it unlawful to make an "untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b-5(b).

A true omission is not a statement that is misleadingly incomplete.  Rather, it is a circumstance in which the defendant has "sa[id] absolutely nothing about matters whose very existence plaintiffs have no reason to consider."  *Abell*, 858 F.2d at 1119.  Take *Affiliated Ute* itself.  There, the bankers said nothing to tribe members about the existence of the secondary market that they had created and from which they were personally benefiting, despite their fiduciary duty to act on behalf of the tribe members.  That was an omission in the classic sense.  Here, by contrast, FirstEnergy told investors a great deal about its efforts to limit the financial exposure from its nuclear plants.

## 2.    As eight courts of appeals have held, the *Affiliated Ute* presumption does not apply to claims based on half-truths.

Claims based on half-truths, like those here, are not subject to *Affiliated Ute*.  Every court of appeals to consider the question has agreed.  *See Volkswagen*, 2 F.4th at 1208-1209 (9th Cir.) (rejecting presumption for "affirmative statements" allegedly "rendered misleading by an omission"); *Waggoner*, 875 F.3d at 96 (2d Cir.) ("The *Affiliated Ute* presumption does not apply to . . . 'half-truths.'"); *Joseph*, 223 F.3d at 1162-1163 (10th Cir.) (*Affiliated Ute* applies in "non-disclosure cases, but not in falsehood *or distortion* cases") (emphasis added); *Interbank*, 629 F.3d at 220 (D.C. Cir.) ("failure to disclose the Ponzi scheme" not "an omission" just because defendant "affirmatively misrepresented the accuracy of [financial] statements"); *Johnston*, 265 F.3d at 193 (3d Cir.) (claims were "based on misrepresentations, rather than omissions," where "the omission alleged would have no impact absent the misrepresentation"); *Abell*, 858 F.2d at 1119 (5th Cir.) (rejecting presumption for "true but misleading incomplete statements"); *Rowe* v. *Maremont Corp.*, 850 F.2d 1226, 1233 n.4 (7th Cir. 1988) ("Because this case involves misstatements and halftruths, and not 'pure omissions,' the district court correctly" declined to apply *Affiliated Ute*); *Vervaecke* v. *Chiles, Heider & Co., Inc.*, 578 F.2d 713, 717-718 & n.2 (8th Cir.

1978) (*Affiliated Ute* does not apply to "misrepresentations" or "omissions in the nature of misrepresentations (misleading statements, half-truths)"). This Court should follow this settled law.

The Ninth Circuit's decision in *Volkswagen* is on point. There, the plaintiffs alleged that "Volkswagen failed to disclose" that it had installed software to let its cars "cheat on emissions tests." 2 F.4th at 1206. Although "that omission loom[ed] large over Plaintiff's claims," the complaint "allege[d] more than nine pages of affirmative misrepresentations" about the company's "environmental compliance and financial liabilities" that were allegedly misleading because they did not mention the emissions fraud. *Id.* at 1206, 1208. The Ninth Circuit thus concluded that the plaintiffs' focus on those alleged half-truths "push[ed] th[e] case outside *Affiliated Ute*'s narrow presumption." *Id.* at 1206.

The courts of appeals' unanimous approach is correct for three reasons. *First*, the logic of Rule 10b-5 does not support applying the *Affiliated Ute* presumption to claims based on half-truth misstatements. An omission is actionable only if the defendant owed a duty to disclose. *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 471 (6th Cir. 2014). And Rule 10b-5 does "not create an affirmative duty to disclose any and all material information." *Matrixx*

*Initiatives, Inc.* v. *Siracusano*, 563 U.S. 27, 44 (2011). Nor do public companies "have a duty to disclose uncharged, unadjudicated wrongdoing," even if it would affect securities prices upon being revealed. *City of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014). Thus, in many cases, including this one, the only source of a duty is that the defendant made affirmative statements, triggering an obligation to disclose information "necessary to make [those] statements made . . . not misleading." *Matrixx Initiatives*, 563 U.S. at 44. A duty not to omit something necessary to make an affirmative statement not misleading is simply a species of the general duty not to make misleading statements. *Affiliated Ute* does not apply in such a case.

*Second*, the logic of *Affiliated Ute* does not extend to half-truths. As explained above, the Supreme Court fashioned this presumption because of the difficulty of proving that the plaintiff "rel[ied] upon what he [was] not told." *Smith*, 845 F.2d at 1363. There is no need for a presumption when the complaint points to half-truth misstatements: a plaintiff "either relied on the alleged affirmative misrepresentations in purchasing the [securities] or it did not." *Volkswagen*, 2 F.4th at 1209.

41

*Third*, expanding *Affiliated Ute* to cover half-truths would "swallow the reliance requirement almost completely." *Joseph*, 223 F.3d at 1163. Virtually "[a]ll misrepresentations are also nondisclosures, at least to the extent that there is a failure to disclose which facts" or implications "in the representation are not true." *Little* v. *First California Co.*, 532 F.2d 1302, 1304 n.4 (9th Cir. 1976). Consequently, "[a]n artfully-pleaded complaint can recharacterize as an omission conduct which more closely resembles a misrepresentation." *Joseph*, 223 F.3d at 1162. Courts rightly do not permit such an end-run of the reliance requirement.

Allowing plaintiffs to recast half-truths as omissions would have an enormous impact on securities class actions. If the *Affiliated Ute* presumption is not available, class plaintiffs must turn to the separate *Basic* "fraud-on-the-market" presumption, which has been the backbone of securities litigation against public companies—and the subject of intense debate—for decades. *See, e.g.*, *Halliburton II*, 573 U.S. at 264 (considering whether to overrule *Basic*). Employing the *Affiliated Ute* presumption for half-truths would allow plaintiffs to evade critical guardrails built into the *Basic* framework. For example, to invoke *Basic*, plaintiffs must show that the securities traded in an efficient market. *See Freeman* v. *Laventhol & Horwath*, 915 F.2d 193, 197-

198 (6th Cir. 1990). No rational plaintiff would bother to try to make that showing if he could trigger *Affiliated Ute* simply through artful pleading.

And under *Basic* (unlike *Affiliated Ute*), a defendant may defeat class certification by demonstrating that "the alleged misrepresentation did not actually affect the . . . market price" of the security. *Halliburton II*, 573 U.S. at 282. This "price-impact" defense is especially important in so-called "event-driven" cases such as this, involving a stock drop after bad news. Plaintiffs in such cases typically point to "generic" half-truths they claim were later revealed to be misleading, such as "[i]ntegrity and honesty are at the heart of our business." *Goldman Sachs Group, Inc.* v. *Arkansas Tchr. Ret. Sys.*, 141 S. Ct. 1951, 1959, 1961 (2021). But as the Supreme Court recently explained, the notion that a stock drop reflects the correction of a generic misrepresentation, rather than just investor reaction to the bad news itself, "break[s] down when there is a mismatch between the contents of the misrepresentation and the corrective disclosure" event. *Id.* at 1961. If, however, *Affiliated Ute* expands to cover half-truth misstatements, this "mismatch" defense would rarely matter, because plaintiffs would have no need to resort to *Basic*.

43

This case is a good example. Many of the half-truths alleged by Plaintiffs are not only generic, but sound quite like those in *Goldman*—unsurprisingly, because companies routinely make such generic and aspirational statements. *Compare* R. 72 (Compl.) at 1580-1581 ¶¶ 104-105 (statements touting FirstEnergy's "good corporate governance," "integrity," "openness," and "trust"), *and id.* at 1584-1585 ¶¶ 110-111 (FirstEnergy "has decision-making and oversight processes in place for political contributions and expenditures"), *with Goldman*, 141 S. Ct. at 1959 ("Integrity and honesty are at the heart of our business"), *and id.* ("We have extensive procedures and controls that are designed to identify and address conflicts of interest."). Under *Goldman*, Defendants have a strong "mismatch" defense. And if this Court orders the Exchange Act class decertified, Defendants will be entitled to invoke that defense if Plaintiffs move, on remand, for certification under the *Basic* presumption. *See In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14, 40, 109 (D.D.C. 2017) (on remand from vacatur of class-certification order, district court must consider "all of the issues bearing on class certification under Rule 23," including "new argument[s]").

This Court should not permit Plaintiffs to evade *Basic* through an overbroad invocation of *Affiliated Ute*—including by pleading a legally

baseless "scheme" claim—that other courts of appeals have rightly rejected in cases involving analogous alleged half-truths.

## II. PLAINTIFFS FAILED TO MEET THEIR BURDEN OF PROVIDING A DAMAGES MODEL THAT SATISFIES *COMCAST*.

In *Comcast*, the Supreme Court held that Rule 23(b)(3) requires courts to assess predominance not just with respect to class plaintiffs' merits theories but also with respect to their damages theories. In particular, plaintiffs have the burden of establishing, through "evidentiary proof," that "damages are susceptible of measurement across the entire class." *Comcast*, 569 U.S. at 33, 35. Although "[c]alculations need not be exact" at this stage, *id.* at 35, plaintiffs still must articulate a valid, reliable method for performing those calculations on a classwide basis. This requirement of a common method—that is, one that can be applied to "all" putative class members, *Ford*, 86 F.4th at 726-727— ensures that the "proposed class[] [is] sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623.

