## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

DIANE OWENS, et al.,

*Plaintiffs-Appellees*,

vs.

FIRSTENERGY CORP., et al.,

*Defendants-Appellants*.

_____

Appeal from the United States District Court
for the Southern District of Ohio
Nos. 20-cv-3785, 20-cv-4287
The Honorable Algenon L. Marbley

## PLAINTIFFS-APPELLEES' ANSWERING BRIEF

| | |
|---|---|
| MURRAY MURPHY MOUL<br>  + BASIL LLP<br>JOSEPH F. MURRAY<br>BRIAN K. MURPHY<br>1114 Dublin Road<br>Columbus, OH 43215<br>Telephone: 614/488-0400<br>614/488-0401 (fax) | ROBBINS GELLER RUDMAN<br>  & DOWD LLP<br>DARREN J. ROBBINS<br>MARK SOLOMON<br>TOR GRONBORG<br>JASON A. FORGE<br>JOSEPH D. DALEY<br>HILLARY B. STAKEM<br>655 West Broadway, Suite 1900<br>San Diego, CA 92101<br>Telephone: 619/231-1058<br>619/231-7423 (fax) |

*Attorneys for Plaintiffs-Appellees*

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 23-3940, 23-3943, 23-3945, 23-3946, 23-3947    Case Name: Diane Owens, et al. v. FirstEnergy Corporation, et al.

Name of counsel: Jason A. Forge

Pursuant to 6th Cir. R. 26.1, Lead Plaintiff Los Angeles County Employees Retirement Association and Plaintiffs Amalgamated Bank, City of Irving Supplemental Benefit Plan, and Wisconsin Laborers' Pension Fund

*Name of Party*

makes the following disclosure:

1.  Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

    No.

2.  Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

    No.

## CERTIFICATE OF SERVICE

I certify that on _____March 11, 2024_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Jason A. Forge

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

# TABLE OF CONTENTS

**Page**

I.  ORAL ARGUMENT STATEMENT ...............................................................1

II.  INTRODUCTION ........................................................................................1

III.  STATEMENT OF THE ISSUES .................................................................2

IV.  STATEMENT OF THE CASE ....................................................................2

    A.  The underlying facts and allegations.....................................................2

    B.  Class certification litigation. ...............................................................12

        1.  Plaintiffs' motion. ....................................................................12

            a.  Plaintiffs highlight Defendants' actionable omissions and "scheme" liability. ...................................12

            b.  Plaintiffs set forth standard classwide damages methodologies supported by several expert reports. ......13

        2.  Defendants' opposition. ............................................................15

        3.  Plaintiffs' reply. ......................................................................19

        4.  Defendants switch counsel for the oral argument....................21

            a.  Lengthy discussion of *Affiliated Ute* and confirmed concession regarding *Basic*. ...........................21

            b.  Extended colloquy concerning damages methodologies.................................................................22

        5.  District Court's class certification order. .................................24

            a.  Certification of liability issues.......................................24

            b.  Certification of damages issues. ....................................26

- i -

V.      SUMMARY OF ARGUMENT ................................................................26

VI.     STANDARD OF REVIEW ...............................................................29

VII.    ARGUMENT .......................................................................................30

        A.      The district court properly found the *Affiliated Ute* presumption
                of reliance here. ..................................................................30

                1.      *Affiliated Ute*. ........................................................31

                2.      This Court has unequivocally applied the *Affiliated Ute*
                        presumption to statements that are rendered misleading
                        by omission. ...............................................................33

                3.      *Affiliated Ute* and *Rubin* confirm the *Affiliated Ute*
                        presumption's direct application here. .........................35

        B.      Defendants waived their specific arguments against the
                presumption of reliance here. ...............................................39

                1.      Defendants waived any arguments concerning Plaintiffs'
                        Rule 10b-5(a) and (c) claims. ......................................40

                2.      Defendants waived their new and contradictory Rule
                        10b-5(b) argument. .....................................................45

                3.      Defendants conceded application of the *Basic*
                        presumption for common stock and have dropped their
                        argument regarding the notes. ......................................48

        C.      The record supports class certification for damages. ............50

                1.      The district court was not required to dissect every
                        argument and counterargument concerning Plaintiffs'
                        damages methodology. ................................................50

- ii -

2.      This Court may affirm the district court's order on any grounds supported by the record...............................................52

3.      This Court may also affirm class certification with a limited remand. .........................................................................56

VIII.   CONCLUSION.................................................................................58

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Abell v. Potomac Ins. Co.*,
  858 F.2d 1104 (5th Cir. 1988) ...........................................................................36

*Affiliated Ute Citizens of Utah v. United States*,
  406 U.S. 128 (1972)..................................................................................*passim*

*Bard v. Brown Cnty.*,
  970 F.3d 738 (6th Cir. 2020) ............................................................................40

*Basic v. Levinson*,
  485 U.S. 224 (1988)..................................................................................*passim*

*Berera v. Mesa Med. Grp., PLLC*,
  779 F.3d 352 (6th Cir. 2015) ............................................................................40

*Brooms v. Regal Tube Co.*,
  881 F.2d 412 (7th Cir. 1989) ............................................................................51

*Brown v. Tidwell*,
  169 F.3d 330 (6th Cir. 1999) ............................................................................52

*Chasins v. Smith, Barney & Co.*,
  438 F.2d 1167 (2d Cir. 1970) ...........................................................................38

*City of Columbus v. Hotels.com, L.P.*,
  693 F.3d 642 (6th Cir. 2012) ...............................................................39, 46, 49

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013)....................................................................................*passim*

*Dixon v. Clem*,
  492 F.3d 665 (6th Cir. 2007) ............................................................................52

*Dodona I, LLC v. Goldman, Sachs & Co.*,
  296 F.R.D. 261 (S.D.N.Y. 2014) ................................................................25, 49

4893-5731-7036.v1

*Dougherty v. Esperion Therapeutics, Inc.*,
  2020 WL 6793326 (E.D. Mich. Nov. 19, 2020).................................54

*Gen. Med., P.C. v. Morning View Care Ctrs.*,
  253 F. App'x 586 (6th Cir. 2007) ....................................39, 47

*Gen. Tel. Co. of Sw. v. Falcon*,
  457 U.S. 147 (1982).................................................57

*Goldman Sachs Group, Inc. v. Ark. Tchr. Ret. Sys.*,
  594 U.S. 113 (2021).................................................49

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014).................................................15

*Harris v. Bozzuto Grp.*,
  821 F. App'x 137 (3d Cir. 2020) ....................................51

*Helwig v. Vencor, Inc.*,
  251 F.3d 540 (6th Cir. 2001) (*en banc*), *abrogated on other grounds
  by Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308 (2007).............33, 36

*Hoxworth v. Blinder, Robinson & Co.*,
  903 F.2d 186 (3d Cir. 1990) ........................................25

*In re BancorpSouth, Inc.*,
  2017 WL 4125647 (6th Cir. Sept. 18, 2017) .........................39

*In re BP p.l.c. Sec. Litig.*,
  2014 WL 2112823 (S.D. Tex. May 20, 2014), *aff'd sub nom. Ludlow*,
  800 F.3d 674 ......................................................53

*In re Dow Corning Corp.*,
  280 F.3d 648 (6th Cir. 2002) .......................................57

*In re FirstEnergy Corp.*,
  2022 WL 681320 ....................................................25

4893-5731-7036.v1

*In re Ford Motor Co.*,
86 F.4th 723 (6th Cir. 2023) ..........................................................51, 52

*In re Interbank*,
629 F.3d at 219-20 .........................................................................25

*In re Scrap Metal Antitrust Litig.*,
527 F.3d 517 (6th Cir. 2008) ..........................................................55

*In re VHS of Mich., Inc.*,
601 F. App'x 342 (6th Cir. 2015) ........................................20, 52, 53

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*,
2 F.4th 1199 (9th Cir. 2021) ...........................................................22

*In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*,
722 F.3d 838 (6th Cir. 2013) ..........................................30, 51, 52, 56

*Keys v. Dart Container Corp. of Ky.*,
2012 WL 2681461 (W.D. Ky. July 6, 2012) ...............................40, 47

*Lexion Med., LLC v. Northgate Techs., Inc.*,
641 F.3d 1352 (Fed. Cir. 2011) .......................................................51

*Lorenzo v. Sec. & Exch. Comm'n*,
587 U.S.__, 139 S. Ct. 1094 (2019).................................................44

*Ludlow v. BP, P.L.C.*,
800 F. 3d 674 (5th Cir. 2015) .........................................................53

*Marks v. Newcourt Credit Grp., Inc.*,
342 F.3d 444 (6th Cir. 2003), *superseded on other grounds by regulation*,
29 C.F.R. §2560.503-1(l).........................................................40, 49

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*,
547 U.S. 71 (2006)........................................................................44

*Olden v. Lafarge Corp.*,
    383 F.3d 495 (6th Cir. 2004) ...........................................................55

*Reithmiller v. Blue Cross & Blue Shield of Mich.*,
    824 F.2d 510 (6th Cir. 1987) ...................................................39, 47

*Rikos v. Procter & Gamble Co.*,
    799 F.3d 497 (6th Cir. 2015) ...........................................................54

*Robert N. Clemens Tr. v. Morgan Stanley DW, Inc.*,
    485 F.3d 840 (6th Cir. 2007) ...........................................................42

*Rubin v. Schottenstein, Zox & Dunn*,
    143 F.3d 263 (6th Cir. 1998) (*en banc*) .....................................*passim*

*Scottsdale Ins. Co. v. Flowers*,
    513 F.3d 546 (6th Cir. 2008) ...................................................39, 49

*Thaddeus–X v. Blatter*,
    175 F.3d 378 (6th Cir. 1999) (*en banc*) ...........................................40

*United States v. Medina-Nevarez*,
    282 F. App'x 517 (9th Cir. 2008) ....................................................51

*W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*,
    325 F.R.D. 280 (D. Minn. 2018) ......................................................12

*Weiner v. Tivity Health, Inc.*,
    334 F.R.D. 123 (M.D. Tenn. 2020) ..................................................54

*Zehentbauer Fam. Land, LP v. Chesapeake Expl., L.L.C.*,
    935 F.3d 496 (6th Cir. 2019) ...........................................................53

## STATUTES, RULES, AND REGULATIONS

15 U.S.C.
    §78j(b) ............................................................................................44

Federal Rules of Civil Procedure
    Rule 23 ..................................................................................................57
    Rule 23(b)(3)..............................................................19, 55, 56, 57
    Rule 23(b)(c)(1)(C).............................................................................57
    Rule 23(f) ............................................................................................39

17 C.F. R.
    §240.10b-5 ...............................................................................*passim*

## SECONDARY AUTHORITIES

John Campbell, et al., *The Econometrics of Financial Markets* (1997)
    Chapter 4 ............................................................................................15

# I.  ORAL ARGUMENT STATEMENT

Pursuant to Sixth Circuit Rule 34(a), Plaintiffs hereby request oral argument. Defendants' shifting arguments may shift again with their reply brief and Plaintiffs respectfully submit that oral argument would assist the Court in determining which, if any, of Defendants' arguments were raised in their opposition below.

# II.  INTRODUCTION

With their opening brief ("OB"), Defendants betray telltale signs of an unmeritorious appeal: they ignore and contradict on-point binding precedent and their own prior arguments, raise arguments never briefed to the district court, disregard the Complaint's specific allegations and their own admissions, and attempt to rewrite SEC Rule 10b-5.  But most of all, Defendants' brief deploys a flurry of rhetorical contortions that collapse far short of reaching its implausible goal: convincing this Court to abandon the purpose of our securities laws by finding that Defendants could not have defrauded FirstEnergy's investors, despite confessing to orchestrating a massive corruption conspiracy that secretly drove an otherwise public solution to the company's "top priority" and was so directly tied to FirstEnergy's stock price that its CEO sent a "Thank you!!" text message to one of the public officials FirstEnergy had bribed, along with a screenshot showing FirstEnergy's rising stock price.