Courts cannot accept "any method of measurement . . . so long as it can be applied classwide, no matter how arbitrary the measurements may be." *Comcast*, 569 U.S. at 36. That would "reduce Rule 23(b)(3)'s predominance requirement to a nullity." *Id.* Thus, plaintiffs must demonstrate that their proposed common damages methodology is "'consistent with [their] liability

case,' *i.e.*, that the model 'measure[s] only those damages attributable to [their] theory' of liability." *Rikos*, 799 F.3d at 523 (quoting *Comcast*, 569 U.S. at 35). As with all Rule 23 prerequisites, "certification is proper only if the trial court is satisfied, after a rigorous analysis," that plaintiffs have met that burden. *Comcast*, 569 U.S. at 33.

The district court here failed to apply any scrutiny, much less the required rigorous scrutiny, to Plaintiffs' damages methodology. Plaintiffs apparently agree, as they recently asked the district court to "clarify" its class-certification opinion by repudiating its only stated reasoning, which conflated Securities Act and Exchange Act damages. Regardless, as shown below, Plaintiffs did not meet their burden of putting forward a damages methodology that satisfies *Comcast*.

### A.   *Comcast* Applies Here.

In opposing Defendants' Rule 23(f) petition, Plaintiffs argued that *Comcast* does not apply here at all. In their view, *Comcast* is limited to its precise facts—that is, it applies only where class plaintiffs present "multiple theories of liability" and a damages model that fails to distinguish among those theories. 23(f) Opp. at 25. Not so. In *Comcast*, the Supreme Court interpreted "Rule 23(b)(3)'s predominance requirement," 569 U.S. at 36, which applies as

much in a single-theory case as in a multiple-theory case. And the Court established a general principle: "any model supporting a plaintiff's damages case must be consistent with its liability case" at "the class certification stage." *Id.* at 35. Only after setting out this general "premise," *id.*, did the Court apply it to the specific facts at issue, *id.* at 36.

As Plaintiffs have noted, this Court once suggested in an unreported opinion—without explanation or citation—that *Comcast* applies only in cases involving multiple liability theories. *See* 23(f) Opp. at 25 (citing *In re VHS of Mich., Inc.*, 601 Fed. Appx. 342, 344 (6th Cir. 2015)). But this Court has since adopted the opposite approach, applying *Comcast* to a single-theory case in a precedential opinion. *Zehentbauer Fam. Land, LP* v. *Chesapeake Expl., L.L.C.*, 935 F.3d 496, 509-510 (6th Cir. 2019) (*Comcast* requires "district court[s] [to] ensure that . . . any damages calculations match the sole remaining theory of liability"). Other courts of appeals have likewise applied *Comcast* to single-theory cases. *See, e.g.*, *Slade* v. *Progressive Sec. Ins. Co.*, 856 F.3d 408, 411 (5th Cir. 2017); *Butler* v. *Sears, Roebuck & Co.*, 727 F.3d 796, 798-799 (7th Cir. 2013); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 255 (D.C. Cir. 2013). This Court should continue to reject Plaintiffs' unfounded limit on *Comcast*.

**B.    The District Court's *Comcast* Analysis Was Based On Clear Legal Error.**

In its class-certification order, the district court did not limit *Comcast* to single-theory cases.  But neither did it perform the required rigorous analysis.  Instead, it rejected FirstEnergy's objections to Plaintiffs' experts under *Comcast* in just a single sentence, based on its conflation of two different statutes.

The district court analyzed Plaintiffs' Securities Act claims and Exchange Act claims separately.  *See* R. 435 (Certification Op.) at 9811-9813, 9818-9820.  It first held that "*Comcast* does not bar certification" of Plaintiffs' Securities Act claims because "Section 11(e) of the Securities Act," which governs misstatements in registration statements, "provides a statutory formula for damages."  *Id.* at 9812 (citation omitted).  That formula "boils down" to the price paid by the plaintiff minus the price at which he sold the security, or the current price if he still holds the security.  *Id.* at 9811; *see* 15 U.S.C. § 77k(e).  The court also noted that Section 12(a)(2) of the Securities Act, which covers misstatements in a prospectus, contains a similar damages formula.  R. 435 (Certification Op.) at 9811; *see* 15 U.S.C. § 77*l*(a)(2).  The court then stated that *Comcast* is effectively "inapposite . . . where damages reflect liability by statutory formula," because the statutory formula itself provides a

48

classwide methodology that satisfies *Comcast*.  R. 435 (Certification Op.) at 9812 (citations omitted).  Defendants do not challenge that holding as it pertains to Plaintiffs' Securities Act claims.

But Defendants do challenge what the district court did next.  Turning to Plaintiffs' Exchange Act claims, the court provided almost no reasoning.  In response to Defendants' extensive arguments on *Comcast*, and after having denied Defendants' request for a hearing with live expert testimony, the court wrote only the following:  "This Court concludes that predominance exists with respect to damages for *the same reasons as articulated in the **previous section***."  R. 435 (Certification Op.) at 9819 (emphasis added).  Again, in that "previous section" the court had relied solely on the fact that the Securities Act contains statutory damages formulas.

Exchange Act damages cannot be calculated using the formulas found in the Securities Act.  The text of the Securities Act covers only claims brought under that Act.  And damages under the two statutes fundamentally differ: Securities Act claims do not require proof of loss causation, so the statute essentially fixes damages as the difference between the prices at which the plaintiff bought and sold (or the current value).  That mechanical approach does not work for Section 10(b) damages, as plaintiffs must make the more

49

complex and demanding showing that their losses were actually caused by the alleged fraud, and not by the myriad other things that can affect security prices. *See Dura Pharms., Inc.* v. *Broudo*, 544 U.S. 336, 342 (2005).

Nor does the Exchange Act itself contain any comparable formula for calculating damages. In opposing interlocutory review, Plaintiffs cited the Private Securities Litigation Reform Act of 1995 (PSLRA), *see* 23(f) Opp. at 14, which contains an upper-bound "[l]imitation on damages," based on the 90-day average of a security's price rather than the lowest price immediately following a fraud-induced drop, 15 U.S.C. § 78u-4(e)(1). But that cap does not displace the need for a valid, reliable damages methodology in the first place. Nor does the PSLRA provide anything like the Securities Act damages formulas, which "prescribe[] the method of calculating damages" and require courts to "apply that method in every case." *McMahan & Co.* v. *Wherehouse Ent., Inc.*, 65 F.3d 1044, 1048 (2d Cir. 1995).

Now that this Court has granted review, Plaintiffs no longer even try to defend the district court's formula-based reasoning. Instead, several months after this Court granted Defendants' Rule 23(f) petition, Plaintiffs asked the district court to "clarify" that it had *not* relied on the Securities Act formulas in its Exchange Act analysis. R. 617-1 (Rule 62.1(a) Mot.) at 13689. In doing

so, however, Plaintiffs never identified any other rationale for the district court's rejection of Defendants' extensive *Comcast* arguments; they simply asked the court to "clarify" that its *Comcast* ruling was "based on full consideration of the parties' briefing, the submitted expert testimony, [and] oral argument." *Id.* at 13697. Beyond being procedurally impermissible, *see supra* at 22 n.4, such an empty "clarification" would not get Plaintiffs far. A district court's Rule 23 analysis is "insufficiently rigorous" if it provides only a "summary conclusion" with "analysis . . . all but absent." *Ford*, 86 F.4th at 727-728.

### C.    Plaintiffs Did Not Propose Any Classwide Damages Methodology That Satisfies *Comcast*.

In any event, Plaintiffs never proposed a reliable means for measuring damages with any meaningful accuracy across their proposed 3.5-year class. At most, Plaintiffs' experts promised they could do so eventually, "using standard economic, financial, and valuation techniques," without actually explaining—let alone justifying—which of these "techniques" they would actually use, or how they could be reliably applied to the circumstances here. R. 293-7 (Dalrymple Rep.) at 6304 ¶ 108. That does not satisfy *Comcast*. This Court should say so now, to provide important guidance to district courts and

to ensure that, on remand, this litigation conforms to the requirements established by *Comcast*.

1. In order to accurately measure every putative class member's damages—as required under *Comcast*—Plaintiffs' damages methodology must be capable of determining the impact of FirstEnergy's alleged wrongdoing on the price of its securities on each of the 861 trading days over the 3.5-year class period. Plaintiffs' theory is that FirstEnergy misled investors by making 46 separate misstatements over this lengthy period, each of which caused its securities to "trade at artificially inflated prices." R. 293-7 (Dalrymple Rep.) at 6303 ¶ 103. Plaintiffs do not claim that FirstEnergy's stock or bond prices increased following any of the misstatements. Instead, they claim that the statements "maintained" inflation in securities prices until the full truth was revealed.[6]

As courts have recognized, the amount of "inflation" in the price of a security "is the difference between the [security] price after the false statement and what it would have been had the statement reflected the truth." *Glickenhaus & Co.* v. *Household Int'l, Inc.*, 787 F.3d 408, 417 (7th Cir. 2015).