## III. STATEMENT OF THE ISSUES

Defendants' appeal presents two questions.

1. Whether the district court abused its discretion where it applied the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153-54 (1972), just as directed by this Court in *Rubin v. Schottenstein, Zox & Dunn*, 143 F.3d 263 (6th Cir. 1998) (*en banc*), and Defendants' only arguments against application of *Affiliated Ute* are arguments they failed to include in their opposition to class certification filed in the district court.

2. Whether the district court abused its discretion by certifying an Exchange Act damages class after Plaintiffs presented a single commonly used methodology for calculating such damages on a classwide basis.

## IV. STATEMENT OF THE CASE

### A. The underlying facts and allegations.

Defendants contend that "this is a case about what FirstEnergy actually *said* to investors." OB at 2 (emphasis in original).[1] That could not be more wrong. This case, as expressly alleged, is about what FirstEnergy *did* and what it *did not say* to investors about what it was doing. Specifically, FirstEnergy has confessed that throughout the Class Period, it and its most senior executives (CEO Charles Jones

---

[1] Throughout this brief emphasis is added and internal citations omitted unless otherwise indicated, excepting citations to the DPA, for which all emphases are in the original.

and Senior Vice President of External Affairs Michael J. Dowling) orchestrated one of the largest corruption conspiracies in U.S. history.[2] Complaint, R.72, PageID#1547/¶3; Deferred Prosecution Agreement ("DPA"), R.259-5/Ex.B, PageID#6015-16; Status Report Transcript, R.438-1, Ex. 17/54:18-55:20, PageID#10007. This confessed criminal conspiracy was the underpinning of a fraudulent scheme and course of business to deceive investors and the market about FirstEnergy's solution to what CEO Jones had declared to investors was FirstEnergy's "top priority": "the preservation of our two nuclear plants in the state and legislation for a zero emission nuclear program." Complaint, R.72, PageID#1580/¶103; DPA, R.259-5/Ex.B, PageID#6018. FirstEnergy has confessed to bribing Larry Householder, who used FirstEnergy's money to get elected as Ohio's Speaker of the House (and has since been convicted and sentenced to 20 years' imprisonment for his role in FirstEnergy's conspiracy) and Samuel Randazzo, whom FirstEnergy corruptly helped get appointed Chairman of the Public Utilities Commission of Ohio ("PUCO") (and is presently under two indictments for his role

---

[2]     Jones and Dowling are currently under indictment for their roles in FirstEnergy's confessed corruption. https://apnews.com/article/ohio-bribery-firstenergy-jones-dowling-randazzo-5aea395d6e3e28d3dc69f61044068e85.

4893-5731-7036.v1

in FirstEnergy's conspiracy).[3] DPA, R.259-5/Ex.B, PageID#6019-29, PageID#6033-42.

For over two years, FirstEnergy spent nearly every earnings call reassuring investors that it was working on its "top priority" without ever mentioning a word about *how* it was pursuing the requisite legislative bailout. Complaint, R.72, PageID#1566/¶66, PageID#1580/¶103, PageID#1586-87/¶¶114-119, PageID#1588-89/¶¶121-125, PageID#1590/¶127. FirstEnergy's secondary priority concerned a "rate distribution case scheduled for 2024, [which it believed] would result in decreased revenue and negatively impact FirstEnergy Corp.'s financial outlook." DPA, R.259-5/Ex.B, PageID#6017. Financial analysts were keenly aware of the imminent rate case, which was negatively impacting FirstEnergy's share price, and FirstEnergy was determined to use its criminal conspiracy to "'*fix ... the Ohio hole*.'" DPA, R.259-5/Ex.B, PageID#6017. "For example, on November 5, 2019, [Jones] texted to [Dowling] an article published that day, in which Morgan Stanley projected low growth for FirstEnergy Corp. because of '*a rate case review in 2024*.' In his note accompanying the article, [Jones] told [Dowling], '*Here's the MS down grade due to the "Ohio hole*.'"" DPA, R.259-5/Ex.B, 6040. The Complaint refers

---

[3]    https://apnews.com/article/bribery-investigation-ohio-speaker-householder-sentenced-7ff5163a7d1fdbbfe6570ed34c7a7f67; https://apnews.com/article/ohio-bribery-firstenergy-jones-dowling-randazzo-5aea395d6e3e28d3dc69f61044068e85.

to FirstEnergy's overarching scheme to defraud investors by corruptly bailing out its failing nuclear plants and fixing the "Ohio hole" as the "Bailout Scheme." Complaint, R.72, PageID#1548/¶6, PageID#1574-76/¶¶93-94.

Upon obtaining this legislative bailout, known as "House Bill 6" or "HB6," FirstEnergy boasted to investors that HB6 "takes about 1/3 of our company and [it] makes it somewhat recession-proof." Complaint, R.72, PageID#1592/¶132. Thereafter, FirstEnergy continued to use its new-found stability as a marketing tool for investors: "I'd like to reiterate FirstEnergy's overall value proposition .... FirstEnergy is a low-risk, fully regulated, stable and predictable wires utility that spans 5 states." Complaint, R.72, PageID#1592/¶134. Jones even told investors how much FirstEnergy appreciated Householder's and Randazzo's help in getting HB6 enacted. Complaint, R.72, PageID#1590-91/¶129.

All these statements—FirstEnergy's pursuit of a legislative solution, the financial benefits to FirstEnergy and stability from HB6, and FirstEnergy's appreciation for Householder's and Randazzo's help in delivering the HB6 legislative solution—were literally true. Yet, they were also terribly misleading, as all these truthful assurances omitted how FirstEnergy was pursuing this legislation, how FirstEnergy achieved these financial benefits, and how FirstEnergy obtained Householder's and Randazzo's help: through a massive multi-million-dollar

corruption scheme. Complaint, R.72, PageID#1547/¶¶3-4, PageID#1632/¶237;

DPA, R.259-5/Ex.B, PageID#6015-16. As FirstEnergy has confessed:

> Between 2017 and March 2020, FirstEnergy Service paid more than $59 million ($16,904,330.86 attributed to FirstEnergy Corp. and $43,092,505 attributed to FES[4]) to Generation Now—a purported 501(c)(4), which FirstEnergy Corp. knew was operated for the benefit of and controlled by [Householder], upon its inception in early 2017. For example, on March 7, 2017, [Jeff Longstreth (another confessed coconspirator)] emailed wiring instructions for Generation Now to [Dowling], noting that "*[t]his is the organization that [Jones] and [Householder] discussed.*" In response, [Dowling] forwarded the email internally, and carbon copied [Longstreth], stating, "*Let's do $250,000 asap and we will do $1M by year-end 2017.*" Similarly, on August 1, 2017, [Dowling] asked, "*Are we at $500k for the c(4) now?*" to which [Longstreth] replied, "*Yes.*"

DPA, R.259-5/Ex.B, PageID#6015.

Preventing investors from learning about the millions of dollars FirstEnergy was pouring into its criminal conspiracy was a central part of FirstEnergy's deception:

> [As Dowling] had outlined in an internal presentation, explaining that 2017 political contributions are "*strictly money spent to influence issues of key importance to FirstEnergy in 2017, such as saving our baseload generation*" and that FirstEnergy Corp.'s "*preferred manner of giving is through section 501(c) groups, as these are considered 'dark money' because they are not required to disclose where the donations come from.*" The presentation noted *that* "*the bulk of our contribution decisions are to c(4)s.*"

---

[4] "FES" was FirstEnergy's wholly owned subsidiary, FirstEnergy Solutions Corp. Complaint, R.72, PageID#1551/¶17.

4893-5731-7036.v1

DPA, R.259-5/Ex.B, PageID#6020.  For example, Jones and Dowling spent months forming and using 501(c)(4) entities to move money around, including arranging the first bribe payment Householder accepted directly:

> [Jones] texted [Dowling], "*FES meeting with [Householder] today. I told him to be nice but listen to us.*"  [Dowling] replied, "He'll learn about the $400k at this mtg."  [Jones] then responded, "*They better get it done quick or he won't be able to spend it.*"  Following the meeting, [Householder] thanked [Jones] via text for the money from FES, stating, "*$400k ... thank you.*"

DPA, R.259-5/Ex.B, PageID#6022-23.  A few months later, when FirstEnergy got Householder elected Speaker of the House, FirstEnergy privately celebrated this major milestone for its fraudulent scheme and course of business, but kept investors in the dark as to its prominent role in getting Householder elected: "[Householder] texted [Jones]: '*[t]hank you for everything it was historical.*'"  DPA, R.259-5/Ex.B, PageID#6024.

Similarly, after FirstEnergy succeeded in getting HB6 enacted, its statements to investors, while literally true, revealed none of the corruption that dripped from its private celebrations of HB6's passage:

> [Dowling]:  *Boom! Congrats. This doesn't happen without ceo leadership.*

> [Dowling]: [Image of House vote]

> [Jones]:  *We made a bbiiiiiiig bet and it paid off.  Actually, 2 big bets. Congrats to you and the entire team!  See if [name] has any Pappy and we'll all head to Columbus tonight.*

[Dowling]: *Huge bet and we played it all right on the budget and HB 6—so we can go back for more!*

[Dowling]: *No party tonight. We are going to plan one with the Speaker later.*

[Dowling]: *You should call the Speaker today.*

[Jones]: *Already texted him…*

DPA, R.259-5/Ex.B, PageID#6029. Likewise, about a week after HB6 passed:

[Jones] sent to [Randazzo] a photo-shopped image of Mount Rushmore with the face of [Randazzo], alongside [Dowling], Ohio Director of State Affairs, and [Matt Evans], imposed over the four presidential faces with the caption, "*HB 6 FUCK ANYBODY WHO AINT US.*" [Randazzo] commented that his picture was smaller than the others and then responded, "*funny.*"

DPA, R.259-5/Ex.B, PageID#6040. Of course, FirstEnergy's investors were among the "anybod[ies] who aint us."

A few months later, after FirstEnergy and Householder had turned back a referendum effort to repeal HB6 (DPA, R.259-5/Ex.B, PageID#6025-26, PageID#6029-31), Jones and Householder began discussing an initiative to extend Ohio's term limits. DPA, R.259-5/Ex.B, PageID#6032-33. By this point, FirstEnergy's purchase of Householder had become a laughing matter internally, while remaining completely concealed from investors:

[Jones]: *…. Talked to Speaker today. He's an expensive friend* 😂

[Tony George]: *I did not know what he wanted to talk to you about.* ☹

- 8 -

[Jones]: *His term limit initiative. 16 years lifetime max in legislature starting when it passes. No need to switch houses. But after 16 your [sic] done for good.*

[Tony George]: *I think it's a great idea especially if he stays there*

DPA, R.259-5/Ex.B, PageID#6032. FirstEnergy's fraudulent scheme and course of business was so intertwined with its share price, when Randazzo fixed the "Ohio hole" by cancelling the rate case, Jones texted Randazzo to thank him for the resulting boost to FirstEnergy's share price:

> Specifically, [Jones] texted [Randazzo] an image showing FirstEnergy Corp.'s stock increase with a note that stated, "*Thank you*!!" [Randazzo] responded, "*Ha—as you know, what goes up may come down. [Matt] helped. Thanks for the note. Spoke to [Mike] last night.*" [Jones] replied, "*Every little bit helps. Those guys are good but it wouldn't happen without you. My Mom taught me to say Thank you,*" to which [Randazzo] replied, "*Thanks.*"

DPA, R.259-5/Ex.B, PageID#6041.