---

[6] Neither the Supreme Court nor this Court has approved this "inflation-maintenance theory" of securities fraud. *See Goldman*, 141 S. Ct. at 1959 n.1.

Here, each class member's damages correspond to the amount of this fraud-induced inflation, if any, in the price of FirstEnergy securities on each date when each class member bought and sold its securities. *See Dura Pharms*, 544 U.S. at 342; R. 293-7 (Dalrymple Rep.) at 6304 ¶ 109. Thus, to measure each class member's damages, Plaintiffs' common methodology must be able to quantify the artificial inflation—again, the difference between the stock or bond price and the hypothetical price if FirstEnergy had truthfully disclosed its illegal campaign contributions—on *every* trading day of the 3.5-year class period. Indeed, Plaintiffs' experts conceded as much. *See* R. 293-7 (Dalrymple Rep.) at 6280 ¶ 12, 6304 ¶¶108-109; R. 293-8 (Jones Rep.) at 6399 ¶ 105.

2.   But, fatally, Plaintiffs' experts said almost nothing about how they would build a common model that could make that required determination. Instead, both experts merely summarized a generic approach to measuring artificial inflation in securities-fraud cases. That method, sometimes called "backcasting," estimates inflation by looking to "corrective disclosures" at or near the end of the class period that revealed a company's wrongdoing, and then assumes that the price drop observed after those events corresponds to the amount of artificial inflation caused by the fraud throughout the class

period.  *See* R. 293-8 (Jones Rep.) at 6397-6398 ¶¶ 101-102 (describing this method); 293-7 (Dalrymple Rep.) at 6303 ¶¶ 104-106 (same).

Both Ms. Jones (Plaintiffs' bonds expert) and Mr. Dalrymple (their stock expert) suggested that they would use a "backcasting" methodology, but neither tied their summaries of that technique to the facts of this case.  Ms. Jones described her approach to calculating damages over six paragraphs, and offered just one sentence that had anything to do with the specifics of this case.  *See* R. 293-8 (Jones Rep.) at 6397 ¶ 102.  The rest of her report could have been copied-and-pasted from any other Exchange Act case.  As for Mr. Dalrymple, his report actually *was* copied, almost verbatim, from a report he had submitted in another case.  *See* R. 430-2 (Dalrymple Rep. Redline).  And in that other case, the district court rejected his report as insufficient under *Comcast.  See Indiana Pub. Ret. Sys.* v. *AAC Holdings, Inc.*, 2023 WL 2592134, at *24-25 (M.D. Tenn. Feb. 24, 2023).

Such a high-level summary of the backcasting methodology might begin to suffice if Plaintiffs' theory of liability were simple and stable, such as where a company falsely reports its earnings and the truth is revealed the next quarter, without any significant intervening events.  But Plaintiffs allege the opposite of a simple fraud.  They contend that over 861 separate trading days

spanning 3.5 years, FirstEnergy repeatedly misled investors about the true nature of its evolving, multifaceted, and overlapping efforts (some legal and some not) to address the risks associated with its nuclear plants.

Applied to that conduct, a generic backcasting approach—and its premise that artificial inflation never changes throughout the class period—cannot work. Rather, as Defendants' expert explained, the ever-shifting nature of FirstEnergy's misconduct and "the chronology of events that unfolded" mean that the artificial inflation in the price of the company's securities, to the extent there was any, fluctuated significantly over the class period. R. 339-5 (Marietta-Westberg Rep.) at 7509 ¶ 99. Thus, any damages approach that assumes constant, uniform inflation would permit at least some class members to "travel to a place forbidden by *Comcast*: they would recover damages other than those resulting from the particular . . . injury on which [Defendants'] liability in this action is premised." *Ludlow* v. *BP, P.L.C.*, 800 F.3d 674, 688 (5th Cir. 2015) (citation omitted).

As an illustration, consider the artificial inflation in the price of FirstEnergy's securities that might have been caused by one alleged misrepresentation that was repeated throughout the class period: that the company was "continuing with legislative efforts to explore a regulatory type

solution" to the financial risks of the nuclear plants. *See, e.g.*, R. 72 (Compl.) at 1576 ¶¶ 95-96; *id.* at 1586-1588 ¶¶ 117-118, 121. That statement would not have impacted FirstEnergy's stock or bond prices much, if at all, during most of the class period here. Had FirstEnergy fully disclosed in 2017 or 2018 that its "legislative efforts" involved illegal contributions to entities controlled by Householder, the company's stock and bond prices likely would not have been much, or any, lower. After all, in Plaintiffs' own telling, FirstEnergy viewed any legislative solution as a "backup plan" until early 2019. *See id.* at 1558-1565 ¶¶ 45-63. By contrast, the impact of full disclosure on the price of FirstEnergy securities would have been greater in July 2019, after Householder had become Speaker and helped enact concrete legislation (HB6) promising financial relief. Had investors learned then that such legislation had been illegally obtained, and that HB6 might be vulnerable to government investigations or repeal, that knowledge likely would have more significantly factored into their valuation of FirstEnergy securities.

That is only the tip of the iceberg.  Consider the timeline of events that transpired over the 3.5-year class period here:



*See* R. 430-1.  As Defendants' damages expert explained, many of these events "would arguably have affected investors' expectations about the likelihood, timing, and financial benefit to FirstEnergy of potential favorable legislation," and thus "would have led to changes in [the] inflation" caused by statements about the company's legislative and regulatory activities.  *See* R. 339-5 (Marietta-Westberg Rep.) at 7510-7511 ¶ 103.  That includes the shifting prospects of FirstEnergy's ultimately unsuccessful attempts to address its

nuclear liabilities, such as federal intervention, state zero-emission legislation, and bankruptcy. The more those efforts seemed likely to work, the less impact the disclosure of the company's inchoate and alleged "backup" plan of illegal contributions would have had on the price of its securities.

3. Courts routinely reject damages methodologies that, like Plaintiffs' here, "fail[] to account for issues presented by [the plaintiffs'] theories." *Ohio Pub. Emps. Ret. Sys.* v. *Fed. Home Loan Mortg. Corp.*, 2018 WL 3861840, at *19 (N.D. Ohio Aug. 14, 2018), *rev'd on other grounds*, 64 F.4th 731 (6th Cir. 2023).[7] In the securities litigation following the BP oil spill, for example, the plaintiffs proposed a single class spanning a 2.5-year period without offering a damages methodology that separated out the impact on the company's securities of the asserted fraud pre- and post-spill. The court denied class certification under *Comcast*, explaining that "[w]ithout a more

---

[7] *See, e.g.*, *Turnbow* v. *Life Partners, Inc.*, 2013 WL 3479884, at *17 (N.D. Tex. July 9, 2013) (denying certification because "[n]umerous factors that affect the amount of damages, if any, to any given class member are not accounted for"); *Loritz* v. *Exide Techs.*, 2015 WL 6790247, at *22 (C.D. Cal. July 21, 2015) (denying certification where plaintiffs' expert "acknowledge[d] the difficulties" in calculating classwide damages, but did not "explain[] how he would" account for them); *In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 55 (S.D.N.Y. 2020) (denying certification where plaintiffs' "model of classwide injury . . . inextricably interweave[d]" factors that did not cause the plaintiffs' injury).

complete explication of how Plaintiffs propose . . . to calculate class members'
damages, and how [they] will incorporate—and, if necessary, respond to" key
differences before and after the spill, it was not confident that "the class-wide
damages methodology proposed w[ould] track Plaintiffs' theories of liability."
*In re BP p.l.c. Sec. Litig.*, 2013 WL 6388408, at *17 (S.D. Tex. Dec. 6, 2013).

The same reasoning applies here. As in *BP*, Plaintiffs have jammed as
many claims and parties as possible into the class they hope to represent, by
proposing as long a class period as they can attempt to justify. They have
reached far back in time—more than two years *before* the introduction of HB6,
the event that they call the "key ingredient" in FirstEnergy's alleged
misconduct, R. 72 (Compl.) at 1572 ¶ 88—for generic statements that they
claim were misleading in light of much later corrective events. After all, the
longer the class period, the more people who bought FirstEnergy securities
during that period and are thus members of the class, increasing the potential
aggregate damages and thus Plaintiffs' settlement leverage.

*Comcast* imposes a critical check on that tactic. To warrant treating
every putative class member "as members of a single class," plaintiffs must
prove "that damages are susceptible of measurement *across th[at] entire
class*" in a manner that is both (i) "common to all the class plaintiffs," and

(ii) "measure[s] only those damages attributable to" plaintiffs' liability theory. 569 U.S. at 31 n.3, 35, 38 (emphasis added).  If plaintiffs fail to do so, then "the complications, the unwieldiness, the delay, and the danger that class treatment would expose the defendant or defendants to settlement-forcing risk are not costs worth incurring."  *Parko* v. *Shell Oil Co.*, 739 F.3d 1083, 1085 (7th Cir. 2014).  That is clearly true here.