"For a time, the Bailout Scheme was a resounding success," sending FirstEnergy's share price to over $50 per share and allowing the Company to secure $5 billion in a "transformational" equity raise and two public bond offerings. Complaint, R.72, PageID#1548-49/¶7. Jones and others were richly rewarded for their participation with tens of millions of dollars in excess compensation tied to FirstEnergy's apparent success. Complaint, R.72, PageID#1548-49/¶7. For example, in 2019 alone, FirstEnergy paid Jones $18 million in performance-based stock units. Complaint, R.72, PageID#1548-49/¶7. Numerous insiders also took advantage of FirstEnergy's inflated stock price to sell millions of dollars of their

own personal FirstEnergy shareholdings. Complaint, R.72, PageID#1548-49/¶7, PageID#1636-38/¶¶248-251. Jones alone sold nearly 265,000 of his own FirstEnergy shares for $10 million at artificially inflated prices during the Class Period—more than double the number of shares he had sold in the preceding ten years. Complaint, R.72, PageID#1636-38/¶¶248-251.

On July 21, 2020, FirstEnergy's fraudulent scheme and course of business came crashing down, but not because it was convicted of anything or even charged. Rather, many of the *acts and corrupt business practices* FirstEnergy had concealed from investors were revealed in a detailed FBI affidavit. Complaint, R.72, PageID#1596-97/¶143. Much of the stock-price inflation FirstEnergy had enjoyed for years was lost the next day, as analysts, regulators, rating agencies, and investors reacted to previously undisclosed information about *how* FirstEnergy had accomplished its "top priority." Complaint, R.72, PageID#1599-1601/¶¶146-150.

As alleged and set forth above, FirstEnergy's fraudulent scheme and course of business defrauded investors and inflated its share price—albeit through concealed actions far more than words. The Complaint expressly alleges nine separate categories of *activities* comprising the "methods and means" of FirstEnergy's Bailout Scheme:

(a)     Using bankruptcy proceedings to try to evade liability for the Nuclear Plants;

(b)     Concealing the Bailout Scheme from the investing public and the bankruptcy court presiding over proceedings related to the Nuclear Plants;

(c)     Paying lobbyists to orchestrate and execute the political corruption necessary to pass and preserve HB6;

(d)     Creating and using a web of pass-through entities to transfer and conceal the money to finance the Bailout Scheme;

(e)     Making personal payments to corrupt politicians and at least one regulator;

(f)     Financing and supporting political campaigns with undisclosed contributions far greater than legally permitted;

(g)     Using corrupted politicians to advance HB6 for consideration, to amend HB6 for FirstEnergy's additional benefit, and ultimately to pass the bill;

(h)     Using a corrupted regulator to help write and support HB6; and

(i)     Corruptly preventing a referendum to repeal HB6.

Complaint, R.72, PageID#1574-75/¶93.

To be sure, FirstEnergy's public statements helped facilitate its fraudulent scheme and course of business by piquing investors' interest in its "top priority" of getting a legislative bailout for its failing nuclear plants, reminding investors it was working on this top priority, and then publicly thanking Householder and Randazzo while lauding the benefits of the legislation once achieved.   Complaint, R.72, PageID#1575-76/¶94.   When making these statements, however, Defendants "omit[ted] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  17

4893-5731-7036.v1

C.F.R. §240.10b-5(b).  In other words, while most of these statements were literally true, they were "misleading" due to all the related information FirstEnergy omitted.

## B.    Class certification litigation.

### 1.    Plaintiffs' motion.

#### a.    Plaintiffs highlight Defendants' actionable omissions and "scheme" liability.

Plaintiffs filed their motion for class certification on June 6, 2022.  Motion for Class Certification, R.293, PageID#6198-206.    Plaintiffs expressly sought certification for their Rule 10b-5(a) and (c) claims.  Memorandum of Law in Support of Class Certification ("Class-Cert. Mem."), R.293-1, PageID#6233 ("With respect to the application of *Affiliated Ute* to Plaintiffs' Rule 10b-5(a) and (c) scheme liability claims, *W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc*., 325 F.R.D. 280, 289-90 (D. Minn. 2018), is instructive.").  Plaintiffs likewise sought certification of their Rule 10b-5(b) claim, as their "Rule 10b-5(b) claims are primarily based on a failure to disclose, and so trigger the *Affiliated Ute* presumption of reliance."  Class-Cert. Mem., R.293-1, PageID#6232.

In addition, Plaintiffs demonstrated that they had also established the applicability of the *Basic v. Levinson*, 485 U.S. 224 (1988) presumption of reliance for all their Rule 10b-5 claims (subsections (a)-(c)) for purchasers of FirstEnergy common stock *and* notes.  Class-Cert. Mem., R.293-1, PageID#6234-40.

- 12 -

### b. Plaintiffs set forth standard classwide damages methodologies supported by several expert reports.

As part of their motion, Plaintiffs set forth the distinct, classwide damages methodologies that applied to their Securities Act and Exchange Act claims. Class-Cert. Mem., R.293-1, PageID#6229-31. As Plaintiffs noted, it is well-established that "out-of-pocket" damages for *Exchange Act* claims can be calculated using an accepted classwide methodology—"[e]vent studies, in combination with fundamental valuation methods, may be applied to isolate only the fraud-related price impact, and to quantify the appropriate amount of inflation." Class-Cert. Mem., R.293-1, PageID#6230; Jones Rpt., R.293-8, PageID#6398.[5] Their two experts' reports fleshed out how that commonly used methodology could be applied to both FirstEnergy's common stock and notes.

Chartered financial analyst W. Scott Dalrymple opined on the market's efficiency (which is undisputed) and methodology for measuring Exchange Act damages associated with FirstEnergy common stock under Plaintiffs' theory of liability. *See* Dalrymple Rpt., R.293-7, PageID#6303-04. In a discrete section of his Report, Dalrymple addressed how the "out-of-pocket" damages can be measured

---

[5] Plaintiffs' experts also explained the methodology for calculating Securities Act damages in accordance with the statute. Class-Cert. Mem., R.293-1, PageID#6229. Defendants don't challenge that methodology. OB at 49.

on a classwide basis.  Dalrymple Rpt., R.293-7, PageID#6276-352/¶¶103-110.

Dalrymple opined that:

- "Estimating share price inflation often begins by analyzing the impact of the curative events.  When previously withheld information was disclosed to the market, artificial price inflation was removed from FirstEnergy's stock price."  Dalrymple Rpt., R.293-7, PageID# 6303/¶104.[6]

- "[O]ne can measure the impact of a curative event on FirstEnergy's share price using the abnormal returns, if any, following such disclosure using an event study approach."  Dalrymple Rpt., R.293-7, PageID#6303/¶105.

- "To the extent that there are issues complicating the quantification of artificial inflation at the time of a curative event, standard financial analysis and valuation tools can be applied to measure inflation and damages in accordance with Plaintiffs' theory of liability.  For instance, practitioners routinely measure the value of expected earnings using income and market approaches, which may be used to quantify the impact of changes in expectations and perceived risk associated with a business or earnings stream.  These techniques may be used to measure the share price impact of alleged misrepresentations directly or to corroborate the observed share price impact of a curative event, as well as to quantify the impact of confounding information, if any, that may have coincided with a curative event."  Dalrymple Rpt., R.293-7, PageID#6303/¶107 (citing literature regarding discounted cash flow calculations).

- After share-price inflation is estimated for each day within the Class Period, "an individual plaintiff's recoverable damages" can be calculated "based on the difference between: (a) share price inflation associated with shares purchased at the time they were purchased; and (b) share price inflation associated with shares sold at the time they

---

[6]     Dalrymple earlier explained that he had, in fact, conducted an event study of FirstEnergy's share-price reaction to information disclosures.  Dalrymple Rpt., R.293-7, PageID#6294-97/¶¶69-82.

4893-5731-7036.v1

were sold after one or more curative events" *or* "held through the last of the curative events." Dalrymple Rpt., R.293-7, PageID#6304/¶109.

The foregoing methods and techniques, Dalrymple pointed out, were "widely accepted and may be applied to any and all members of the proposed Class" who purchased FirstEnergy common stock. Dalrymple Rpt., R.293-7, PageID#6304/¶110; *accord* Dalrymple Rpt., R. 293-7, PageID#6294/¶69 n.108 (citing *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 280-81 (2014); John Campbell, et al., *The Econometrics of Financial Markets* (1997), Chapter 4).[7]

### 2. Defendants' opposition.

Defendants' August 17, 2022 opposition conceded the applicability of the *Basic* presumption for purchasers of its common stock, while contesting the presumption for note purchasers. Defendants' Class-Certification Opposition ("Class-Cert. Opp."), R.339, PageID#7199. Even as to the notes, however, Defendants did *not* attempt to rebut the *Basic* presumption by showing a lack of price impact. Rather, Defendants contested only the existence of an efficient market for its notes. Class-Cert. Opp., R.339, PageID#7198-220. Likewise, Defendants'

---

[7] Plaintiffs' other expert, chartered financial analyst Cynthia Jones, echoed Dalrymple's recitation of the commonly used event study and fundamental valuation methodologies to measure out-of-pocket damages for Exchange Act claims—albeit for FirstEnergy's notes sold during the Class Period. *See* Jones Rpt., R.293-8, PageID#6397-99/¶¶100-106. Defendants do not assert here any of their opposition arguments regarding FirstEnergy's notes. Accordingly, Plaintiffs will not elaborate on the record below regarding the damages' methodologies for FirstEnergy's notes.

4893-5731-7036.v1

opposition focused almost exclusively on Plaintiffs' *Rule 10b-5(b) "statements"* claim (Class-Cert. Opp., R.339, PageID#7195-96), which alleges that FirstEnergy "made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."  Complaint, R.72, PageID#1646/¶270.

Regarding the *Affiliated Ute* presumption of reliance, Defendants limited their opposition to the "statements" comprising Plaintiffs' Rule 10b-5(b) claim.  Class-Cert. Opp., R.339, PageID#7195-98.  Defendants contended the *Affiliated Ute* determination concerning Plaintiffs' statements' claim turned on whether the alleged statements are the first type of unlawful statement (misrepresentations) or the second type (statements that are misleading by omission).  Class-Cert. Opp., R.339, PageID#7195-98.  They argued that, of the "nine categories of misstatements [the district court had previously identified], at least seven … can be characterized as involving misrepresentations [versus statements rendered misleading by omission]. And, of those seven, five—the second, fourth, fifth, sixth, and ninth categories— exclusively/primarily involve only affirmative misrepresentations."  Class-Cert. Opp., R.339, PageID#7196.  Defendants' count left two categories of statements that were exclusively misleading by omission and two of the five so-called misrepresentation categories that included both types of unlawful statements.  Class-Cert. Opp., R.339, PageID#7196.  Therefore, Defendants argued, because the

categories of misrepresentations outnumbered the categories of statements rendered misleading by omission, "[t]his is not, as Plaintiffs would have it, a primarily omission-based case." Class-Cert. Opp., R.339, PageID#7196. At no point in their opposition did Defendants argue that statements rendered misleading by omission cannot trigger the *Affiliated Ute* presumption, but rather, their opposition simply presumed the opposite. Class-Cert. Opp., R.339, PageID#7195-96.