## D.    Plaintiffs Cannot Rely On Their Experts' Promises Of A Future *Comcast*-Compliant Methodology.

Because Plaintiffs have not satisfied their burden under *Comcast*, the only permissible result here is decertification.  Plaintiffs have promised to unveil their damages model in the future, but class certification is not appropriate unless such promises are fulfilled *before* the motion is decided.

In response to challenges to their generic backcasting approach to damages, Plaintiffs' experts suggested that they could use "standard economic, financial, and valuation techniques" to measure "any changes in share price inflation."  *See* R. 293-7 (Dalrymple Rep.) at 6304 ¶ 108; *see* R. 293-8 (Jones Rep.) at 6398 ¶ 103.  But neither expert actually explained how he or she would use any such "standard" technique to measure damages on a classwide basis over the 3.5-year class period here, given the complex and evolving nature of the alleged fraud.  Notably, neither expert identified which

"specific technique or techniques"—Mr. Dalrymple said it "might be multiple techniques"—would be used.  R. 339-3 (Dalrymple Dep. Tr.) at 7289 p. 190:16-17.  Mr. Dalrymple would not even offer his full menu of possible approaches, which he described as "very, very broad," "cover[ing] any number of fundamental valuation techniques."  *Id.* at 7288 p. 187:9-12.  Instead, both experts promised that, although they had not yet "specifically put forward a model that specifies how inflation would change over time, such a model could be put forward." *Id.* at 7287 p. 182:1-8; *see* R. 346-3 (Dalrymple Rebuttal Rep.) at 7751-7752 ¶¶ 15-22 (claiming that there are "widely accepted valuation and economic techniques" that might be used, but not identifying what "specific technique or model[s]" are appropriate for this case); R. 346-2 (Jones Rebuttal Rep.) at 7739 ¶ 65 ("standard valuation tools . . . can be used to identify the appropriate level of artificial inflation at various points in time").

*Comcast* "does not countenance this approach." *Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. at 55.  If such "intentions (hopes, in other words) were enough, predominance, as a check on casting lawsuits in the class action mold, would be out the window." *Parko*, 739 F.3d at 1086.  As this Court recently reiterated in reversing a class-certification order, Rule 23 is "[f]ar more than a mere pleading standard." *Ford*, 86 F.4th at 726 (internal

quotation marks omitted). It requires plaintiffs to provide "significant evidentiary proof" that Rule 23's requirements are "actually satisfied, not merely . . . properly alleged." *Id.* at 726, 729. Simply put, Rule 23(b)(3) demands more than a mere "promise of a model to come." *Ward* v. *Apple, Inc.*, 784 Fed. Appx. 539, 540 (9th Cir. 2019); *see Fort Worth Emps.' Ret. Fund* v. *J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 141-142 (S.D.N.Y. 2014) (requiring "assurance beyond [experts'] say-so" that "there is a damages model that will permit the calculation of damages on a classwide basis").

In opposing this Court's interlocutory review, Plaintiffs contended that discovery would need to "progress further" before their experts could provide any more details on how they would account for variations in inflation. 23(f) Opp. at 17. Plaintiffs' stock expert said something similar. R. 346-3 (Dalrymple Rebuttal Rep.) at 7752 ¶ 22 ("[I]t would be premature to present a specific technique or model relevant to a particular claim."). But Plaintiffs chose when to move for certification, the claims they moved to certify, and their lengthy 3.5-year class period. It was their burden, when they moved for certification, to establish the prerequisites for certifying their proposed class. They failed.

## CONCLUSION

For the foregoing reasons, the Court should reverse the district court's order certifying a class comprising Plaintiffs' Exchange Act claims and instruct the district court to decertify that class.

FEBRUARY 9, 2024

Respectfully submitted,

/s/ Geoffrey J. Ritts
GEOFFREY J. RITTS
ADRIENNE F. MUELLER
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
(216) 586-3939

MARJORIE P. DUFFY
M. RYAN HARMANIS
JONES DAY
325 John H. McConnell Boulevard,
Suite 600
Columbus, Ohio 43215
(614) 469-3939

*Counsel for Appellants Steven E. Strah, K. Jon Taylor, Jason J. Lisowski, George M. Smart, Paul T. Addison, Michael J. Anderson, Steven J. Demetriou, Julia L. Johnson, Donald T. Misheff, Thomas N. Mitchell, James F. O'Neil III, Christopher D. Pappas,*

/s/ Robert J. Giuffra, Jr.
ROBERT J. GIUFFRA, JR.
SHARON L. NELLES
DAVID M.J. REIN
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
(212) 558-4000

MORGAN L. RATNER
KATHLEEN O'MALLEY
SULLIVAN & CROMWELL LLP
1700 New York Avenue NW
Washington, DC 20006
(202) 956-7500

*Counsel for Appellant FirstEnergy Corp.*

/s/ David L. Axelrod
DAVID L. AXELROD
TIMOTHY D. KATSIFF
EMILIA MCKEE VASSALLO

63

*Sandra Pianalto, Luis A. Reyes, Jerry Sue Thornton, and Leslie M. Turner*

BALLARD SPAHR LLP
1735 Market Street
Philadelphia, PA 19103
(215) 665-8500

*Counsel for Appellant James F. Pearson*

## CERTIFICATE OF COMPLIANCE

This Brief complies with Federal Rule of Appellate Procedure 32(a) because it contains 12,806 words.

This Brief also complies with the requirements of Federal Rules of Appellate Procedure 32(a) because it was prepared in 14-point font using a proportionally spaced typeface.

/s/ Robert J. Giuffra, Jr.
ROBERT J. GIUFFRA, JR.

FEBRUARY 9, 2024

## CERTIFICATE OF SERVICE

I hereby certify that, on this 9th day of February, 2024, I electronically filed the foregoing Brief with the Clerk of Court using the CM/ECF system. I certify that service will be accomplished by the CM/ECF system for all participants in this case who are registered CM/ECF users.

/s/ Robert J. Giuffra, Jr.
ROBERT J. GIUFFRA, JR.

FEBRUARY 9, 2024

## DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

Pursuant to Sixth Circuit Rule 30(g)(1), Appellants hereby designate the following filings in the district court record as relevant to the disposition of this appeal:

| Record Entry # | Description | Date of Filing | PageID # |
|---|---|---|---|
| 72 | Consolidated Complaint for Violations of the Federal Securities Laws | 02/26/2021 | 1545-1674 |
| 161 | Memorandum of Law in Support of the FirstEnergy Defendants' Motion to Dismiss | 05/18/2021 | 2170-2256 |
| 161-1 | Declaration of Geoffrey J. Ritts in Support of the FirstEnergy Defendants' Motion to Dismiss | 05/18/2021 | 2257-2259 |
| 161-2 | Exhibit A:  Excerpt 2021 10-K | 05/18/2021 | 2260-2281 |
| 161-3 | Exhibit B:  Excerpt 2020 10-Q | 05/18/2021 | 2282-2292 |
| 161-4 | Exhibit C:  Strah Form 4 (2017) | 05/18/2021 | 2293-2294 |
| 161-5 | Exhibit D:  Strah Form 4 (2020) | 05/18/2021 | 2295-2296 |
| 161-6 | Exhibit E:  Taylor Form 4 (2017) | 05/18/2021 | 2297-2298 |
| 161-7 | Exhibit F:  Taylor Form 4 (2018) | 05/18/2021 | 2299-2300 |
| 161-8 | Exhibit G:  Pearson Form 4 (2017) | 05/18/2021 | 2301-2302 |
| 161-9 | Exhibit H:  Pearson Form 4 (2019) | 05/18/2021 | 2303-2304 |
| 176 | Plaintiffs' Omnibus Opposition to Defendants' Motions to Dismiss | 07/02/2021 | 4055-4160 |
| 176-1 | Declaration of Jason A. Forge in Support of Plaintiffs' Omnibus Opposition to Defendants' Motions to Dismiss | 07/02/2021 | 4161-4166 |
| 176-2 | Exhibit A:  2021 10-Q | 07/02/2021 | 4167-4272 |
| 193 | Reply in Support of the FirstEnergy Defendants' Motion to Dismiss | 08/02/2021 | 4426-4479 |
| 219 | Opinion & Order Granting in Part and Denying in Part Defendants' Motion to Dismiss | 03/07/2022 | 4717-4791 |