Defendants' opposition never acknowledged Plaintiffs' Rule 10b-5(a) claim. Their only mention of an alleged "scheme" was to a "'bribery scheme,'" not a scheme to defraud under Rule 10b-5(a). Class-Cert. Opp., R.339, PageID#7197. And even as to this "bribery scheme," Defendants' arguments against applying *Affiliated Ute* used that same analysis of the categories of statements to argue that "[f]or similar reasons" *Affiliated Ute* was inapplicable—"Plaintiffs here affirmatively challenge numerous affirmative statements." Class-Cert. Opp., R.339, PageID#7197. But as actually alleged, FirstEnergy's commission of bribery was just one of several other activities and statements (some false, most rendered misleading by omission) comprising the "methods and means" of FirstEnergy's alleged scheme to defraud (*i.e.*, the "Bailout Scheme"). Complaint, R.72, PageID#1574-76/¶¶93-94.

4893-5731-7036.v1

Defendants' opposition made no mention whatsoever of Plaintiffs' fraudulent course of business claim (Rule 10b-5(c)). Complaint, R.72, PageID#1640/¶257; PageID#1645-46/¶¶269-270.

As to *damages*, Defendants did not argue that the event study methodology (combined with fundamental valuation techniques) was inapplicable or couldn't be employed on a classwide basis to measure out-of-pocket damages here. Rather, they insisted that Plaintiffs' Exchange Act damages methodology (for the common stock and the notes) failed to satisfy *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013) because Plaintiffs had failed to demonstrate how they would account for what Defendants called "time-varying inflation." Class-Cert. Opp., R.339, PageID#7182-90. Defendants submitted an expert report from Jennifer Marietta-Westberg, but she did not opine that damages could not be calculated on a classwide basis. *See* Marietta-Westberg Rpt., R.339-5, PageID#7464-541. Rather, she opined that Plaintiffs' expert had not explained how his methodology "would" (not *could*) "account for time-varying inflation for FirstEnergy common stock during the Proposed Class Period." Class-Cert. Opp., R.339, PageID#7508/¶97. But she didn't opine on whether there actually *was* any "time-varying inflation," or offer any opinion on Plaintiffs' Securities Act damages methodology.

### 3. Plaintiffs' reply.

Plaintiffs disagreed with how Defendants had categorized the alleged statements, explaining that the analysis is more qualitative than quantitative and that FirstEnergy's misrepresentations were ancillary to what it had omitted: "[t]he heart of the fraud is what was concealed—why the cover provided by the misstatements was needed in the first place." Plaintiffs' Class-Certification Reply ("Class-Cert. Reply"), R.346, PageID#7647. Nevertheless, as set forth above, both sides asked the district court to consider both affirmatively false statements and those rendered misleading by omission to determine whether the *Affiliate Ute* presumption of reliance applied.

Plaintiffs' Reply also explained that their experts' damages methodology readily satisfied Rule 23(b)(3) because they were capable of calculating the inflation that was present in FirstEnergy common stock or notes "on each day of the Class Period"—and that methodology was grounded in Plaintiffs' theory of liability. Class-Cert. Reply, R.346, PageID#7674-75; *see also* Class-Cert. Reply, R.346, PageID#7674 n.59.[8]

---

[8] In essence, both of Plaintiffs' experts would use: (i) event studies to estimate securities' artificial inflation; (ii) use fundamental valuation techniques to remove effects of "confounding" information to isolate only fraud-related price impact attributable to Plaintiffs' liability theory; (iii) estimate securities' inflation on each Class Period day; and (iv) apply those inflation figures to each Class Member's

In rebuttal reports responding to Marietta-Westberg and Defendants' arguments, Plaintiffs' two experts further detailed how Exchange Act damages could be calculated on a classwide basis using the commonly accepted methodology set forth in their initial reports. *See* Jones Rebuttal Rpt., R.346-2, PageID#7736-39¶¶62-66; Dalrymple Rebuttal Rpt., R.346-3, PageID#7751/¶17 ("Even if the amount of artificial inflation is found to be time-varying, Dr. Marietta-Westberg does not explain why an event study or fundamental valuation approach applied on specific dates or periods, such as those identified in the Marietta-Westberg Report, would be infeasible.").

Plaintiffs further explained that *Comcast*'s concerns about *multiple* theories of liability were absent in cases like this with its singular liability theory—as this Court has observed. Class-Cert. Reply, R.346, PageID#7674 (citing *In re VHS of Mich., Inc.*, 601 F. App'x 342, 344 (6th Cir. 2015)). And in any event, even if *Comcast* applied, Plaintiffs noted numerous courts had approved the event study methodology (combined with fundamental valuation techniques) offered by Dalrymple and Jones to measure out-of-pocket damages. Class-Cert. Reply, R.346, PageID#7675-76 (tabulating cases). Indeed, at no point in Defendants' own expert's

---

individual purchase and sale transactions (subject to the PSLRA's 90-day lookback "formula"). Class-Cert. Reply, R.346, PageID#7675.

4893-5731-7036.v1

report did she dispute that this methodology can measure out-of-pocket damages on a classwide basis. Marietta-Westberg Rpt., R.339-5, PageID#7507-12.

### 4. Defendants switch counsel for the oral argument.

Six months after briefing was completed, and only one month before a scheduled hearing on Plaintiffs' motion for class certification, Defendants formally began the process of switching counsel. Pro Hac Mtn., R.417, PageID#9520-24. On March 17, 2023, the district court conducted a hearing on Plaintiffs' motion for class certification. Transcript, R.437, PageID#9844-92.

### a. Lengthy discussion of *Affiliated Ute* and confirmed concession regarding *Basic*.

During the hearing, Plaintiffs reminded the court that Defendants had conceded the *Basic* presumption for Plaintiffs' claims as to FirstEnergy's common stock. Transcript, R.437, PageID#9855 ("Defendants concede that on the stock"). Defendants' new counsel so confirmed. Transcript, R.437, PageID#9870 ("[t]his is clearly a *Basic* case"); *see also* Transcript, R.437, PageID#9873 ("*On these bonds*, [Plaintiffs are] overreaching by asking the Court to certify a '34 Act class.")).

But Defendants' new counsel tried to pivot and make a new argument that was not raised in, and conflicted with, Defendants' written opposition. Referring to statements that are misleading by omission as "half-truths" (as in "only half of the truth," not "half true, half false"), Defendants contended that "every one of the [alleged] misstatements is a half-truth." Transcript, R.437, PageID#9869-70,

- 21 -

PageID#9874-75.  The case Defendants' new counsel emphasized, *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 2 F.4th 1199 (9th Cir. 2021), was not even a case Defendants had cited in their opposition.  *Compare* Transcript, R.437, PageID#9868, PageID#9874, *with* Class-Cert. Opp., R.339, PageID#7167-73.  Defendants' new counsel then tried to make the new argument that the *Affiliated Ute* presumption of reliance does not apply to statements that are misleading by omission.  Transcript, R.437, PageID#9874-75.  When the district court asked if this Court followed this supposed rule ("Are there any Sixth Circuit cases that have followed that?"), Defendants' new counsel represented that, "[t]he Sixth Circuit has not yet dealt with this issue, whether *Ute* applies in a case involving half-truths."  Transcript, R.437, PageID#9875.  That representation was inaccurate.

### b. Extended colloquy concerning damages methodologies.

At least one-third of the certification hearing concerned the issue of Exchange Act damages.  *See* Transcript, R.437, PageID#9856-68, PageID#9881-82; *see also* Transcript, R. 437, PageID#9856 (Plaintiffs setting aside discussion of Securities Act damages because "I don't think defendants are challenging that one; certainly, their expert didn't.").

In response to direct questioning from the court, Plaintiffs explained that both Dalrymple and Jones had advanced an Exchange Act damages methodology for FirstEnergy stock and notes that were "effectively the same."  Transcript, R.437,

PageID#9856. Distilled to their essence, "you plug in a purchase price for the stock and then you plug in an inflation price." Transcript, R.437, PageID#9857. After a jury has found the amount of artificial inflation "during different parts of the class period," those numbers "get[] plugged in. It's the same formula for every single member of the class." Transcript, R.437, PageID#9857; *accord* Transcript, R.437, PageID#9856-58.

When the district court inquired about possible "individualized" inquiries given different class members' securities transactions, Plaintiffs explained that the formula took those differences into account while using the constant "plug-in" numbers. Transcript, R.437, PageID#9857-58, PageID#9858-59; *see also* Transcript, R.437, PageID#9859 (although different Class members' damages "are different," the "formula is the exact same"). The court understood. "So it really, then, doesn't matter when the individual purchased the stock or what the stock price was at the time of purchase because it's the same formula." Transcript, R.437, PageID#9859.

Regarding Defendants' time-varying-inflation argument, Plaintiffs' experts had the necessary tools to figure out damages even if there *was* a difference in inflation over time: "You've got to block a time. It's all in the exact same formula." Transcript, R.437, PageID#9860. Ultimately, a jury would decide just what the

proper inflation was: "that number [then] gets plugged into the formula; same for every class member." Transcript, R.437, PageID#9860

The district court then considered Defendants' damages counter-arguments at length. Transcript, R.437, PageID#9860-68. At the end of their extended back-and-forth, the court reassured defense counsel, "I understand." Transcript, R.437, PageID#9868.

Later, the district court revisited Plaintiffs' damages methodology. Transcript, R.437, PageID#9881-82. Plaintiffs explained that Defendants' argument implied that Plaintiffs needed to have already calculated the actual damages—but "[t]hat's not what happens at class certification." Transcript, R.437, PageID#9881. Rather, all that's needed is a "methodology by which damages would be calculated." Transcript, R.437, PageID#9882. At bottom, Plaintiffs explained that Defendants' expert had opined only that "I don't think you accounted for time-varying inflation," not that "it's impossible to calculate damages"—"because it's clearly not [impossible]." Transcript, R.437, PageID#9882.

### 5. District Court's class certification order.

#### a. Certification of liability issues.

The district court entered its Order certifying the case as a class action two weeks later. Order, R.435, PageID#9781-831. The Order did not credit the argument Defendants' new counsel first raised at oral argument (*i.e.*, that statements

that are rendered misleading by omission (aka "half-truths") are ineligible for the *Affiliated Ute* presumption). Instead, the court focused on the arguments the parties had briefed, finding persuasive "a fellow district court's reasoning that 'the theory behind the *Affiliated Ute* presumption ... is not undermined simply because a defendant makes misstatements at the same time it omits material information.' *Dodona I, LLC v. Goldman, Sachs & Co.*, 296 F.R.D. 261, 270 (S.D.N.Y. 2014)." Order, R.435, PageID#9821. The court also embraced

> the approach of the Third Circuit, applying the *Affiliated Ute* presumption to matters involving "(1) failures to disclose, *i.e.*, 'pure omissions'; and (2) failures to clarify 'true but misleading statements' ... *i.e.*, 'half-truths, which, although analytically closer to lies than to nondisclosure, are obviously closer to omissions than are pure misrepresentations.'" *See In re Interbank*, 629 F.3d at 219-20 (quoting *Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 202 (3d Cir. 1990)).

Order, R.435, PageID#9821.

Ultimately the court "conclude[d] from a review of the relevant misstatements and omissions from Plaintiffs' Complaint, *see In re FirstEnergy Corp.*, 2022 WL 681320, at *9, 12, that the communications at issue are primarily omissions-based.... Accordingly, the application of *Affiliated Ute* is appropriate here," leaving only the question of whether the facts "'withheld [were] material in the sense that a reasonable investor might have considered them important in the making of th[e] decision to purchase or sell.'" Order, R.435, PageID#9821-22 (quoting *Affiliated Ute*, 406 U.S. at 153-54). The court then reaffirmed its previous finding that "the

4893-5731-7036.v1

facts that were withheld constitute 'omissions of *material* fact.'"  Order, R.435, PageID#9822 (emphasis in original).