| Record Entry # | Description | Date of Filing | PageID # |
|---|---|---|---|
| 293 | Plaintiffs' Motion for Class Certification | 06/06/2022 | 6198-6206 |
| 293-1 | Memorandum of Law in Support of Plaintiffs' Motion for Class Certification | 06/06/2022 | 6207-6249 |
| 293-2 | Declaration of Hillary B. Stakem in Support of Plaintiffs' Motion for Class Certification | 06/06/2022 | 6250-6258 |
| 293-3 | Exhibit A:  Declaration of Esmeralda del Bosque | 06/06/2022 | 6259-6262 |
| 293-4 | Exhibit B:  Declaration of Mandy Tenner | 06/06/2022 | 6263-6266 |
| 293-5 | Exhibit C:  Declaration of Brad Duff | 06/06/2022 | 6267-6270 |
| 293-6 | Exhibit D:  Declaration of John Schmitt | 06/06/2022 | 6271-6274 |
| 293-7 | Exhibit E:  Expert Report of W. Scott Dalrymple, CFA | 06/06/2022 | 6275-6352 |
| 293-8 | Exhibit F:  Expert Report of Cynthia L. Jones, CFA | 06/06/2022 | 6353-6460 |
| 293-9 | Exhibit G:  Firm Resume of Robbins Geller Rudman & Dowd LLP | 06/06/2022 | 6461-6620 |
| 293-10 | Proposed Order | 06/06/2022 | 6621-6623 |
| 339 | Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification | 09/23/2022 | 7161-7234 |
| 339-1 | Declaration of Geoffrey J. Ritts in Support of Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification | 09/23/2022 | 7235-7237 |
| 339-2 | Exhibit A:  July 12, 2022 email from H. Stakem | 09/23/2022 | 7238-7239 |
| 339-3 | Exhibit B:  Transcript of Deposition of W. Scott Dalrymple, CFA | 09/23/2022 | 7240-7349 |

| Record Entry # | Description | Date of Filing | PageID # |
|---|---|---|---|
| 339-4 | Exhibit C:  Transcript of Deposition of Cynthia Jones, CFA | 09/23/2022 | 7350-7462 |
| 339-5 | Exhibit D:  Expert Report of Dr. Jennifer Marietta-Westberg | 09/23/2022 | 7463-7541 |
| 339-6 | Exhibit E:  Excerpts of Transcript of Deposition of Los Angeles County Employees Retirement Association | 09/23/2022 | 7542-7548 |
| 339-7 | Exhibit F:  Excerpts of Transcript of Deposition of Wisconsin Laborers' Pension Fund | 09/23/2022 | 7549-7558 |
| 339-8 | Exhibit G:  Excerpts of Transcript of Deposition of City of Irving Supplemental Benefit Plan | 09/23/2022 | 7559-7566 |
| 339-9 | Exhibit H:  Excerpts of Transcript of Deposition of Amalgamated Bank | 09/23/2022 | 7567-7575 |
| 339-10 | Exhibit I:  July 19, 2022 email from C. Kopko | 09/23/2022 | 7576-7578 |
| 346 | Plaintiffs' Reply in Further Support of Motion for Class Certification | 09/28/2022 | 7606-7692 |
| 346-1 | Declaration of Hillary B. Stakem in Support of Plaintiffs' Reply in Further Support of Motion for Class Certification | 09/28/2022 | 7693-7702 |
| 346-2 | Exhibit H:  Expert Rebuttal Report of Cynthia L. Jones, CFA | 09/28/2022 | 7703-7743 |
| 346-3 | Exhibit I:  Expert Rebuttal Report of W. Scott Dalrymple, CFA | 09/28/2022 | 7744-7754 |
| 346-4 | Exhibit J:  Morgan Stanley, $1.75 Billion Offering:  Transaction Summary | 09/28/2022 | 7755-7763 |
| 346-5 | Exhibit K:  Morgan Stanley, $750 Million Offering:  Transaction Summary | 09/28/2022 | 7764-7770 |
| 346-6 | Exhibit L:  Deposition Transcript of Brad Duff | 09/28/2022 | 7771-7854 |

| Record Entry # | Description | Date of Filing | PageID # |
|---|---|---|---|
| 346-7 | Exhibit M:  Deposition Transcript of Eleanor Innes | 09/28/2022 | 7855-7949 |
| 346-8 | Exhibit N:  Deposition Transcript of Esmeralda del Bosque | 09/28/2022 | 7950-8076 |
| 346-9 | Exhibit O:  Deposition Transcript of John Schmitt | 09/28/2022 | 8077-8194 |
| 346-10 | Exhibit P:  Deposition Transcript of Jennifer Marietta-Westberg, Ph.D. | 09/28/2022 | 8195-8343 |
| 346-11 | Revised Proposed Order | 09/28/2022 | 8344-8346 |
| 352 | Plaintiffs' Notice of Supplemental Authority in Support of Their Motion for Class Certification | 10/12/2022 | 8567-8576 |
| 352-1 | Exhibit A:  *St. Clair Cnty. Emps.' Ret. Sys.* v. *Acadia Healthcare Co.*, 2022 WL 4598044 (M.D. Tenn. Sept. 30, 2022) | 10/12/2022 | 8577-8585 |
| 369 | Defendants' Response to Plaintiffs' Notice of Supplemental Authority | 11/09/2022 | 8832-8840 |
| 389 | Order Setting Hearing on Motion to Certify Class | 12/08/2022 | 9125 |
| 424 | Defendant FirstEnergy Corp.'s Notice of Supplemental Authority in Opposition to Plaintiffs' Motion for Class Certification | 03/10/2023 | 9639-9643 |
| 424-1 | Exhibit A:  *Ind. Pub. Ret. Sys.* v. *AAC Holdings, Inc.*, 2023 WL 2228987 (M.D. Tenn. Feb. 24, 2023) | 03/10/2023 | 9644-9671 |
| 426 | Plaintiffs' Response to Defendant FirstEnergy Corp.'s Notice of Supplemental Authority in Opposition to Plaintiffs' Motion for Class Certification | 03/14/2023 | 9678-9688 |
| 430 | Letter from R. Giuffra, Jr. to C.J. Marbley | 03/17/2023 | 9707 |

| Record Entry # | Description | Date of Filing | PageID # |
|---|---|---|---|
| 430-1 | Exhibit A:  Defendant FirstEnergy Corp.'s Oral Argument Presentation | 03/17/2023 | 9708-9750 |
| 430-2 | Exhibit B:  Redline Comparing Dalrymple Expert Reports (Submitted at Oral Argument) | 03/17/2023 | 9751-9754 |
| 435 | Opinion and Order Granting Class Certification Motion | 03/30/2023 | 9781-9831 |
| 437 | Transcript of Class Certification Oral Argument | 04/03/2023 | 9844-9892 |
| 439 | Non-Speaking Defendants' Response to Plaintiffs' April 3, 2023 Letter | 04/04/2023 | 10053-10056 |
| 439-1 | Exhibit A:  Plaintiffs' April 3, 2023 Letter | 04/04/2023 | 10057-10058 |
| 446 | Order Construing ECF No. 439-1 as a Motion to Clarify and Dismissing without Prejudice Count I for the Non-Speaking Defendants and All Counts for Defendant Ty Pine | 04/18/2023 | 10138-10140 |
| 617 | Plaintiffs' Rule 62.1(a) Motion Regarding Clarification of the Class Certification Order | 01/10/2024 | 13683-13686 |
| 617-1 | Memorandum of Law in Support of Plaintiffs' Rule 62.1(a) Motion | 01/10/2024 | 13687-13699 |
| 617-2 | Proposed Order Granting Plaintiffs' Rule 62.1(a) Motion | 01/10/2024 | 13700-13701 |
| 623 | Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for a Rule 62.1(a) Indicative Ruling | 01/31/2024 | 13806-13823 |
| 626 | Plaintiffs' Reply in Support of Their Motion for a Rule 62.1(a) Indicative Ruling | 02/06/2024 | 13870-13881 |

**STATUTORY AND REGULATORY ADDENDUM**

# STATUTORY AND REGULATORY ADDENDUM
# TABLE OF CONTENTS

## Table of Contents

**Page**

A.   15 U.S.C. § 77k ................................................................1a

B.   15 U.S.C. § 77*l* ...............................................................6a

C.   15 U.S.C. § 78j ................................................................7a

D.   15 U.S.C. § 78u-4 ............................................................9a

E.   17 C.F.R. § 240.10b-5 .....................................................27a

**A.**   15 U.S.C. § 77k provides:

**Civil liabilities on account of false registration statements**

(a) Persons possessing cause of action; persons liable

In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may, either at law or in equity, in any court of competent jurisdiction, sue--

(1) every person who signed the registration statement;

(2) every person who was a director of (or person performing similar functions) or partner in the issuer at the time of the filing of the part of the registration statement with respect to which his liability is asserted;

(3) every person who, with his consent, is named in the registration statement as being or about to become a director, person performing similar functions, or partner;

(4) every accountant, engineer, or appraiser, or any person whose profession gives authority to a statement made by him, who has with his consent been named as having prepared or certified any part of the registration statement, or as having prepared or certified any report or valuation which is used in connection with the registration statement, with respect to the statement in such registration statement, report, or valuation, which purports to have been prepared or certified by him;

(5) every underwriter with respect to such security.

If such person acquired the security after the issuer has made generally available to its security holders an earning statement covering a period of at least twelve months beginning after the effective date of the registration statement, then the right of recovery under this subsection shall be conditioned on proof that such person acquired the security relying upon such untrue statement in the registration statement or relying upon the

registration statement and not knowing of such omission, but such reliance may be established without proof of the reading of the registration statement by such person.