Last, the district court rejected Defendants' argument that Plaintiffs may not engage both the *Basic* and *Affiliated Ute* presumptions, and found the *Basic* presumption applicable "to the extent this case also involves misstatements."  Order, R.435, PageID#9822.

### b.    Certification of damages issues.

Although the district court's written Order does not discuss Plaintiffs' proposed use of event study methodology (combined with fundamental valuation techniques) to measure out-of-pocket damages for their *Exchange Act* claims,[9] this methodology was not disputed, and the transcript of the lengthy hearing the district court conducted demonstrates that the court had full command of the parties' arguments and submissions, including multiple expert reports.

## V.    SUMMARY OF ARGUMENT

There are only two possible explanations why 31 lawyers from 11 law firms teamed to file four briefs, spanning 133 pages of arguments concerning two discrete issues.  Either: (1) the issues are so complicated it takes an army of lawyers to explain them; or (2) the issues are so simple, and not in their clients' favor, it takes

---

[9]    Defendants don't challenge the court's Securities Act damages holdings.

4893-5731-7036.v1

an army of lawyers to complicate them in hopes of obscuring the right outcome. Plaintiffs respectfully submit it is the latter. For example, Defendants cite 51 cases from around the country while ignoring a squarely on-point *en banc* decision of this Court.

In *Rubin*, 143 F.3d at 268, this Court sitting *en banc* unequivocally held that the *Affiliated Ute* presumption of reliance applies to statements that are rendered misleading by omission. Defendants concede on appeal that Plaintiffs' Rule 10b-5(b) claim is "based exclusively, or at least primarily, on" statements that are allegedly misleading by omission—what they call "half-truths." OB at 34. The combination of this Court's decision in *Rubin* and Defendants' concession confirms that the district court acted properly by applying the *Affiliated Ute* presumption of reliance here. This is a prototypical case for application of the *Affiliated Ute* presumption because FirstEnergy unlawfully schemed to defraud investors (Rule 10b-5(a)), made a series of statements that, while literally true, were materially misleading by omission (Rule 10b-5(b)), and engaged in a fraudulent course of business (Rule 10b-5(c)) through a series of acts and statements that concealed from investors a massive criminal conspiracy that FirstEnergy was executing to address its self-proclaimed "top priority"—bailing out its failing nuclear plants.

This entire fraudulent scheme and course of business depended on keeping investors and the public in the dark, and that's exactly what FirstEnergy did, despite

repeatedly talking about its pursuit of bailout legislation, the benefits of the legislation, and the very men it had corrupted to achieve that legislation. When FirstEnergy chose to speak about these subjects, it "assumed a duty to speak fully and truthfully on those subjects." *Rubin*, 143 F.3d at 268. FirstEnergy violated that duty and its attempt to escape liability for doing so is not well-reasoned or well-supported. In addition to misconstruing *Affiliated Ute*—and ignoring *Rubin* completely—Defendants' specific arguments against application of any presumption of reliance are both waived (due to their failure to raise them in their opposition to Plaintiffs' motion for class certification) and meritless.

As for damages, the full record below and specifically the district court's keen engagement during oral argument, illustrates the rigorous scrutiny it applied to both Securities Act and Exchange Act damages methodologies. Defendants demand more detail, but the record reflects the district court's careful consideration of the parties' briefs, expert reports, and arguments. Hundreds of pages of class-certification briefing and exhibits, five expert reports opining on damages, and fully one-third of a class-certification hearing spent on the damages issue alone, speak to a sound exercise of discretion to hold that predominance exists for the case's Exchange Act claims (relatedly, that same extensive record provides more than enough material for this Court to affirm, if needed, on any grounds thus supported.).

*Comcast* is a red herring here, as Plaintiffs allege only one theory of Exchange Act liability: that Defendants' fraudulent scheme and course of business, aided by misleadingly incomplete statements, inflated FirstEnergy securities during the Class Period. Plaintiffs' proffered damages methodology that matched up with that theory—measuring "out-of-pocket" damages—is a tried-and-tested methodology approved by courts in countless securities-fraud lawsuits.

Defendants' arguments about hypothetical time-varied inflation do not change Plaintiffs' lone theory of liability or the corresponding universally accepted damages methodology, and Defendants' implicit contention that damages must be calculated now is wrong. As the district court determined, it's enough that Plaintiffs showed damages are capable of being measured classwide using a specific methodology.

Throughout all the briefing and argument below, and even in their Opening Brief, Defendants have not disputed that this case exclusively consists of questions common to all class members that will yield common answers based on common evidence. In other words, Defendants have never identified, let alone demonstrated, a single individual question this case presents. It is a quintessential case for class treatment.

## VI. STANDARD OF REVIEW

This Court has set forth comprehensively the standard of review for appeals of class certification decisions:

4893-5731-7036.v1

A district court has broad discretion to decide whether to certify a class. This court has described its appellate review of a class certification decision as narrow and as very limited. We will reverse the class certification decision in this case only if [the appellant] makes a strong showing that the district court's decision amounted to a clear abuse of discretion. An abuse of discretion occurs if the district court relies on clearly erroneous findings of fact, applies the wrong legal standard, misapplies the correct legal standard when reaching a conclusion, or makes a clear error of judgment. We will not find an abuse of discretion unless we reach a definite and firm conviction that the district court committed a clear error of judgment.

*In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 850 (6th Cir. 2013).

No such abuse of discretion occurred here.

## VII. ARGUMENT

### A. The district court properly found the *Affiliated Ute* presumption of reliance here.

Before explaining *Affiliated Ute*'s clear application here and demonstrating that FirstEnergy waived the *Affiliated-Ute*-related arguments in its Opening Brief, it is important to acknowledge the rule FirstEnergy allegedly violated and the Supreme Court's application of that rule in *Affiliated Ute*:

"[T]he Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." One such rule so prescribed is Rule 10b-5. This declares that, in connection with the purchase or sale of any security, it shall be "unlawful for any person, directly or indirectly," ([a]) "To employ any device, scheme, or artifice to defraud," ([b]) "To make any untrue statement of a material fact' or to omit to state a material fact so that the statements made 'in the light of the circumstances," are misleading, and ([c]) "To engage in any act,

practice, or course of business which operates or would operate as a fraud or deceit upon any person."

406 U.S. at 150-51.

After summarizing both the statute and rule, the Supreme Court reminded that their entire purpose demands their broad reach:

> These proscriptions, by statute and rule, are broad and, by repeated use of the word "any," are obviously meant to be inclusive. … Congress intended securities legislation enacted for the purpose of avoiding frauds to be construed "not technically and restrictively, but flexibly to effectuate its remedial purposes."

*Id.*, 406 U.S. at 151.

### 1. *Affiliated Ute.*

*Affiliated Ute* was about a 1960's scheme to cheat members of the Ute Indian Tribe of Utah out of getting the fair value for their oil rights. *Affiliated Ute*, 406 U.S. 133-34. Tribal Members created a corporation (the Ute Distribution Corporation ("UDC")) to hold and manage the mineral rights of members, who received pro rata shares of the UDC. *Id.* at 136. The securities-fraud scheme was one that involved primarily a failure to disclose. Specifically, two employees of the bank that served as the transfer agent for UDC shares facilitated the sales of Ute Members' shares to themselves and to other white buyers without disclosing their awareness of higher prevailing market prices for subsequent sales of the same shares to other white buyers. *Id.* at 152.

Regarding their own purchases, the Court found that the individual defendants had violated Rule 10b-5(b) by misrepresenting "that the prevailing market price of the UDC shares was the figure at which their purchases were made." *Affiliated Ute*, 406 U.S. at 152. But the Tenth Circuit had reversed the district court's finding of liability beyond the bankers' purchases for themselves, reasoning that because there was no reliance on the individual defendants' misrepresentations, there was no violation for the sales to other white purchasers. *Id*. The Supreme Court reversed. Invoking subsections (a) and (c) of Rule 10b-5, the Court held that "[t]hese defendants' activities, outlined above, disclose, within the very language of one or the other of those subparagraphs, a 'course of business' or a 'device, scheme, or artifice' that operated as a fraud upon the Indian sellers." *Id*. at 153. "This is so," the Court explained, "because the defendants devised a plan and induced the mixed-blood holders of UDC stock to dispose of their shares without disclosing to them material facts that reasonably could have been expected to influence their decisions to sell." *Id*. Because the individual defendants had prearranged buyers for the shares being sold by the Native Americans, they were effectively market makers, and "the [Native American] sellers had the right to know that the defendants were in a position to gain financially from their sales and that their shares were selling for a higher price in that market." *Id*. at 153. Accordingly, the Court held under circumstances "involving primarily a failure to disclose, positive proof of reliance is

not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision." *Id.* at 153-54.

### 2. This Court has unequivocally applied the *Affiliated Ute* presumption to statements that are rendered misleading by omission.

The disclosure duty in *Affiliated Ute* arose from something the defendants chose to do: pre-arrange buyers for shares whose sales they were facilitating. Similarly, this Court has unequivocally held that when parties choose to speak about certain subjects, they "assume[] a duty to speak fully and truthfully on those subjects." *Rubin*, 143 F.3d at 268; *see also, Helwig v. Vencor, Inc.*, 251 F.3d 540, 561 (6th Cir. 2001) (*en banc*) ("a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths"), *abrogated on other grounds by Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308 (2007). In *Rubin*, the defendant company's lawyer (Barnhart) had talked about the company's existing credit line with Star Bank with prospective investors, who asked about certain aspects of the credit line. Barnhart's answers were misleading by omission:

> Instead of informing Weiss that MDI was already in default under its financing agreement with Star Bank, or that the granting of a security interest would constitute another incident of default, or—most significantly—that the proposed investment itself would constitute a default, Barnhart stated that "MDI was doing fine with the Star Bank, but that since MDI had experienced some recent operating losses ... the

Star Bank would be reluctant to permit the Plaintiffs to have a secured interest in MDI."

*Rubin*, 143 F.3d at 266.

Nevertheless, the district court granted summary judgment to the defendants based on its holding that the company's lawyer owed no duty of disclosure to the prospective outside investors, and a divided three-judge panel affirmed. *Id.* at 265. This Court then reheard the matter *en banc* and *reversed* the district court, holding that the moment the company's lawyer chose "to speak to [the plaintiffs] concerning the status of MDI's relationship with Star Bank, and about Star Bank's likely reaction to a substantial loan from Rubin and Cohen, he assumed a duty to speak fully and truthfully on those subjects." *Id.* at 268. Likewise, this Court observed that under *Affiliated Ute*, "'positive proof of reliance is not a prerequisite to recovery [in a failure-to-disclose case]. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision.'" *Id.* (quoting *Affiliated Ute*, 406 U.S. at 153-54) (alterations in *Rubin*). The materiality of the information the company's lawyer omitted was clear, so this Court held that the plaintiffs were entitled to the *Affiliated Ute* presumption of reliance and had "shown sufficient facts to entitle them to a trial on their omission-based claim." *Rubin*, 143 F.3d at 268. Last, this Court held that the plaintiffs had also "shown sufficient facts to merit a trial on their misrepresentation-based claim." *Rubin*, 143 F.3d at 270.