(b) Persons exempt from liability upon proof of issues

Notwithstanding the provisions of subsection (a) no person, other than the issuer, shall be liable as provided therein who shall sustain the burden of proof-

(1) that before the effective date of the part of the registration statement with respect to which his liability is asserted (A) he had resigned from or had taken such steps as are permitted by law to resign from, or ceased or refused to act in, every office, capacity, or relationship in which he was described in the registration statement as acting or agreeing to act, and (B) he had advised the Commission and the issuer in writing that he had taken such action and that he would not be responsible for such part of the registration statement; or

(2) that if such part of the registration statement became effective without his knowledge, upon becoming aware of such fact he forthwith acted and advised the Commission, in accordance with paragraph (1) of this subsection, and, in addition, gave reasonable public notice that such part of the registration statement had become effective without his knowledge; or

(3) that (A) as regards any part of the registration statement not purporting to be made on the authority of an expert, and not purporting to be a copy of or extract from a report or valuation of an expert, and not purporting to be made on the authority of a public official document or statement, he had, after reasonable investigation, reasonable ground to believe and did believe, at the time such part of the registration statement became effective, that the statements therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading; and (B) as regards any part of the registration statement purporting to be made upon his authority as an expert or purporting to be a copy of or extract from a report or valuation of himself as an expert, (i) he had, after reasonable investigation, reasonable ground to believe and did

believe, at the time such part of the registration statement became effective, that the statements therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading, or (ii) such part of the registration statement did not fairly represent his statement as an expert or was not a fair copy of or extract from his report or valuation as an expert; and (C) as regards any part of the registration statement purporting to be made on the authority of an expert (other than himself) or purporting to be a copy of or extract from a report or valuation of an expert (other than himself), he had no reasonable ground to believe and did not believe, at the time such part of the registration statement became effective, that the statements therein were untrue or that there was an omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading, or that such part of the registration statement did not fairly represent the statement of the expert or was not a fair copy of or extract from the report or valuation of the expert; and (D) as regards any part of the registration statement purporting to be a statement made by an official person or purporting to be a copy of or extract from a public official document, he had no reasonable ground to believe and did not believe, at the time such part of the registration statement became effective, that the statements therein were untrue, or that there was an omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading, or that such part of the registration statement did not fairly represent the statement made by the official person or was not a fair copy of or extract from the public official document.

(c) Standard of reasonableness

In determining, for the purpose of paragraph (3) of subsection (b) of this section, what constitutes reasonable investigation and reasonable ground for belief, the standard of reasonableness shall be that required of a prudent man in the management of his own property.

(d) Effective date of registration statement with regard to underwriters

If any person becomes an underwriter with respect to the security after the part of the registration statement with respect to which his liability is

asserted has become effective, then for the purposes of paragraph (3) of subsection (b) of this section such part of the registration statement shall be considered as having become effective with respect to such person as of the time when he became an underwriter.

(e) Measure of damages; undertaking for payment of costs

The suit authorized under subsection (a) may be to recover such damages as shall represent the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and (1) the value thereof as of the time such suit was brought, or (2) the price at which such security shall have been disposed of in the market before suit, or (3) the price at which such security shall have been disposed of after suit but before judgment if such damages shall be less than the damages representing the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and the value thereof as of the time such suit was brought: Provided, That if the defendant proves that any portion or all of such damages represents other than the depreciation in value of such security resulting from such part of the registration statement, with respect to which his liability is asserted, not being true or omitting to state a material fact required to be stated therein or necessary to make the statements therein not misleading, such portion of or all such damages shall not be recoverable. In no event shall any underwriter (unless such underwriter shall have knowingly received from the issuer for acting as an underwriter some benefit, directly or indirectly, in which all other underwriters similarly situated did not share in proportion to their respective interests in the underwriting) be liable in any suit or as a consequence of suits authorized under subsection (a) for damages in excess of the total price at which the securities underwritten by him and distributed to the public were offered to the public. In any suit under this or any other section of this subchapter the court may, in its discretion, require an undertaking for the payment of the costs of such suit, including reasonable attorney's fees, and if judgment shall be rendered against a party litigant, upon the motion of the other party litigant, such costs may be assessed in favor of such party litigant (whether or not such undertaking has been required) if the court believes the suit or the defense to have been without merit, in an amount sufficient to reimburse him for the reasonable expenses incurred by him, in connection with such suit, such

costs to be taxed in the manner usually provided for taxing of costs in the court in which the suit was heard.

(f) Joint and several liability; liability of outside director

(1) Except as provided in paragraph (2), all or any one or more of the persons specified in subsection (a) shall be jointly and severally liable, and every person who becomes liable to make any payment under this section may recover contribution as in cases of contract from any person who, if sued separately, would have been liable to make the same payment, unless the person who has become liable was, and the other was not, guilty of fraudulent misrepresentation.

(2) (A) The liability of an outside director under subsection (e) shall be determined in accordance with section 78u-4(f) of this title.

(B) For purposes of this paragraph, the term "outside director" shall have the meaning given such term by rule or regulation of the Commission.

(g) Offering price to public as maximum amount recoverable

In no case shall the amount recoverable under this section exceed the price at which the security was offered to the public.

**B.**    15 U.S.C. § 77*l* provides:

## Civil liabilities arising in connection with prospectuses and communications

(a) In general

Any person who--

(1) offers or sells a security in violation of section 77e of this title, or

(2) offers or sells a security (whether or not exempted by the provisions of section 77c of this title, other than paragraphs (2) and (14) of subsection (a) of said section), by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable, subject to subsection (b), to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

(b) Loss causation

In an action described in subsection (a)(2), if the person who offered or sold such security proves that any portion or all of the amount recoverable under subsection (a)(2) represents other than the depreciation in value of the subject security resulting from such part of the prospectus or oral communication, with respect to which the liability of that person is asserted, not being true or omitting to state a material fact required to be stated therein or necessary to make the statement not misleading, then such portion or amount, as the case may be, shall not be recoverable.

**C.**        15 U.S.C. § 78j provides:

**Manipulative and deceptive devices.**

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange--

(a) (1) To effect a short sale, or to use or employ any stop-loss order in connection with the purchase or sale, of any security other than a government security, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

(2) Paragraph (1) of this subsection shall not apply to security futures products.

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement1 any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

(c) (1) To effect, accept, or facilitate a transaction involving the loan or borrowing of securities in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

(2) Nothing in paragraph (1) may be construed to limit the authority of the appropriate Federal banking agency (as defined in section 1813(q) of Title 12), the National Credit Union Administration, or any other Federal department or agency having a responsibility under Federal law to prescribe rules or regulations restricting transactions involving the loan or borrowing of securities in order to protect the safety and soundness of a financial institution or to protect the financial system from systemic risk.

Rules promulgated under subsection (b) that prohibit fraud, manipulation, or insider trading (but not rules imposing or specifying reporting or recordkeeping requirements, procedures, or standards as prophylactic measures against fraud, manipulation, or insider trading), and judicial precedents decided under subsection (b) and rules promulgated thereunder that prohibit fraud, manipulation, or insider trading, shall apply to security-based swap agreements to the same extent as they apply to securities. Judicial precedents decided under section 77q(a) of this title and sections 78i, 78o, 78p, 78t, and 78u-1 of this title, and judicial precedents decided under applicable rules promulgated under such sections, shall apply to security-based swap agreements to the same extent as they apply to securities.

**D.**     15 U.S.C. § 78u-4 provides:

**Private securities litigation**

(a) Private class actions

(1) In general

The provisions of this subsection shall apply in each private action arising under this chapter that is brought as a plaintiff class action pursuant to the Federal Rules of Civil Procedure.

(2) Certification filed with complaint

(A) In general

Each plaintiff seeking to serve as a representative party on behalf of a class shall provide a sworn certification, which shall be personally signed by such plaintiff and filed with the complaint, that--

(i) states that the plaintiff has reviewed the complaint and authorized its filing;

(ii) states that the plaintiff did not purchase the security that is the subject of the complaint at the direction of plaintiff's counsel or in order to participate in any private action arising under this chapter;

(iii) states that the plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary;

(iv) sets forth all of the transactions of the plaintiff in the security that is the subject of the complaint during the class period specified in the complaint;

(v) identifies any other action under this chapter, filed during the 3-year period preceding the date on which the certification is signed by the plaintiff, in which the plaintiff has sought to serve as a representative party on behalf of a class; and

(vi) states that the plaintiff will not accept any payment for serving as a representative party on behalf of a class beyond the plaintiff's pro rata share of any recovery, except as ordered or approved by the court in accordance with paragraph (4).

(B) Nonwaiver of attorney-client privilege

The certification filed pursuant to subparagraph (A) shall not be construed to be a waiver of the attorney-client privilege.

(3) Appointment of lead plaintiff

(A) Early notice to class members

(i) In general

Not later than 20 days after the date on which the complaint is filed, the plaintiff or plaintiffs shall cause to be published, in a widely circulated national business-oriented publication or wire service, a notice advising <u>members</u> of the purported plaintiff class--

(I) of the pendency of the action, the claims asserted therein, and the purported class period; and

(II) that, not later than 60 days after the date on which the notice is published, any member of the purported class may move the court to serve as lead plaintiff of the purported class.

(ii) Multiple actions

If more than one action on behalf of a class asserting substantially the same claim or claims arising under this chapter is filed, only the plaintiff or plaintiffs in the first filed action shall be required to cause notice to be published in accordance with clause (i).