### 3. *Affiliated Ute* and *Rubin* confirm the *Affiliated Ute* presumption's direct application here.

This case presents a prototypical application of the *Affiliated Ute* presumption of reliance. In both *Affiliated Ute* and *Rubin*, the defendants chose to do something that triggered a duty to disclose information, and they violated that duty. Here, at the start of the Class Period and continuing throughout, FirstEnergy repeatedly chose to speak about its pursuit of legislation to bail out its failing nuclear plants. Complaint, R.72, PageID#1566/¶66, PageID#1580/¶103, PageID#1588/¶¶121-122, PageID#1589/¶125, PageID#1590/¶127. That included FirstEnergy and its wholly owned subsidiary speaking about the benefits from HB6, as well as the fact that Householder and Randazzo had worked on getting HB6 enacted. Complaint, R.72, PageID#1590-92/¶¶129-132. By choosing to make these statements, FirstEnergy triggered "[the] duty to speak fully and truthfully on th[e]se subjects." *Rubin*, 143 F.3d at 268. While these statements were all literally true, FirstEnergy violated its "duty to speak *fully* ... on th[e]se subjects" by not disclosing *anything* about the many suspect and outright unlawful activities in which it was engaging to pursue and preserve this legislation, which became HB6, including many activities that directly involved the very individuals (Householder and Randazzo) FirstEnergy publicly thanked for helping with HB6 without revealing *anything* about having bribed them for their help. For example, FirstEnergy has confessed to intentionally using a network of 501(c)(4) entities to hide the tens of millions of dollars it was

- 35 -

using to pursue and preserve this legislation it chose to discuss so frequently. DPA, R.259-5/Ex.B, PageID#6005. It is readily apparent that this directly related, non-disclosed information was "material in the sense that a reasonable investor might have considered [it] important in the making of [their purchase] decision.'" *Rubin*, 143 F.3d at 268. Accordingly, the district court properly determined that Plaintiffs are entitled to the *Affiliated Ute* presumption of reliance.

On the subject of failures to disclose, Defendants' Opening Brief cites out-of-circuit cases from around the country but fails to even mention this Court's decision that is directly on point: *Rubin*. *See* OB at iv-vii (listing 51 cases, but not *Rubin* (or *Helwig*)).

Likewise, Defendants' efforts to distinguish *Affiliated Ute* fail. Defendants contend *Affiliated Ute* provides a "classic" example of a case in which the defendants "'sa[id] absolutely nothing about matters whose very existence plaintiffs have no reason to consider'" because the bankers had said nothing about their role in making a market of pre-arranged buyers. OB at 38 (quoting *Abell v. Potomac Ins. Co.*, 858 F.2d 1104, 1119 (5th Cir. 1988)). That is untrue. In *Affiliated Ute*, the bank and individual defendants had obviously discussed with the Native American plaintiffs the fact that people would be buying their shares, as that was the entire reason the plaintiffs were working with the bankers: to sell their shares. 406 U.S. at 146-47. In other words, they clearly discussed the "matter" of the bank facilitating the

plaintiffs' share sales. The material information directly related to this subject that the bankers failed to disclose was the fact that they had "made" the market into which the plaintiffs were selling, and the buyers were paying more than the plaintiffs were receiving—which disparity would benefit the bankers. *Id*. at 147.

Defendants contend that the bankers said "absolutely nothing" about being the market makers for the Native Americans' sales, as if that *prevents* application of the *Affiliated-Ute* presumption here, but that kind of related material omission is exactly what triggers the presumption. This Court's holding in *Rubin* confirms that the *Affiliated Ute* presumption applies when a defendant chooses to speak about certain subjects, but materially violates the resulting "duty to speak fully and truthfully *on those subjects*." *Rubin*, 143 F.3d at 268. Here, FirstEnergy repeatedly talked about a legislative solution to bail out the Company's failing nuclear plants and publicly thanked Householder and Randazzo for their help in getting HB6 enacted. These literally true statements were rendered misleading when FirstEnergy "said absolutely nothing" about its many questionable and outright unlawful activities undertaken in pursuing and preserving such legislation.[10]

---

[10] *Rubin* has been the law of this Circuit for nearly a quarter-century, so Defendants' scare tactics ring hollow. OB at 25, 42 (citing out-of-Circuit cases to fan the fear of "'swallow[ing]'" the reliance requirement if, as *Rubin* holds, the *Affiliated Ute* presumption is applied to "half-truths"). The reason *Rubin* hasn't triggered such apocalyptic consequences is that it applies to statements that are literally true but are rendered misleading by material omission, not to statements that are false and what is omitted is simply the information that would correct them. *See*

Defendants also inaccurately represent that the defendants in *Affiliated Ute* owed a "fiduciary duty" to the plaintiffs. OB at 38, 41. The Supreme Court said no such thing. In fact, the Court based its finding of a duty to disclose on a case that: (1) held that a market maker's failure to disclose violated Rules 10b-5 and 15c1-4; and (2) left undisturbed the district court's finding that the market maker had *not* violated any fiduciary duty to the buyer. *Affiliated Ute*, 406 U.S. at 153 (citing *Chasins v. Smith, Barney & Co.*, 438 F.2d 1167 (2d Cir. 1970), which left undisturbed the district court's finding that the market maker had *not* violated any fiduciary duty to the buyer (*id.* at 1169)). Moreover, even if there happened to have been a fiduciary relationship in *Affiliated Ute* (there was not), it clearly would not be a prerequisite to applying the presumption, as *Rubin* confirms. The *defendants'* lawyer in *Rubin* certainly did not have a fiduciary relationship with the *plaintiffs*, yet this Court still held the *Affiliated Ute* presumption applicable.

Last, *Affiliated Ute* and *Rubin* involved *both* omissions *and* misrepresentations. In both cases, the omissions claims were allowed to proceed to verdict—with the *Affiliated Ute* presumption of reliance applying to the omissions claims—while the misrepresentation claims proceeded *without* the presumption.

---

*Rubin*, 143 F.3d at 268-70 (applying *Affiliated Ute* to literally true statements rendered misleading by omission, but requiring a separate and distinct showing of reliance for statement that was false).

*Affiliated Ute*, 406 U.S. at 149, 152-53; *Rubin*, 143 F.3d at 268, 270; *see also, In re BancorpSouth, Inc.*, 2017 WL 4125647, at *1 (6th Cir. Sept. 18, 2017) (denying Rule 23(f) and finding district court did not abuse its "broad discretion" in allowing the plaintiff to proceed with presumptions of reliance under both *Basic* and *Affiliated Ute*). Therefore, no "uniform approach to proving reliance is necessary," directly contravening one of FirstEnergy's core contentions. OB at 33.

## B. Defendants waived their specific arguments against the presumption of reliance here.

Implicitly confirming that the district court did not abuse its discretion, Defendants make several arguments in their Opening Brief that they never raised in their oppositions to Plaintiffs' motion for class certification and which directly contradict the opposition Defendants filed with the district court. All these arguments are waived. *City of Columbus v. Hotels.com, L.P.*, 693 F.3d 642, 652 (6th Cir. 2012) ("'an argument not raised before the district court is waived on appeal to this Court'") (quoting *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 552 (6th Cir. 2008)).

Similarly, arguments raised "for the first time at oral argument [are] thus waived." *Gen. Med., P.C. v. Morning View Care Ctrs.*, 253 F. App'x 586, 589 (6th Cir. 2007) (citing *Reithmiller v. Blue Cross & Blue Shield of Mich.*, 824 F.2d 510, 511 n.2 (6th Cir. 1987)). Following this Court's direction, "district courts in the Sixth Circuit have held that '[i]t is well established that a moving party may not raise

- 39 -

a new issue for the first time in its reply brief or at oral argument.'" *Keys v. Dart Container Corp. of Ky.*, 2012 WL 2681461, at *6 (W.D. Ky. July 6, 2012) (citing cases).

Stripped of these waived arguments, this is a significantly narrowed appeal, which Defendants may not broaden with yet more new arguments in their reply brief. "An appellant waives an issue when he fails to present it in his initial briefs before this court." *Marks v. Newcourt Credit Grp., Inc.*, 342 F.3d 444, 462 (6th Cir. 2003), *superseded on other grounds by regulation*, 29 C.F.R. §2560.503-1(l), *Bard v. Brown Cnty.*, 970 F.3d 738 (6th Cir. 2020); *Thaddeus–X v. Blatter*, 175 F.3d 378, 403 n.18 (6th Cir. 1999) (*en banc*) ("We do not address defendants' belated argument that they are entitled to qualified immunity. It was not presented to this court in the initial briefs on appeal and is therefore waived."); *Berera v. Mesa Med. Grp., PLLC*, 779 F.3d 352, 355 (6th Cir. 2015) (same).

### 1. Defendants waived any arguments concerning Plaintiffs' Rule 10b-5(a) and (c) claims.

As set forth above, FirstEnergy's Bailout Scheme spanned nine categories of activities (Complaint, R.72, PageID#1574-75/¶93), but in challenging the application of the *Affiliated Ute* presumption in their opposition briefs, Defendants focused only on the *statements* aspect of this case, not the many activities comprising the crux of Plaintiffs' fraudulent scheme and course of business claims. *E.g.*, Class-Cert. Opp., R.339, PageID#7195-98. Plaintiffs' lone claim based only on statements

(both false statement and literally true statements rendered misleading by omission) is their Rule 10b-5(b) claim, but Plaintiffs also expressly sought application of *Affiliated Ute* to their Rule 10b-5(a) and (c) claims, which are mostly based on activities.  Class-Cert. Mem., R.293-1, PageID#6233.

Nevertheless, the only reference to a "scheme" in Defendants' opposition is not to Plaintiffs' expressly alleged Rule 10b-5(a) scheme to defraud investors, but rather to FirstEnergy's confessed "'bribery scheme.'"  Class-Cert. Opp., R.339, PageID#7197.  And Defendants used their same statements' analysis to argue that "[f]or similar reasons" *Affiliated Ute* was inapplicable—"Plaintiffs here affirmatively challenge numerous affirmative statements."  Class-Cert. Opp., R.339, PageID#7197.  But FirstEnergy's actual commission of bribery was just one of several other activities and statements (some false, the vast majority misleading by omission) comprising the "methods and means" of FirstEnergy's alleged scheme to defraud, including many concealed *acts* that were not bribes, such as the extensive use of 501(c)(4) entities discussed above and "supporting political campaigns with undisclosed contributions far greater than legally permitted."  Complaint, R.72, PageID#1574-76/¶¶93-94.

Likewise, Defendants' opposition made no mention whatsoever of Plaintiffs' fraudulent course of business claim (Rule 10b-5(c)).  Complaint, R.72, PageID#1640/¶257, PageID#1645-46/¶¶269-270.  Having no substantive basis to

- 41 -

oppose Plaintiffs' Rule 10b-5(a) and (c) claims, Defendants apparently made the tactical decision to ignore them out of existence. This Court has emphasized that Rule 10b-5(a), (b), and (c) are distinct subsections and has held that a failure to reference Rule 10b-5(a) or (c) in a brief constitutes a waiver of any arguments concerning such claims. *See Robert N. Clemens Tr. v. Morgan Stanley DW, Inc.*, 485 F.3d 840, 852-53 (6th Cir. 2007).

Irrespective of Defendants' motives, because Plaintiffs expressly sought certification for their Rule 10b-5(c) claim and Defendants' opposition did not address this claim, they have waived any arguments against the district court's certification of these claims—including, specifically, the application of *Affiliated Ute*'s presumption to this claim.