(iii) Additional notices may be required under Federal rules

Notice required under clause (i) shall be in addition to any notice required pursuant to the Federal Rules of Civil Procedure.

(B) Appointment of lead plaintiff

(i) In general

Not later than 90 days after the date on which a notice is published under subparagraph (A)(i), the court shall consider any motion made by a purported class member in response to the notice, including any motion by a class member who is not individually named as a plaintiff in the complaint or complaints, and shall appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members (hereafter in this paragraph referred to as the "most adequate plaintiff") in accordance with this subparagraph.

(ii) Consolidated actions

If more than one action on behalf of a class asserting substantially the same claim or claims arising under this chapter has been filed, and any party has sought to consolidate those actions for pretrial purposes or for trial, the court shall not make the determination required by clause (i) until after the decision on the motion to consolidate is rendered. As soon as practicable after such decision is rendered, the court shall appoint the most adequate plaintiff as lead plaintiff for the consolidated actions in accordance with this paragraph.

(iii) Rebuttable presumption

(I) In general

Subject to subclause (II), for purposes of clause (i), the court shall adopt a presumption that the most adequate plaintiff in any private action arising under this chapter is the person or group of persons that--

(aa) has either filed the complaint or made a motion in response to a notice under subparagraph (A)(i);

(bb) in the determination of the court, has the largest financial interest in the relief sought by the class; and

(cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.

(II) Rebuttal evidence

The presumption described in subclause (I) may be rebutted only upon proof by a member of the purported plaintiff class that the presumptively most adequate plaintiff--

(aa) will not fairly and adequately protect the interests of the class; or

(bb) is subject to unique defenses that render such plaintiff incapable of adequately representing the class.

(iv) Discovery

For purposes of this subparagraph, discovery relating to whether a member or members of the purported plaintiff class is the most adequate plaintiff may be conducted by a plaintiff only if the plaintiff first demonstrates a reasonable basis for a finding that the presumptively most adequate plaintiff is incapable of adequately representing the class.

(v) Selection of lead counsel

The most adequate plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class.

(vi) Restrictions on professional plaintiffs

Except as the court may otherwise permit, consistent with the purposes of this section, a person may be a lead plaintiff, or an officer, director, or fiduciary of a lead plaintiff, in no more than 5 securities class actions brought as plaintiff class actions

pursuant to the Federal Rules of Civil Procedure during any 3-year period.

(4) Recovery by plaintiffs

The share of any final judgment or of any settlement that is awarded to a representative party serving on behalf of a class shall be equal, on a per share basis, to the portion of the final judgment or settlement awarded to all other members of the class. Nothing in this paragraph shall be construed to limit the award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class to any representative party serving on behalf of a class.

(5) Restrictions on settlements under seal

The terms and provisions of any settlement agreement of a class action shall not be filed under seal, except that on motion of any party to the settlement, the court may order filing under seal for those portions of a settlement agreement as to which good cause is shown for such filing under seal. For purposes of this paragraph, good cause shall exist only if publication of a term or provision of a settlement agreement would cause direct and substantial harm to any party.

(6) Restrictions on payment of attorneys' fees and expenses

Total attorneys' fees and expenses awarded by the court to counsel for the plaintiff class shall not exceed a reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class.

(7) Disclosure of settlement terms to class members

Any proposed or final settlement agreement that is published or otherwise disseminated to the class shall include each of the following statements, along with a cover page summarizing the information contained in such statements:

(A) Statement of plaintiff recovery

The amount of the settlement proposed to be distributed to the parties to the action, determined in the aggregate and on an average per share basis.

13a

(B) Statement of potential outcome of case

    (i) Agreement on amount of damages

        If the settling parties agree on the average amount of damages per share that would be recoverable if the plaintiff prevailed on each claim alleged under this chapter, a statement concerning the average amount of such potential damages per share.

    (ii) Disagreement on amount of damages

        If the parties do not agree on the average amount of damages per share that would be recoverable if the plaintiff prevailed on each claim alleged under this chapter, a statement from each settling party concerning the issue or issues on which the parties disagree.

    (iii) Inadmissibility for certain purposes

        A statement made in accordance with clause (i) or (ii) concerning the amount of damages shall not be admissible in any Federal or State judicial action or administrative proceeding, other than an action or proceeding arising out of such statement.

(C) Statement of attorneys' fees or costs sought

If any of the settling parties or their counsel intend to apply to the court for an award of attorneys' fees or costs from any fund established as part of the settlement, a statement indicating which parties or counsel intend to make such an application, the amount of fees and costs that will be sought (including the amount of such fees and costs determined on an average per share basis), and a brief explanation supporting the fees and costs sought. Such information shall be clearly summarized on the cover page of any notice to a party of any proposed or final settlement agreement.

(D) Identification of lawyers' representatives

The name, telephone number, and address of one or more representatives of counsel for the plaintiff class who will be

reasonably available to answer questions from class members concerning any matter contained in any notice of settlement published or otherwise disseminated to the class.

(E) Reasons for settlement

A brief statement explaining the reasons why the parties are proposing the settlement.

(F) Other information

Such other information as may be required by the court.

(8) Security for payment of costs in class actions

In any private action arising under this chapter that is certified as a class action pursuant to the Federal Rules of Civil Procedure, the court may require an undertaking from the attorneys for the plaintiff class, the plaintiff class, or both, or from the attorneys for the defendant, the defendant, or both, in such proportions and at such times as the court determines are just and equitable, for the payment of fees and expenses that may be awarded under this subsection.

(9) Attorney conflict of interest

If a plaintiff class is represented by an attorney who directly owns or otherwise has a beneficial interest in the securities that are the subject of the litigation, the court shall make a determination of whether such ownership or other interest constitutes a conflict of interest sufficient to disqualify the attorney from representing the plaintiff class.

(b) Requirements for securities fraud actions

(1) Misleading statements and omissions

In any private action arising under this chapter in which the plaintiff alleges that the defendant--

(A) made an untrue statement of a material fact; or

(B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading;

(C) the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

(2) Required state of mind

(A) In general

Except as provided in subparagraph (B), in any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

(B) Exception

In the case of an action for money damages brought against a credit rating agency or a controlling person under this chapter, it shall be sufficient, for purposes of pleading any required state of mind in relation to such action, that the complaint state with particularity facts giving rise to a strong inference that the credit rating agency knowingly or recklessly failed--

(i) to conduct a reasonable investigation of the rated security with respect to the factual elements relied upon by its own methodology for evaluating credit risk; or

(ii) to obtain reasonable verification of such factual elements (which verification may be based on a sampling technique that does not amount to an audit) from other sources that the credit

rating agency considered to be competent and that were independent of the issuer and underwriter.

(3) Motion to dismiss; stay of discovery

(A) Dismissal for failure to meet pleading requirements

In any private action arising under this chapter, the court shall, on the motion of any defendant, dismiss the complaint if the requirements of paragraphs (1) and (2) are not met.

(B) Stay of discovery

In any private action arising under this chapter, all discovery and other proceedings shall be stayed during the pendency of any motion to dismiss, unless the court finds upon the motion of any party that particularized discovery is necessary to preserve evidence or to prevent undue prejudice to that party.

(C) Preservation of evidence

(i) In general

During the pendency of any stay of discovery pursuant to this paragraph, unless otherwise ordered by the court, any party to the action with actual notice of the allegations contained in the complaint shall treat all documents, data compilations (including electronically recorded or stored data), and tangible objects that are in the custody or control of such person and that are relevant to the allegations, as if they were the subject of a continuing request for production of documents from an opposing party under the Federal Rules of Civil Procedure.

(ii) Sanction for willful violation

A party aggrieved by the willful failure of an opposing party to comply with clause (i) may apply to the court for an order awarding appropriate sanctions.

(D) Circumvention of stay of discovery

Upon a proper showing, a court may stay discovery proceedings in any private action in a State court, as necessary in aid of its jurisdiction, or to protect or effectuate its judgments, in an action subject to a stay of discovery pursuant to this paragraph.

(4) Loss causation

In any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages.

(c) Sanctions for abusive litigation

(1) Mandatory review by court

In any private action arising under this chapter, upon final adjudication of the action, the court shall include in the record specific findings regarding compliance by each party and each attorney representing any party with each requirement of Rule 11(b) of the Federal Rules of Civil Procedure as to any complaint, responsive pleading, or dispositive motion.

(2) Mandatory sanctions

If the court makes a finding under paragraph (1) that a party or attorney violated any requirement of Rule 11(b) of the Federal Rules of Civil Procedure as to any complaint, responsive pleading, or dispositive motion, the court shall impose sanctions on such party or attorney in accordance with Rule 11 of the Federal Rules of Civil Procedure. Prior to making a finding that any party or attorney has violated Rule 11 of the Federal Rules of Civil Procedure, the court shall give such party or attorney notice and an opportunity to respond.