Even if one were to stretch Defendants' opposition in the district court to reach Plaintiffs' Rule 10b-5(a) claim, its entire "scheme" argument was based on an analysis of FirstEnergy's *statements*, not a single act. That opposition certainly did *not* raise the argument Defendants' Opening Brief raises for the first time—that the "in connection with the purchase or sale of any security" language of Rule 10b-5 has different meaning when applied to Rule 10b-5(a) and (c) claims than when applied to Rule 10b-5(b) claims. *Cf.* Class-Cert. Opp., R.339. But that is what Defendants try to argue on appeal.

4893-5731-7036.v1

Defendants seek to defy decades of case law with the argument that when "'in connection with the purchase or sale of any security'" is applied to Rule 10b-5(a) and (c), the Rule is limited to situations in which the defendants themselves are either purchasing or selling shares. OB at 35-36. It is irrefutable, and objectively verifiable, that Defendants did not raise this argument in their opposition to Plaintiffs' motion for class certification. Class-Cert. Opp., R.339. Defendants' justification for doing so on appeal is relegated to a footnote: "This Court can address this question now, notwithstanding that it "'implicate[s] the merits of [P]laintiffs' cause of action,' because it 'also implicate[s] the merits of the class certification decision' on appeal." OB at 34 n.5. This explanation is self-defeating because even if this new argument was legitimately related to the district court's class-certification determination, that would just mean Defendants were obligated to raise it in their opposition below. They did not; the argument is waived.

This waived argument is also baseless. Far from interpreting the application of Rule 10b5-(a) and (c) to be more restrictive than applications of Rule 10b-5(b), the Supreme Court has consistently held the opposite. The main thrust of the *Affiliated Ute* decision was the Court's determination that subsections (a) and (c) are *not as restricted as subsection (b)*: "To be sure, the second sub-paragraph of the rule specifies the making of an untrue statement of a material fact and the omission to

- 43 -

state a material fact. *The first and third subparagraphs are not so restricted*." 406 U.S. 152-53.

Nearly 50 years later, in *Lorenzo v. Sec. & Exch. Comm'n*, 587 U.S.__, 139 S. Ct. 1094 (2019), the Supreme Court reaffirmed the "expansive[ness]" of subsections (a) and (c), finding that they are "sufficiently broad to include within their scope" conduct that "falls *outside* subsection (b) of the Rule." *Id*. at 1101-02. The Court so found even though the conduct at issue involved precisely the kind of "statements" covered by subsection (b). The Court also warned against overly restrictive interpretations (such as FirstEnergy's new (and waived) argument) when confronting "behavior that, though plainly fraudulent, might otherwise fall outside the scope of the Rule." *Id*. at 1102. Therefore, Defendants' waived argument that the reach of subsections (a) and (c) is so narrow as to be restricted to defendants directly involved in the purchase or sale of the securities at issue directly conflicts with the Supreme Court's multiple holdings that subsections (a) and (c) have a *broader*, not narrower, reach than subsection (b); *see also Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 72 (2006) ("When this Court has sought to give meaning to that phrase [('in connection with the purchase or sale of any security')] in the §10(b) and Rule 10b-5 context, it has broadly required that the alleged fraud 'coincide' with a securities transaction, an interpretation that comports with the SEC's longstanding views.").

That Defendants reach so far as to make such a clearly waived (and baseless)

argument demonstrates that their criticism of the district court is not well taken.

> **2. Defendants waived their new and contradictory Rule 10b-5(b) argument.**

Equally as bad, Defendants opposition before the district court raised

arguments regarding Plaintiffs' Rule 10b-5 subsection (b) claim, but not the

subsection (b) argument they raise on appeal. More concerning, the waived

argument they now raise directly contradicts the argument they made to the district

court.

Subsection (b) proscribes two kinds of statements: those that are untrue and

those that are true but are rendered misleading by omission. Specifically, the rule

provides that it is unlawful "(b) To make any untrue statement of a material fact or

to omit to state a material fact necessary in order to make the statements made, in

the light of the circumstances under which they were made, not misleading." 17

C.F.R. §240.10b-5(b). Defendants' opposition to class certification conceded that

statements rendered misleading by omission are, in fact, *omissions* for purposes of

*Affiliate Ute* analysis. Class-Cert. Opp., R.339, PageID#7195-96. In fact, it was

such a given that *Affiliated Ute* applies to statements rendered misleading by

omission, Defendants' opposition never once even used the phrase "half-truth";

whereas Defendants' Opening Brief uses it 31 times. *Compare* Class-Cert. Opp.,

R.339, *with* OB at 2, 4, 6, 8, 24, 25, 34, 37-45. Instead, Defendants' opposition

compared the number of alleged misrepresentations (to which *Basic* applies) to the number of statements allegedly rendered misleading by omission (to which *Affiliated Ute* applies). Class-Cert. Opp., R.339, PageID#7195-96. Because by Defendants' count, the former outweighed the latter, Defendants contended that, "[t]his is not, as Plaintiffs would have it, a primarily omission-based case." Class-Cert. Opp., R.339, PageID#7196. Defendants' opposition *never* argued that *Affiliated Ute* does not apply to *either* type of statement. Had it done so, the entire comparison would have been nonsensical.

The parties' briefs reflected a shared recognition that the *Affiliated Ute* presumption applies to statements that are rendered misleading by omission. This was not in dispute because it has been the law of this Circuit for at least a quarter-century. *See Rubin*, 143 F.3d at 268.

Nevertheless, in defiance of their own opposition before the district court and this Court's *en banc* decision in *Rubin*, Defendants argue on appeal that statements that are misleading by omission may not be considered omissions for application of the *Affiliated Ute* presumption of reliance. Because Defendants' opposition to class certification failed to raise this argument, it is waived for appeal and should not be considered. *City of Columbus*, 693 F.3d at 652.

After Defendants switched counsel, they tried to raise this new argument for the first time during oral argument on Plaintiffs' motion for class certification. That

4893-5731-7036.v1

was too late, as this Court has made abundantly clear—arguments raised "for the first time at oral argument [are] thus waived." *Gen. Med., P.C.*, 253 F. App'x at 589 (citing *Reithmiller*, 824 F.2d at 511 n.2). District courts consistently follow this policy (*Keys*, 2012 WL 2681461, at *6-*7 (citing cases)), and here we see why this is such a sound policy. When Defendants' new counsel tried to make the new argument that the *Affiliated Ute* presumption of reliance did not apply to statements that are misleading by omission, the district court naturally asked, "[a]re there any Sixth Circuit cases that have followed that?" Transcript, R.437, PageID#9874-75. In response, Defendants' new counsel represented that, "[t]he Sixth Circuit has not yet dealt with this issue, whether *Ute* applies in a case involving half-truths." Transcript, R.437, PageID#9875.

That representation was inaccurate. As discussed at length above, in *Rubin*, this Court, sitting *en banc*, unequivocally applied the *Affiliated Ute* presumption of reliance to statements that were rendered misleading by omission, making irrelevant any cases from outside this Circuit that Defendants contend reject such applications of the *Affiliated Ute* presumption. Had Defendants timely raised the argument that the *Affiliated Ute* presumption of reliance does not apply to statements that are rendered misleading by omission, Plaintiffs could have cited *Rubin* to correct this mistake. Instead, Defendants' counsel invited error by shooting from the hip at the

hearing and missing the mark. Thankfully, the district court did not accept this invitation and its class certification Order did not credit this waived argument.

Defendants now concede that "Plaintiffs' claims are based exclusively, or at least primarily, on alleged half-truths"—*i.e.,* statements that were misleading by omission of material information concerning the identical subject about which FirstEnergy chose to speak (its pursuit of a legislative fix for its failing nuclear plants). OB at 2, 34. Having established that Defendants waived the argument against applying the *Affiliate Ute* presumption of reliance to such statements that are misleading by omission (and that this waived argument conflicts with this Court's *en banc* decision in *Rubin* in any event), this concession amounts to an admission that Plaintiffs are entitled to the *Affiliated Ute* presumption.

### 3. Defendants conceded application of the *Basic* presumption for common stock and have dropped their argument regarding the notes.

Before the district court, Defendants explicitly waived any opposition to the application of the *Basic* presumption to Plaintiffs' Rule 10b-5 claims regarding FirstEnergy common stock, by contesting the presumption only for purchasers of its notes. Class-Cert. Opp., R.339, PageID#7199 (disputing only application of "*Basic* reliance presumption as to the Notes," which are not the subject of FirstEnergy's Opening Brief). Even as to the notes, Defendants did *not* attempt to rebut the *Basic* presumption by showing a lack of price impact. Rather, their opposition to the *Basic*

presumption was limited to contesting the existence of an efficient market for its notes.  Class-Cert. Opp., R.339, PageID#7198-7220.  The district court rejected Defendants' opposition and found the *Basic* presumption of reliance applicable to purchasers of its notes.  Order, R.435, PageID#9825.  Because Defendants' Opening Brief does not challenge this finding, they have waived all arguments against the application of the *Basic* presumption here to FirstEnergy's notes.  *Marks*, 342 F.3d at 462 ("An appellant waives an issue when he fails to present it in his initial briefs before this court.").

Even though such arguments have been waived, Defendants now improperly try to argue against application of the *Basic* presumption.  OB at 54-55.  Regarding FirstEnergy's common stock, Defendants waived all arguments against *Basic* by conceding its application before the district court.  Class-Cert. Opp., R.339, PageID#7199.  *City of Columbus*, 693 F.3d at 652 ("'an argument not raised before the district court is waived on appeal to this Court'" (quoting *Scottsdale Ins.*, 513 F.3d at 552)).  Nevertheless, Defendants assert that in *Goldman Sachs Group, Inc. v. Ark. Tchr. Ret. Sys.*, 594 U.S. 113, 123 (2021), the Supreme Court held that the inference that stock drop proves price-impact "'break[s] down when there is a mismatch between the contents of the misrepresentation and the corrective disclosure" event.  The Supreme Court issued its *Goldman* opinion on June 21, 2021—14 months *before* Defendants filed their opposition to Plaintiffs' motion for

class certification. Yet now, over a year after filing that opposition and nearly a year after arguing the motion, Defendants' Opening Brief argues for the first time ever that "[t]his case is a good example" of a situation where "Defendants have a strong 'mismatch' defense." OB at 54-55. So strong apparently, that they never raised it and don't have a single expert report supporting it. Defendants have waived any price-impact arguments.

### C. The record supports class certification for damages.

Defendants contend that the district court: (i) applied inadequate scrutiny to Plaintiffs' Exchange Act damages methodology; and (ii) conflated the damages methodologies from the Securities Act and Exchange Act. *See, e.g.*, OB at 46. These arguments, based on a single sentence from the district court's class-certification Order, are belied by the full record below.

### 1. The district court was not required to dissect every argument and counterargument concerning Plaintiffs' damages methodology.

Before the district court issued its class-certification order, the parties had submitted extensive briefing on their damages arguments, including five expert reports, culminating in a lengthy hearing during which the district court repeatedly demonstrated its engagement with these issues. *See* Transcript, R.437, PageID#9856-68, PageID#9881-82. Still, Defendants complain that the district court should have provided more detail in its order. *See, e.g.*, OB at 49; *accord* OB

at 51.  As in *Whirlpool*, however, this Court's review is not so limited.  722 F.3d at

852 ("After reviewing the factual record and entertaining oral argument … [b]y

sifting the abundant evidence through the sieve of the legal claims, the court satisfied

the requirement to perform a 'rigorous analysis.'").  In other words, this Court

determines the adequacy of the district court's analysis based on the entire record,

not just its written order.

Other jurisdictions are in accord.  *See, e.g.*, *Lexion Med., LLC v. Northgate

Techs., Inc.*, 641 F.3d 1352, 1359 (Fed. Cir. 2011) ("Where the record adequately

supports the judgment, the district court does not have an obligation to recite every

detail of its reasoning."); *Brooms v. Regal Tube Co.*, 881 F.2d 412, 419 (7th Cir.