(3) Presumption in favor of attorneys' fees and costs

(A) In general

18a

Subject to subparagraphs (B) and (C), for purposes of paragraph (2), the court shall adopt a presumption that the appropriate sanction--

(i) for failure of any responsive pleading or dispositive motion to comply with any requirement of Rule 11(b) of the Federal Rules of Civil Procedure is an award to the opposing party of the reasonable attorneys' fees and other expenses incurred as a direct result of the violation; and

(ii) for substantial failure of any complaint to comply with any requirement of Rule 11(b) of the Federal Rules of Civil Procedure is an award to the opposing party of the reasonable attorneys' fees and other expenses incurred in the action.

(B) Rebuttal evidence

The presumption described in subparagraph (A) may be rebutted only upon proof by the party or attorney against whom sanctions are to be imposed that--

(i) the award of attorneys' fees and other expenses will impose an unreasonable burden on that party or attorney and would be unjust, and the failure to make such an award would not impose a greater burden on the party in whose favor sanctions are to be imposed; or

(ii) the violation of Rule 11(b) of the Federal Rules of Civil Procedure was de minimis.

(C) Sanctions

If the party or attorney against whom sanctions are to be imposed meets its burden under subparagraph (B), the court shall award the sanctions that the court deems appropriate pursuant to Rule 11 of the Federal Rules of Civil Procedure.

(d) Defendant's right to written interrogatories

In any private action arising under this chapter in which the plaintiff may recover money damages, the court shall, when requested by a defendant,

submit to the jury a written interrogatory on the issue of each such defendant's state of mind at the time the alleged violation occurred.

(e) Limitation on damages

(1) In general

Except as provided in paragraph (2), in any private action arising under this chapter in which the plaintiff seeks to establish damages by reference to the market price of a security, the award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market.

(2) Exception

In any private action arising under this chapter in which the plaintiff seeks to establish damages by reference to the market price of a security, if the plaintiff sells or repurchases the subject security prior to the expiration of the 90-day period described in paragraph (1), the plaintiff's damages shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the security and the mean trading price of the security during the period beginning immediately after dissemination of information correcting the misstatement or omission and ending on the date on which the plaintiff sells or repurchases the security.

(3) "Mean trading price" defined

For purposes of this subsection, the "mean trading price" of a security shall be an average of the daily trading price of that security, determined as of the close of the market each day during the 90-day period referred to in paragraph (1).

(f) Proportionate liability

(1) Applicability

Nothing in this subsection shall be construed to create, affect, or in any manner modify, the standard for liability associated with any action arising under the securities laws.

(2) Liability for damages

(A) Joint and several liability

Any covered person against whom a final judgment is entered in a private action shall be liable for damages jointly and severally only if the trier of fact specifically determines that such covered person knowingly committed a violation of the securities laws.

(B) Proportionate liability

(i) In general

Except as provided in subparagraph (A), a covered person against whom a final judgment is entered in a private action shall be liable solely for the portion of the judgment that corresponds to the percentage of responsibility of that covered person, as determined under paragraph (3).

(ii) Recovery by and costs of covered person

In any case in which a contractual relationship permits, a covered person that prevails in any private action may recover the attorney's fees and costs of that covered person in connection with the action.

(3) Determination of responsibility

(A) In general

In any private action, the court shall instruct the jury to answer special interrogatories, or if there is no jury, shall make findings, with respect to each covered person and each of the other persons claimed by any of the parties to have caused or contributed to the loss

incurred by the plaintiff, including persons who have entered into settlements with the plaintiff or plaintiffs, concerning--

（i) whether such person violated the securities laws;

（ii) the percentage of responsibility of such person, measured as a percentage of the total fault of all persons who caused or contributed to the loss incurred by the plaintiff; and

（iii) whether such person knowingly committed a violation of the securities laws.

(B) Contents of special interrogatories or findings

The responses to interrogatories, or findings, as appropriate, under subparagraph (A) shall specify the total amount of damages that the plaintiff is entitled to recover and the percentage of responsibility of each covered person found to have caused or contributed to the loss incurred by the plaintiff or plaintiffs.

(C) Factors for consideration

In determining the percentage of responsibility under this paragraph, the trier of fact shall consider--

（i) the nature of the conduct of each covered person found to have caused or contributed to the loss incurred by the plaintiff or plaintiffs; and

（ii) the nature and extent of the causal relationship between the conduct of each such person and the damages incurred by the plaintiff or plaintiffs.

(4) Uncollectible share

(A) In general

Notwithstanding paragraph (2)(B), upon1 motion made not later than 6 months after a final judgment is entered in any private action, the court determines that all or part of the share of the judgment of the covered person is not collectible against that covered person, and is

also not collectible against a covered person described in paragraph (2)(A), each covered person described in paragraph (2)(B) shall be liable for the uncollectible share as follows:

(i) Percentage of net worth

Each covered person shall be jointly and severally liable for the uncollectible share if the plaintiff establishes that--

(I) the plaintiff is an individual whose recoverable damages under the final judgment are equal to more than 10 percent of the net worth of the plaintiff; and

(II) the net worth of the plaintiff is equal to less than $200,000.

(ii) Other plaintiffs

With respect to any plaintiff not described in subclauses (I) and (II) of clause (i), each covered person shall be liable for the uncollectible share in proportion to the percentage of responsibility of that covered person, except that the total liability of a covered person under this clause may not exceed 50 percent of the proportionate share of that covered person, as determined under paragraph (3)(B).

(iii) Net worth

For purposes of this subparagraph, net worth shall be determined as of the date immediately preceding the date of the purchase or sale (as applicable) by the plaintiff of the security that is the subject of the action, and shall be equal to the fair market value of assets, minus liabilities, including the net value of the investments of the plaintiff in real and personal property (including personal residences).

(B) Overall limit

In no case shall the total payments required pursuant to subparagraph (A) exceed the amount of the uncollectible share.

(C) Covered persons subject to contribution

A covered person against whom judgment is not collectible shall be subject to contribution and to any continuing liability to the plaintiff on the judgment.

(5) Right of contribution

To the extent that a covered person is required to make an additional payment pursuant to paragraph (4), that covered person may recover contribution--

(A) from the covered person originally liable to make the payment;

(B) from any covered person liable jointly and severally pursuant to paragraph (2)(A);

(C) from any covered person held proportionately liable pursuant to this paragraph who is liable to make the same payment and has paid less than his or her proportionate share of that payment; or

(D) from any other person responsible for the conduct giving rise to the payment that would have been liable to make the same payment.

(6) Nondisclosure to jury

The standard for allocation of damages under paragraphs (2) and (3) and the procedure for reallocation of uncollectible shares under paragraph (4) shall not be disclosed to members of the jury.

(7) Settlement discharge

(A) In general

A covered person who settles any private action at any time before final verdict or judgment shall be discharged from all claims for contribution brought by other persons. Upon entry of the settlement by the court, the court shall enter a bar order constituting the final discharge of all obligations to the plaintiff of the settling covered person arising out of the action. The order shall bar all future claims for contribution arising out of the action--

24a

(i) by any person against the settling covered person; and

(ii) by the settling covered person against any person, other than a person whose liability has been extinguished by the settlement of the settling covered person.

(B) Reduction

If a covered person enters into a settlement with the plaintiff prior to final verdict or judgment, the verdict or judgment shall be reduced by the greater of--

(i) an amount that corresponds to the percentage of responsibility of that covered person; or

(ii) the amount paid to the plaintiff by that covered person.

(8) Contribution

A covered person who becomes jointly and severally liable for damages in any private action may recover contribution from any other person who, if joined in the original action, would have been liable for the same damages. A claim for contribution shall be determined based on the percentage of responsibility of the claimant and of each person against whom a claim for contribution is made.

(9) Statute of limitations for contribution

In any private action determining liability, an action for contribution shall be brought not later than 6 months after the entry of a final, nonappealable judgment in the action, except that an action for contribution brought by a covered person who was required to make an additional payment pursuant to paragraph (4) may be brought not later than 6 months after the date on which such payment was made.

(10) Definitions

For purposes of this subsection--

(A) a covered person "knowingly commits a violation of the securities laws"

(i) with respect to an action that is based on an untrue statement of material fact or omission of a material fact necessary to make the statement not misleading, if--

(I) that covered person makes an untrue statement of a material fact, with actual knowledge that the representation is false, or omits to state a fact necessary in order to make the statement made not misleading, with actual knowledge that, as a result of the omission, one of the material representations of the covered person is false; and

(II) persons are likely to reasonably rely on that misrepresentation or omission; and

(ii) with respect to an action that is based on any conduct that is not described in clause (i), if that covered person engages in that conduct with actual knowledge of the facts and circumstances that make the conduct of that covered person a violation of the securities laws;

(B) reckless conduct by a covered person shall not be construed to constitute a knowing commission of a violation of the securities laws by that covered person;

(C) the term "covered person" means--

(i)  a defendant in any private action arising under this chapter; or

(ii) a defendant in any private action arising under section 77k of this title, who is an outside director of the issuer of the securities that are the subject of the action; and

(D) the term "outside director" shall have the meaning given such term by rule or regulation of the Commission.

**E.**    17 C.F.R. § 240.10b-5 provides:

**Employment of manipulative and deceptive devices.**

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

(d) in connection with the purchase or sale of any security.