1989) (although district court didn't "explicitly" address disputed issue, "[w]e

believe that such a finding may be implicit in the district court's holding"); *Harris

v. Bozzuto Grp.*, 821 F. App'x 137, 140 n.2 (3d Cir. 2020) (although court "failed to

articulate its … analysis explicitly, the record on appeal still supports affirmation").

Given the briefing and oral-argument record here, the court's ultimate ruling "had

sufficient support … to survive clear error review."  *United States v. Medina-

Nevarez*, 282 F. App'x 517, 519 (9th Cir. 2008).[11]

---

[11]    Defendants' reliance on the "'insufficiently rigorous'" holding in this Court's
*Ford* de-certification decision is thus misplaced.  OB at 51 (citing *In re Ford Motor
Co.*, 86 F.4th 723 (6th Cir. 2023)).  Considering a class-certification decision dealing
with "two distinct theories of design defect," the Court criticized the district court
for "not detail[ing] its reasons" for rejecting the defendant's arguments about the

- 51 -

The district court's command of the parties' arguments confirms that it performed the requisite "rigorous scrutiny."

### 2. This Court may affirm the district court's order on any grounds supported by the record.

Because this Court's consideration is not limited to the district court's order, it may always affirm a district court's decision on *any* grounds supported by the record. *See, e.g.*, *Dixon v. Clem*, 492 F.3d 665, 673 (6th Cir. 2007) (acknowledging district-court error but affirming nonetheless while declining supplemental briefing on the point); *Brown v. Tidwell*, 169 F.3d 330, 332 (6th Cir. 1999) ("This court can affirm a decision of the district court on any grounds supported by the record.").

Defendants' emphasis on *Comcast* is misplaced, as this Court has explained that it "'breaks no new ground on the standard for certifying a class action.'" *Whirlpool*, 722 F.3d at 860. Rather, "*Comcast* applies where multiple theories of liability exist, those theories create separable anticompetitive effects, *and* the combined effects can result in aggregated damages." *VHS of Mich.*, 601 F. App'x at 344. "In such cases, the plaintiff's model must measure damages attributable only to the liability theory … accepted for class-action treatment." *Id.* "Where there is

---

two theories, instead providing only a "summary conclusion" with "analysis ... all but absent." *Ford*, 86 F.4th at 727-28. As shown *supra*, the district court here did much more than summarily conclude that Defendants' arguments didn't prevail, and this case has *never* involved multiple distinct damages theories.

4893-5731-7036.v1

no chance of aggregated damages attributable to rejected liability theories, the Supreme Court's concerns do not apply." *Id.*[12]

And so it is here. There are no competing theories of liability that could result in aggregated damages—Plaintiffs have instead advanced a singular theory of Exchange Act liability: that Defendants' omissions and fraudulent scheme inflated the prices of FirstEnergy securities during the Class Period, injuring investors who purchased or otherwise acquired them during that time. Order, R.435, PageID#9792. Likewise, Plaintiffs' event study methodology (combined with fundamental valuation techniques) is universally accepted for measuring out-of-pocket

---

[12] Defendants try to distinguish *VHS*'s "multiple liability theories" observation by suggesting that a subsequent published decision by this Court "adopted the opposite approach" and applied *Comcast* to a "single-theory case." OB at 47 (citing *Zehentbauer Fam. Land, LP v. Chesapeake Expl., L.L.C.*, 935 F.3d 496, 509 (6th Cir. 2019)). While *Zehentbauer* remarked that the damages calculation had to match the "sole remaining theory of liability" there, that was because plaintiffs had advanced *separate* liability theories *prior* to class certification. 935 F.3d at 506, 509. Here, Plaintiffs' Exchange Act claims have always advanced only one theory of liability and only one long-accepted damages methodology.

Defendants' reliance on *Ludlow v. BP, P.L.C.*, 800 F. 3d 674 (5th Cir. 2015) is similarly misguided. *See* OB at 55, 59. There, as in *Comcast*, the plaintiff refused to tailor its damage methodology to the claims it was seeking to certify for class treatment, instead insisting on pursuing a theory of "consequential damages" that was "antithetical to the 'fraud-on-the-market' theory which enables the classwide resolution of their claims." *In re BP p.l.c. Sec. Litig.*, 2014 WL 2112823, at *12 (S.D. Tex. May 20, 2014), *aff'd sub nom. Ludlow*, 800 F.3d 674. The widely accepted use of event studies and fundamental valuation techniques to measure out-of-pocket damages that Plaintiffs propose here bears no resemblance to the rejected approach in *Ludlow*.

- 53 -

damages—and "*Comcast* did not change this, or render the model improper." *Weiner v. Tivity Health, Inc*., 334 F.R.D. 123, 137 (M.D. Tenn. 2020) (citing cases); *see also Dougherty v. Esperion Therapeutics, Inc*., 2020 WL 6793326, at \*6 (E.D. Mich. Nov. 19, 2020) ("numerous courts in the Sixth Circuit (and beyond) have found Plaintiffs' proposed methodology sufficient in securities fraud claims based on misstatements or omissions"). Defendants' own expert discussed event studies at length without ever disputing their reliability for measuring out-of-pocket damages. Marietta-Westberg Rpt., R.339-5, PageID#7487-502.

Defendants' related time-varying-inflation argument (OB at 52-55) also misses the mark. First and foremost, Defendants did not and do not dispute that all damages questions and answers will be common to all class-member purchasers on any given day. This alone is reason enough to affirm the district court. *Rikos v. Procter & Gamble Co*., 799 F.3d 497, 505 (6th Cir. 2015) ("plaintiffs must show that there is a common question that will yield a common answer for the class (to be resolved later at the merits stage), and that that common answer relates to the actual theory of liability in the case").

Defendants did not dispute Plaintiffs' expert's opinion that "[e]vent studies, in combination with fundamental valuation methods, may be applied to isolate only the fraud-related price impact, and to quantify the appropriate amount of inflation." Jones Rpt., R.293-8, PageID#6398. This remains undisputed even if the amount of

inflation varies over time. *See* Dalrymple Rebuttal Rpt., R.346-3, PageID#7751 ("Even if the amount of artificial inflation is found to be time-varying, Dr. Marietta-Westberg does not explain why an event study or fundamental valuation approach applied on specific dates or periods, such as those identified in the Marietta-Westberg Report, would be infeasible."). Instead, what Defendants effectively demand is that damages on a day-by-day basis be calculated *now*. Defendants' expert did not opine that an event study methodology (combined with fundamental valuation techniques) *could not* account for time-varying inflation, but rather opined that Plaintiffs' expert had not explained how his methodology "*would* account for time-varying inflation for FirstEnergy common stock during the Proposed Class Period." Marietta-Westberg Rpt., R.339-5, 7508/¶97. But this Court has "never required a precise mathematical calculation of damages before deeming a class worthy of certification." *See, e.g.*, *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 535 (6th Cir. 2008).

At bottom, Plaintiffs have shown that classwide Exchange Act damages are capable of measurement here—satisfying both Rule 23(b)(3) and any *Comcast*-type concerns. The district court's discretionary class-certification order should not be disturbed. *Olden v. Lafarge Corp.*, 383 F.3d 495, 507 (6th Cir. 2004) ("'decision *certifying* the class is subject to a "very limited" review and will be reversed "only

upon a strong showing that the … decision was a clear abuse of discretion"'") (Court's emphasis).

### 3. This Court may also affirm class certification with a limited remand.

Even accepting *arguendo* that the district court's order should have reflected more of the scrutiny the court had demonstrated during oral argument regarding damages, that can be cleared up on remand and should not otherwise disturb the balance of the court's class-certification order. Following this Court's direction, the district court made clear that a precise measure of damages can wait, and even if Plaintiffs' damages experts do not "get it right," that will not shield Defendants from classwide liability. In other words, the district court's liability class does not require a damages class:

> They can always modify it because—you're talking about the precise measure of damages. It's like saying, look, I know that what they did was wrong and I know that it harmed a lot of investors, but because their damages expert didn't get it right, let's just leave them with no recourse. *And that's not what's going to happen in this case.*

Transcript, R.437, PageID#9866. The district court's perspective is consistent with this Court's holding in *Whirlpool* that even after *Comcast*, "'[r]ecognition that individual damages calculations do not preclude class certification under Rule 23(b)(3) is well nigh universal ....'" 722 F.3d at 861. "'[I]n 'the mine run of cases, it remains the "black letter rule" that a class may obtain certification under Rule

23(b)(3) when liability questions common to the class predominate over damages questions unique to class members.'" *Id.*

Far from abandoning their defense of the district court's reasoning with a recent indicative-ruling motion, as Defendants assert (OB at 50-51), Plaintiffs' motion seeks a "simple clarification" that would bring into the district court's Order additional aspects of its thorough examination and engagement at oral argument to: (i) avert the waste of judicial resources; and (ii) resolve fully half of Defendants' appeal "that, at most, will lead to a remand for the same outcome." Indicative Ruling Mtn., R.617-1, PageID#13689. In other words, Plaintiffs' motion seeks to avoid the very form-over-substance arguments Defendants raise. Similarly, it is always well within this Court's discretion to remand to the district court for additional written determinations without reversing its decision. *See, e.g.*, *In re Dow Corning Corp*., 280 F.3d 648, 663 (6th Cir. 2002) (affirming district court's determination, but "REMAND[ING] this case to the district court for those matters needing additional findings"). After all, Rule 23 expressly allows that a class-certification order "may be altered or amended before final judgment." Rule 23(b)(c)(1)(C); *see also Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982) ("Even after a certification order is entered, the judge remains free to modify it in the light of subsequent developments in the litigation.").

4893-5731-7036.v1

## VIII. CONCLUSION

This Court should affirm the district court's class-certification decision.

DATED: March 11, 2024

Respectfully submitted,

ROBBINS GELLER RUDMAN
  & DOWD LLP
DARREN J. ROBBINS
MARK SOLOMON
TOR GRONBORG
JASON A. FORGE
JOSEPH D. DALEY
HILLARY B. STAKEM

*s/Jason A. Forge*
JASON A. FORGE

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

MURRAY MURPHY MOUL
  + BASIL LLP
JOSEPH F. MURRAY (0063373)
BRIAN K. MURPHY (0070654)
1114 Dublin Road
Columbus, OH 43215
Telephone: 614/488-0400
614/488-0401 (fax)

*Attorneys for Plaintiffs-Appellees*

4893-5731-7036.v1

## RULE 32(g) CERTIFICATE

The undersigned counsel certified that PLAINTIFFS-APPELLEE'S ANSWERING BRIEF uses a proportionally spaced Times New Roman typeface, 14-point, and that the text of the brief comprises 12,903 words according to the word count provided by Microsoft Word 2016 word processing software.

*s/Jason A. Forge*
JASON A. FORGE

<u>DECLARATION OF SERVICE</u>

I, the undersigned, declare:

1.      That declarant is and was, at all times herein mentioned, a citizen of the United States and employed in the City and County of San Diego, over the age of 18 years, and not a party to or interested party in the within action; that declarant's business address is 655 West Broadway, Suite 1900, San Diego, California 92101.

2.      I hereby certify that on March 11, 2024, I electronically filed the foregoing document: PLAINTIFFS-APPELLEES' ANSWERING BRIEF with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the appellate CM/ECF system.

3.      I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

I declare under penalty of perjury that the foregoing is true and correct. Executed on March 11, 2024, at San Diego, California.

_____
*s/Jason A. Forge*
JASON A. FORGE